## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

IN RE GARRETT MOTION INC.
SECURITIES LITIGATION

Case No. 1:20-cv-07992-JPC

**CLASS ACTION**

**<u>JURY TRIAL DEMANDED</u>**

## CONSOLIDATED AMENDED COMPLAINT FOR
## <u>VIOLATIONS OF THE FEDERAL SECURITIES LAWS</u>

**TABLE OF CONTENTS**

I.      INTRODUCTION ........................................................................................................ 2

II.      JURISDICTION AND VENUE ................................................................................. 9

III.      PARTIES ................................................................................................................... 10

     A.      Plaintiffs ........................................................................................................ 10

     B.      The D&O Defendants .................................................................................... 11

     C.      Defendant Su Ping Lu .................................................................................. 13

     D.      Non-Party Garrett ........................................................................................ 14

IV.      SUBSTANTIVE ALLEGATIONS ......................................................................... 14

     A.      Honeywell Faces Billions of Dollars in Legacy Asbestos Liability .................... 14

     B.      Honeywell Devises a Plan to Spin-Off Underperforming Assets and
Legacy Asbestos Liabilities to Boost Honeywell's Valuation ............................ 15

     C.      Honeywell Combines Garrett's Turbocharger Business with the Legacy
Asbestos Liabilities ...................................................................................... 17

     D.      Garrett's Crucial Relationship with OEMs ........................................................ 19

     E.      The Sham Spin-Off Negotiations ...................................................................... 20

     F.      The Spin-Off Agreements Massively Limited Garrett's Financial and
Operational Flexibility .................................................................................. 24

     G.      Defendants Knew from Inception That the Structure of the Spin-Off Made
It Virtually Impossible for Garrett to Succeed as an Independent Company ....... 30

     H.      Despite the Known Problems Undermining Garrett, Honeywell and
Defendant Lu Issue Statements Touting Garrett's Future ..................................... 33

     I.      The D&O Defendants Issue False and Misleading Statements Following
the Spin-Off .................................................................................................. 35

     J.      Garrett Secretly Hires Financial Advisors That Concluded Bankruptcy
Was Likely ................................................................................................... 39

     K.      Garrett Partially Concedes its Capital Structure is Untenable While
Continuing to Make Bullish Statements ........................................................... 41

     L.      Garrett Files for Bankruptcy Protection and Concedes Its Capital Structure
Has Undermined its Viability Since the Spin-Off ............................................. 44

V.      DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS
        AND OMISSIONS OF MATERIAL FACTS ................................................................. 45

        A.      Pre-Spin Off False and Misleading Statements By Defendant Lu ....................... 45

        B.      D&O Defendants' 2018 Class Period False and Misleading Statements ............. 48

        C.      D&O Defendants' 2019 Class Period False and Misleading Statements ............. 52

        D.      D&O Defendants' 2020 Class Period False and Misleading Statements ............. 68

VI.     DEFENDANTS ACTED WITH SCIENTER ................................................................. 78

        A.      Defendants Had Actual Knowledge Their Public Statements Were False
                and Misleading When Made ................................................................................. 79

        B.      Defendants Were Aware of Garrett's Overleveraged Capital Structure by
                Virtue of Their Positions at Honeywell ............................................................... 83

        C.      Additional Allegations of Defendant Lu's Scienter.............................................. 84

        D.      Special Compensation Arrangements Motivated the Defendants to Inflate
                Garrett's Stock Price ........................................................................................... 85

VII.    LOSS CAUSATION......................................................................................................... 87

VIII.   PRESUMPTION OF RELIANCE ................................................................................... 89

IX.     INAPPLICABILITY OF THE STATUTORY SAFE HARBOR AND BESPEAKS
        CAUTION DOCTRINE .................................................................................................. 90

X.      CLASS ACTION ALLEGATIONS ................................................................................ 91

XI.     CLAIMS FOR RELIEF ................................................................................................... 92

COUNT I For Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Against the
        D&O Defendants .................................................................................................. 92

COUNT II For Violations of Section 20(a) of the Exchange Act Against the D&O
        Defendants ........................................................................................................... 94

COUNT III For Violations of Section 10(b) of the Exchange Act, and SEC Rule 10b-5(a),
        (b) and (c) Promulgated Thereunder, and Section 20(a) of the Exchange Act Against
        Defendant Lu ........................................................................................................ 95

XII.    PRAYER FOR RELIEF ................................................................................................... 97

XIII.   JURY DEMAND .............................................................................................................. 97

Lead Plaintiffs The Gabelli Asset Fund, The Gabelli Dividend & Income Trust, The Gabelli Value 25 Fund Inc. and GAMCO Asset Management Inc. (together, "Lead Plaintiffs") bring this class action (the "Action") for violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 against certain of the current and former officers and directors (collectively, the "Defendants") of Garrett Motion Inc. ("Garrett") on behalf of themselves and a Class (defined below) of similarly situated investors.

Lead Plaintiffs' allegations are based upon personal knowledge as to themselves and their own acts and upon information and belief as to all other matters.  Lead Plaintiffs' information and belief is based on an investigation conducted by Lead Plaintiffs' counsel, which included, among other things, consultation with financial experts and a review of public filings with the U.S. Securities and Exchange Commission ("SEC"), press releases, investor presentations, earnings calls, analyst research and media reports, public filings in the Garrett bankruptcy proceedings (*In re Garrett Motion Inc.*, No. 20-12212-MEW, United States Bankruptcy Court, Southern District of New York) (the "Bankruptcy Proceedings" or "Chapter 11 Case"), and public filings in the pending litigation between Garrett and Honeywell (*Garrett Motion Inc. et al. v. Honeywell International Inc. et al.*, Index No. 657106/2019) that was removed from the Supreme Court of the State of New York, County of New York, Commercial Division to the United States Bankruptcy Court (Adv. Proc. No. 20-01223 (MEW) (the "Adversary Proceeding).

Lead Plaintiffs believe that substantial additional evidentiary support for the allegations set forth herein will be uncovered through discovery.

## I.     INTRODUCTION

1.      This is a federal securities class action arising because the directors and officers of now bankrupt Garrett made numerous public statements about the Company's purportedly robust financial profile, research and development ("R&D") capacity, and growth prospects they knew to be untrue.   Indeed, in the first day filings in Garrett's Chapter 11 Case – which came less than two years after the Company was spun-off by Honeywell International Inc. ("Honeywell") as a stand-alone entity – Defendants admitted they knew from the start that Garrett was not viable as a going concern because Garrett's "***inherited capital structure is not sustainable***"[1] which "***puts the Company at a substantial disadvantage to its competitors***."[2]

2.      On October 1, 2018, multi-national industrial giant Honeywell "spun" off its automobile engine turbocharger manufacturing business as a new stand-alone company (the "Spin-Off").   Existing Honeywell shareholders received shares in the Spin-Off of Garrett, which began trading on the New York Stock Exchange ("NYSE") under the ticker symbol "GTX."   The Company immediately generated significant investor interest at its $17.60 per share starting price. More than 24 million shares traded the first day and the share price increased 4.5% by the close of trading.

3.      However, the truth about Garrett was remarkably different than Defendants' public statements.   Unbeknownst to investors, Garrett's senior executives and directors knew since the date of the Spin-Off that Garrett's capital structure and onerous obligations to Honeywell from the Spin-Off made it nearly impossible for Garrett to operate as a going concern on a long-term basis. As Defendant Olivier Rabiller – Garrett's CEO – would later admit, the Company's "rigid capital

---

[1] All emphasis is added.

[2] *See* Chapter 11 Cases, Doc. 15, Declaration of Sean Deason in Support of the Debtors' Chapter 11 Petitions and First Day Pleadings (cited herein as the "Deason Decl.") at ¶ 3.

structure" made the independent Garrett "really unsustainable."  In fact, Garrett quietly enlisted professionals to explore its strategic alternatives – including a bankruptcy – less than a year after the Spin-Off.  Less than a year after that, on September 20, 2020, Garrett sought Chapter 11 bankruptcy protection.

4.     As became clear from admissions in Garrett's Chapter 11 Case, the Company's ultimately fatal capital structure originated from the sham "negotiation" process for the Spin-Off managed completely by Honeywell and its conflicted representatives, including, in particular, Defendant Su Ping Lu.  Defendant Lu, who was Garrett's President and sole director during the Spin-Off negotiations, was hand-picked by Honeywell from its in-house legal department for the sole purpose of papering the transaction.  At all times Lu was an employee of Honeywell – not Garrett – and she acted exclusively at Honeywell's direction and under its control without regard to her obligations to Garrett or to Garrett's post-spin public shareholders.  Honeywell also used the same outside counsel and financial advisors to represent both Honeywell and Garrett in negotiating the Spin-Off.  Garrett has subsequently admitted in court that its counsel "***blindly acceded to Honeywell's wishes, regardless of the best interest of their other client, Garrett***"[3] and that its purportedly independent financial advisor that opined on the Company's solvency was "***hopelessly conflicted.***"[4]

5.     The seeds of Garrett's bankruptcy started when Defendant Lu forced Garrett to enter into a variety of Agreements (defined below) whereby Garrett would assume liability for billions of dollars of Honeywell's unrelated asbestos liabilities and tax payments (collectively, the

---

[3] Adversary Proceedings, No. 657106/2019 (N.Y. Sup. Ct. Sept. 23, 2020), Doc. No. 17 (Complaint) at ¶3.

[4] Adversary Proceedings, No. 657106/2019 (N.Y. Sup. Ct. Sept. 23, 2020), Doc. No. 53 (Notice of Removal).

"Honeywell Obligations").  Most significantly, Honeywell caused a subsidiary of the Company (Garrett ASASCO Inc., or "ASASCO") to enter into a financially catastrophic Indemnification and Reimbursement Agreement (the "Indemnification Agreement") requiring the Company to reimburse Honeywell for the legacy asbestos liabilities for a term of 30 years and payments up to *$5.25 billion*.  The asbestos liability was *not* related to Garrett's turbocharger business, but was inherited by Honeywell from its unrelated Friction business that manufactured brakes.  Garrett was also forced to issue new third-party indebtedness to fund an approximately *$1.6 billion* cash dividend to Honeywell pursuant to a credit agreement (the "Credit Agreement").

6.     While the existence of the Indemnification Agreement and debt was generally disclosed to investors, Garrett and its directors and officers did not disclose what they now admit they knew since inception of the Spin-Off —that the Indemnification Agreement and debt made it virtually impossible for Garrett to remain competitive as an independent company or to function as a going concern.  Instead, to generate market interest to make the scheme work, Garrett's directors and officers (the "D&O Defendants") touted Garrett's purportedly robust financial profile, R&D capacity, and growth prospects.  For example, during the Class Period, Garrett and the "D&O Defendants" repeatedly emphasized that Garrett enjoyed:

> ➢     "flawless operational execution of the spinoff;"

> ➢     "Financial Flexibility and Efficiency;"

> ➢     "significant flexibility to help mitigate the impact from any short-term fluctuations in the underlying macro environment;"

> ➢     "Increasing R&D" and "Investment capacity available to support growth and innovation;"

> ➢     "Strong financial foundation support[ing] new growth vectors and innovation" and potential "bolt-on acquisition opportunities;" and

> ➢     "position[ing] to create enduring value for shareholders."

4

7.     ***None*** of these frequently repeated themes were true.  In fact, as Garrett revealed for the first time in August 2020, the Company secretly retained financial advisors in the fourth quarter of 2019 (just one year after the Spin-Off) and those advisors concluded that ***no financial or strategic transactions would be available to Garrett without restructuring*** the Honeywell Obligations and funded debt through bankruptcy and/or litigation.  In recognition of this fact, Garrett attempted to renegotiate the Honeywell Obligations, engaging in an unsuccessful (and undisclosed) mediation with Honeywell in the Fall of 2019, and ultimately sued Honeywell in late 2019.

8.     Tellingly, Garrett's first day bankruptcy filings ***admit*** that Garrett and certain of the D&O Defendants knew since the time of the Spin-Off that the Company's capital structure and Indemnification Agreement would make it impossible for the Company to succeed for at least the following reasons:

- *First*, the D&O Defendants knew that Garrett's precarious balance sheet created by the Spin-Off would make it difficult for Garrett to maintain its business and financial relationships with OEMs[5] and suppliers.  Garrett designs and manufacturers turbochargers, one of the central components of vehicle engines, and Garrett typically bids for business 3-5 years prior to the production of the vehicles.  Because Garrett was substantially overleveraged compared to its primary competitors (even before considering the effects of the Indemnification Agreement), Defendants were aware that OEMs and suppliers had growing concerns about its viability and its growing technological disadvantages.  (Deason Decl. at ¶¶ 67-68).

- *Second*, the D&O Defendants knew Garrett's leverage and indemnity obligations would make it nearly impossible for the Company to navigate the highly uncertain and rapidly shifting automotive industry.  In recent years, the automotive industry has faced uncertainty due to technological changes and unprecedented disruptions, which has led to increased competition from new participants and necessary consolidation among existing industry participants.  The D&O Defendants knew since the time of the Spin-Off that the Company's capital structure would effectively

---

[5] An "OEM" is an original equipment manufacturer that makes devices from component parts bought from other organizations.

preclude it from engaging in strategic acquisitions or other consolidation. (Deason Decl. at ¶¶ 69-70).

- *Third*, the D&O Defendants knew Garrett's ability to invest in R&D to sustain its business would be severely constrained because Garrett's balance sheet was heavily burdened by its debt and the Indemnification Agreement since the Spin-Off.  Moreover, because of its balance sheet and high leverage, Garrett had no access to incremental debt to fund R&D or capital expenditures.  These constraints were crucial because Garrett's business model and industry position requires constant investment in new technology, both to improve the Company's existing products and to develop new products to meet customer demands.  Indeed, Garrett describes itself as a "technology company."  (Deason Decl. at ¶¶ 65-66).

- *Fourth*, the D&O Defendants knew Garrett would not have access to the equity capital necessary to grow as an independent company and that no lender or investor would contribute new equity capital subordinated to both the Company's funded debt and its indemnity obligations.  (Deason Decl. at ¶ 71).

9.     Garrett and the D&O Defendants demonstrably misled investors about these realities during and after the October 1, 2018 Spin-Off.  To make matters worse, the D&O Defendants issued numerous countervailing statements directly contradicting what they now admit they knew.  For example, in an earnings release in February 2020, Garrett's President and CEO, Defendant Olivier Rabiller, told investors that "*[w]ith significant financial flexibility* combined with the industry's broadest portfolio for LV, commercial vehicle, hybrid, and fuel cell products, we are well positioned to build upon the progress we achieved during our first full year as an independent company."  Not only does this statement (and many others like it detailed below) directly contradict the fact D&O Defendants now admit they knew from October 2018 that Garrett was not viable as an independent company, but it was also manifestly misleading in the face of the fact Garrett had, by this time, retained professionals to evaluate its strategic options, including bankruptcy.

10.     Ultimately, the D&O Defendants could only hide the fact that it was impossible to navigate Garrett's capital structure issues for so long.  The truth was partially disclosed on May 11, 2020, when Defendant Rabiller admitted that Garrett's "***former parent imposed on us a rigid capital structure*** that was unable unless Garrett executed perfectly in a highly favorable macroeconomic and industry environment, meaning ***that was really unsustainable*** that way unless everything was perfect.  With insight, it is clear that our capital structure was ill suited to cope with any meaningful operating challenges."  Defendant Rabiller's statement came just before the market opened, and Garrett's stock price fell $1.05 per share during the trading day from its opening price of $6.66 per share, to close at $5.61 per share, a decline of approximately 16%.  The price of Garrett's stock continued to fall an additional $1.03 per share over the next two days, causing more than $155 million in total market capitalization losses.

11.     Further, on August 26, 2020 before the market opened, Garrett issued a press release stating that its "***leveraged capital structure poses significant challenges*** to its overall strategic and financial flexibility and may impair its ability to gain or hold market share in the highly competitive automotive supply market, thereby putting Garrett at a meaningful disadvantage relative to its peers."  Garrett further stated that its "high leverage is exacerbated by significant claims asserted by Honeywell against certain Garrett subsidiaries under the disputed subordinated asbestos indemnity and the tax matters agreement."  Following this news, Garrett's stock price fell $3.04 per share, or 44%, to close at $3.84 per share.  Garrett's stock price fell an additional $0.56 per share the following trading day to close at $3.28 per share as the market further digested the news, causing a total market capitalization loss of $272 million.

12.     Additional truth was partially revealed on September 18, 2020, when *The Wall Street Journal* reported that "Auto Supplier Garrett Motion Nears Bankruptcy Sale to KPS." *The*

*Wall Street Journal* detailed, among other things, that Garrett's bankruptcy filing was imminent due to its unsustainable capital structure.  On this news, Garrett's stock price fell an additional 16%, from $2.41 per share on September 17, 2020 to $2.01 per share on September 18, 2020.

13.    The full truth was revealed on September 20, 2020 when Garrett filed its Chapter 11 Case in the United States Bankruptcy Court for the Southern District of New York.   In connection with the announcement, Garrett CEO Olivier Rabiller stated that "[a]lthough the fundamentals of our business are strong and we have continued to try to develop our business strategy, ***the financial strains of the heavy debt load and liabilities we inherited in the spinoff from Honeywell – all exacerbated by COVID-19 – have created a significant long-term burden on our business***."  Following this announcement, Garrett's shares ceased trading under the symbol GTX and began trading under the symbol GTXMQ.  Shares closed at $1.76 per share on the next trading day, September 22, 2020.

14.    In its first day bankruptcy filings, Garrett admitted that it had been engaged in a year-long strategic review process and knew since the Spin-Off that its capital structure was not sustainable.   Indeed, Defendant Deason's declaration stated that Garrett's ***"inherited capital structure is not sustainable.  It puts the Company at a substantial disadvantage to its competitors when dealing with OEMs and other business partners, reduces the Company's ability to invest in new technologies***, eliminates access to new debt and equity capital, and limits the Company's ability to absorb adverse market conditions."  (Deason Decl. at ¶ 3).

15.    These statements were, of course, starkly contrary to the D&O Defendants' representations throughout the Class Period.

16.    This action is brought on behalf of the Class of investors that received common stock in the Spin-Off or purchased or otherwise acquired Garrett securities between October 1,

2018 and September 18, 2020 (the trading day before Garrett filed for bankruptcy protection), excluding Defendants (the "Class"), based on:  (i) Defendants' false and misleading statements and omissions of material facts concerning the independent Company's viability following the Spin-Off; and (ii) scheme liability against Defendant Su Ping Lu.  In all, Garrett common stock lost approximately $6.33 per share in value as result of Defendants' unlawful conduct, causing more than $479 million in market losses.

## II.   JURISDICTION AND VENUE

17.     This Court has jurisdiction over this Action under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. § 78) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).  In addition, because this is a civil action arising under the laws of the United States, this Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1337.

18.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b).  Substantial acts in furtherance of the alleged fraud or the effects of the fraud have occurred in this District.  Many of the acts charged herein, including the dissemination of materially false and/or misleading information, occurred in substantial part in this District.  Moreover, Garrett has voluntarily elected to file for bankruptcy protection in this District and in those filings has asserted jurisdiction based on certain bank accounts of its subsidiaries.

19.     Personal jurisdiction exists over each Defendant either because the Defendant conducts business in or maintains operations in this District, or is an individual who is either present in this District for jurisdictional purposes or has sufficient minimum contacts with this District to render the exercise of jurisdiction over the Defendant by this Court permissible under traditional notions of fair play and substantial justice.

20.     In connection with the acts alleged herein, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to the mail, interstate telephone communications and the facilities of a national securities exchange.

## III.   PARTIES

### A.   Plaintiffs

21.     Lead Plaintiff The Gabelli Asset Fund is a mutual fund managed by Gabelli Funds, LLC, and has its principal place of business in Rye, New York.  The Gabelli Asset Fund's Class-Period transactions in the securities at issue are listed at ECF No.17-1.

22.     Lead Plaintiff The Gabelli Dividend & Income Trust Fund is a mutual fund managed by Gabelli Funds, LLC, and has its principal place of business in Rye, New York.  The Gabelli Asset Fund's Class-Period transactions in the securities at issue are listed at ECF No.17-1.

23.     Lead Plaintiff The Gabelli Value 25 Fund Inc. is a mutual fund managed by Gabelli Funds, LLC, and has its principal place of business in Rye, New York.  The Gabelli Asset Fund's Class-Period transactions in the securities at issue are listed at ECF No.17-1.

24.     Lead Plaintiff GAMCO Asset Management Inc. is an investment manager, and has its principal place of business in Rye, New York.  The Gabelli Asset Fund's Class-Period transactions in the securities at issue are listed at ECF No.17-2.

25.     Lead Plaintiffs and their affiliated entities owned more than 1.1% of Garrett's common stock outstanding on the date the Company filed its Chapter 11 Case and suffered more than $9.9 million in losses as a result of their investment in Garrett securities during the Class Period and Defendants' misconduct alleged herein.

### B.     The D&O Defendants

26.     Defendant Olivier Rabiller was Garrett's President and Chief Executive Officer at all relevant times following the Spin-Off.  On June 15, 2018, Honeywell announced Defendant Rabiller would become Garrett's CEO following the Spin-Off.  Defendant Rabiller officially assumed the position of CEO and became a member of the Garrett Board effective October 1, 2018 – the date of the Spin-Off.  Before joining Garrett, Rabiller served as President and CEO of the Transportation Systems division at Honeywell, and before that as Vice President and General Manager of Transportation Systems for Honeywell's High Growth Regions, Business Development and Aftermarket.  Defendant Rabiller signed or is quoted in documents alleged to be false and misleading dated October 1, 2018, November 6, 2018, November 7, 2018, March 1, 2019, May 7, 2019, July 30, 2019, September 9, 2019, November 8, 2019, February 27, 2020, April 7, 2020,  May 11, 2020, June 12, 2020 and July 30, 2020 and participated in various Garrett investor calls/presentations including those on November 6, 2018, January 15, 2019, February 20, 2019, May 7, 2019, July 30, 2019, September 10, 2019, November 8, 2019, November 20, 2019, February 27, 2020, May 11, 2020 and July 30, 2020.

27.     Defendant Alessandro Gili was Garrett's Chief Financial Officer from October 1, 2018 to September 2, 2019.  Defendant Gili signed documents or was quoted in press releases alleged to be false and misleading dated November 7, 2018, February 20, 2019, March 1, 2019, May 7, 2019 and July 30, 2019, and participated in various Garrett investor calls/presentations including those on November 7, 2018, February 20, 2019, May 7, 2019 and July 30, 2019.  On September 2, 2019, Garrett and Defendant Gili entered into a separation agreement.

28.     Defendant Peter Bracke was Garrett's Interim CFO from September 5, 2019 to June 2020.  Since June 2020, Bracke has served as Garrett's Vice President and Chief Transformation Officer.  Prior to September 5, 2019, Mr. Bracke was the Company's Vice President, FP&A and

Business Finance.  Prior to the Spin-Off, Bracke held various senior-level roles within multiple divisions at Honeywell during his more than 20-year tenure at the company.  Defendant Bracke signed documents alleged to be false and misleading dated November 8, 2019, February 27, 2020, and May 11, 2020 and participated in various Garrett investor calls/presentations on those same dates, as well as the earnings call July 30, 2020.

29.     Defendant Sean Deason has been Garrett's CFO since June 8, 2020.  Defendant Deason signed Garrett's Form 10-Q including false and misleading statements dated July 30, 2020 and participated in Garrett's earnings call on the same day.

30.     Defendant Russell James has served as Garrett's Chief Accounting Officer and Controller since the Spin-Off.  Defendant James signed documents alleged to be false and misleading dated March 1, 2019 and February 27, 2020.

31.     Defendant Carlos M. Cardoso has served as Garrett's non-executive chairperson of the Board since the Spin-Off.  Defendant Cardoso signed documents alleged to be false and misleading dated March 1, 2019 and February 27, 2020.

32.     Defendant Maura J. Clark has served as a member of the Garrett Board since the Spin-Off.  Defendant Clark signed documents alleged to be false and misleading dated March 1, 2019 and February 27, 2020.

33.     Defendant Courtney M. Enghauser has served as a member of the Garrett Board since the Spin-Off.  Defendant Enghauser signed documents alleged to be false and misleading dated March 1, 2019 and February 27, 2020.

34.     Defendant Susan L. Main has served as a member of the Garrett Board since the Spin-Off.  Defendant Main signed documents alleged to be false and misleading dated March 1, 2019 and February 27, 2020.

35.     Defendant Carsten J. Reinhardt has served as a member of the Garrett Board since the Spin-Off.  Defendant Reinhardt signed documents alleged to be false and misleading dated March 1, 2019 and February 27, 2020.

36.     Defendant Scott A. Tozier has served as a member of the Garrett Board since the Spin-Off.  Defendant Tozier signed documents alleged to be false and misleading dated March 1, 2019 and February 27, 2020.

37.     Defendants Rabiller, Gili, Bracke, Deason, James, Cardoso, Clark, Enghauser, Main, Reinhardt, and Tozier are collectively referred to herein as the "D&O Defendants."

**C.      Defendant Su Ping Lu**

38.     Defendant Su Ping Lu was a member of Honeywell's General Counsel's office.  At all times Defendant Lu was an employee of Honeywell acting under its direction and control.  She was a lawyer with no knowledge of or experience in the automotive industry or the turbocharger business.  At no time was she ever a paid employee of Garrett despite the fact that Defendant Lu was nominally given the title of President and installed by Honeywell as Garrett's sole pre spin board member in order to paper over various aspects of the Spin-Off, all of which worked to Honeywell's benefit and to the detriment of Garrett's post-spin shareholders.  Lu signed the Spin-Off Registration Statement on or about August 23, 2018 and signed various amendments to the Registration Statement.  Lu acted in the dual (and deeply conflicted) roles of an assistant general counsel for Honeywell and as President and Director of Garrett throughout the pre-Spin-Off process until her resignation from Garrett on September 30, 2018 – the day before the Spin-Off.  On paper at least Defendant Lu had many separate roles in the various Garrett entities and subsidiaries.  She served as a president for Garrett Motion Holdings, Incl., Garrett Motion, Inc., and Garrett ASASCO, Inc.  She also served as a director for Garrett Transportation I, Inc., Garrett Motion LLC., Garrett Transportation Systems UK II Ltd., Garrett Turbo Ltd., Garrett Motion Inc.,

Garrett Transportation Systems Ltd., and Garrett Transportation Systems Inc.  She also served as a manager for Garrett Motion LLC and Garrett Borrowing LLC.  She also served as Class A Manager and Authorized Signatory for Garrett LX I S.à.r.l., Garrett LX II S.à.r.l., and Garrett LX III S.à.r.l.  Defendant Lu is represented by in this action by Honeywell's outside counsel in the Garrett Chapter 1 Cases and the Garrett-Honeywell Adversary Proceedings.

> **D.   Non-Party Garrett**

39.   Garrett Motion Inc. is a Delaware Corporation with its principal executive offices located in Rolle, Switzerland.  Garrett designs, manufactures and sells turbochargers, electric-boosting and connected vehicle technologies for original equipment manufacturers and the aftermarket.  Garrett filed its Chapter 11 Case on September 20, 2020 in the United States Bankruptcy Court for the Southern District of New York, asserting jurisdiction based on, among other things, bank accounts of its subsidiaries in New York.  When the statutory bankruptcy stay is lifted Garrett will be formally joined as a party defendant to this litigation.

# IV.   SUBSTANTIVE ALLEGATIONS

> **A.   Honeywell Faces Billions of Dollars in Legacy Asbestos Liability**

40.   The Bendix Corporation ("Bendix") began manufacturing products with asbestos in 1939.  Bendix manufactured brakes using twenty-five to fifty percent asbestos until at least 1983, more than 15 years after Bendix was on notice of the dangers of asbestos and 12 years after the United States Environmental Protection Agency ("EPA") formally classified the mineral as a human carcinogen.

41.   On April 1, 1985, Bendix was merged into Allied Corporation, which was subsequently merged into AlliedSignal Inc.  On December 4, 1999, AlliedSignal Inc. merged with Honeywell Inc. and Honeywell Inc. ceased to exist as a legal entity.  On that same day, AlliedSignal Inc. changed its name to Honeywell International Inc. (the combined company took

Honeywell's name in order to avoid being associated with asbestos, despite AlliedSignal having nearly twice Honeywell's annual revenues).

42.     Plaintiffs in lawsuits across the country have claimed Bendix and its predecessors (Allied Corporation/AlliedSignal) did not completely cease using asbestos until 2001.  Honeywell has faced enormous liabilities from Bendix asbestos-related products and operations.  In its 2004 annual report, Honeywell estimated it resolved 71,000 Bendix-related asbestos claims from 1981 through 2004.  By 2012, Honeywell estimated it continued to have 23,141 unresolved claims pending against it.

43.     Honeywell disclosed through a Form 8-K filed on August 23, 2018 that, as a result of an SEC enforcement action, Honeywell would restate its Bendix-related asbestos claims liability from $616 million to $1.7 billion as of December 31, 2017 to account for projected costs through 2059.

**B.     Honeywell Devises a Plan to Spin-Off Underperforming Assets and Legacy Asbestos Liabilities to Boost Honeywell's Valuation**

44.     Honeywell is one of the world's largest conglomerates and currently employs nearly 103,000 employees across 70 countries.  From 2002 to 2015, under then-CEO Dave Cote, Honeywell engaged in a growth-by-acquisition strategy, completing more than 100 deals, resulting in an increase of over $12 billion in annual sales revenue.  In the wake of the failed acquisition of United Technologies Corp. ("UTC") in 2016, Cote began exploring alternatives to bolster Honeywell's revenues and create cost-cutting opportunities to boost Honeywell's valuation.  Cote devised a strategy to boost Honeywell's valuation by disposing of underperforming assets through spin-offs and divestitures.

45.     To facilitate the implementation of his plan to trim Honeywell's business units and eliminate money-losing assets, on April 4, 2016, Honeywell elevated Cote's hand-picked

successor Darius Adamcyzk (formerly the head of the performance materials business) to the newly-created role of President and Chief Operating Officer.  Adamczyk led Honeywell's detailed review of its entire business portfolio for the purpose of identifying potential strategic transactions to improve Honeywell's balance sheet.  Defendant Adamczyk succeeded Cote as Honeywell's CEO on March 31, 2017.

46.     Just a month later, on April 27, 2017, Third Point LLC ("Third Point"), an activist hedge fund led by Daniel S. Loeb, published its First Quarter 2017 investor letter disclosing Third Point had acquired a large stake in Honeywell.  Third Point advocated for a breakup of Honeywell to enhance shareholder value.  Third Point argued that a spin-off transaction of Honeywell's Aerospace division would "transform Honeywell into an industrial growth company" and specifically highlighted Honeywell's lack of premium valuation relative to its peer group, stating: "[t]his peer group currently trades at an average forward P/E multiple of 23x, a nearly 30% premium to Honeywell's forward P/E multiple of 18x.  A more focused Honeywell should match or exceed the multiples of its peer group, especially if management delivers on its commitment to return to free cash flow conversion in excess of 100% by 2018."

47.     Honeywell resisted Third Point's call to spin-off the Aerospace business.  In an Aerospace investor showcase held in May 2017, Honeywell emphasized it had "invested over $18 billion in aerospace" since 2010 – investments that would be lost to Honeywell shareholders if it spun off the aerospace unit before having a chance to profit from those investments.

48.     However, Adamczyk was feeling the pressure.  During a presentation at the Electrical Products Group conference on May 23, 2017, Adamczyk stated that: "I am aligned with Third Point . . . we do have an opportunity to simplify our portfolio.  How we do that, well, we're still assessing that."  Adamczyk stated that in response to Third Point's advances, Honeywell

would decide by Fall of 2017 whether to (i) "do nothing," (ii) pursue a spin-off of the Aerospace division or (iii) do "something different."

49.     Following a series of meetings with Third Point, Adamczyk indicated he wanted to keep the aerospace business, but instead proposed the spin-off of Honeywell's transportation and homes business segments in to two separate publicly-traded companies.  On October 10, 2017, Honeywell announced its intention to spin-off its:  (1) Transportation Systems business – a manufacturer of turbochargers for vehicles (what would become Garrett Motion); and (2) Homes and Global Distribution business, that Honeywell claimed was a "Leading Provider to Global Home HVAC Controls and Security Markets Plus Leading Global Fire and Security Distributor (ADI)" (a basket of previously unrelated underperforming businesses and product lines that would later be cobbled together to become Resideo).

### C.     Honeywell Combines Garrett's Turbocharger Business with the Legacy Asbestos Liabilities

50.     To facilitate the Spin-Off, Honeywell incorporated Garrett in Delaware as a wholly owned subsidiary on March 14, 2018.  Garrett designs and manufactures highly engineered turbocharger, electric-boosting and connected vehicle technologies for OEMs and the automotive aftermarket for gasoline and diesel engines that enhance performance, fuel economy and drivability.

51.     The earliest predecessor of Garrett was a company founded in 1954 called Garrett AiResearch.  Garrett AiResearch's Industrial Division, headquartered in Phoenix, Arizona, produced turbochargers and turboprop engines for ground and air vehicles.  One of Garrett AiResearch's earliest products was a turbocharger for the Caterpillar mining vehicle.  In 1964, Garrett AiResearch merged with Signal Oil & Gas and was renamed Signal Companies in 1968. In 2004, this entity became Honeywell's Transportation Systems division.

52.     Honeywell summarized Garrett's lineage in a June 14, 2018 press release discussing the renaming of Transportation Systems as Garrett Motion:

> The Garrett name ties back to Honeywell's turbo origins in the 1950s. At that time, entrepreneur and engineer Cliff Garrett led a project team to develop a turbocharger for a Caterpillar D9 crawler tractor that launched in 1954, marking the beginning of the turbocharged era for the automotive industry. Since then, Transportation Systems technologies and innovations have been used by nearly every major global auto maker, resulting in approximately 100 million vehicles with our products and an average launch rate of 100 new applications annually spanning, gas, diesel, natural gas, electric and fuel cell powertrains.
>
> ***
>
> "There is a strong emotional attachment to the Garrett name, which has stood for pioneering turbo technology for more than 60 years and has made an indelible mark on the driving habits of millions of vehicle owners as well as the history of automotive engine performance," said Transportation Systems President and CEO Olivier Rabiller, "Moving forward, the Garrett name will continue to be synonymous with turbocharging technologies and also support the tangible progress and investments we have made in electric products, software and connected vehicles, and the future growth we see reshaping our industry."

53.     The Transportation Systems division was described by Honeywell as "a global leader in turbocharger technologies with best-in-class engineering capabilities for a broad range of engine types across automobile, truck and other vehicle markets."

54.     According to pre-Spin-Off statements by Honeywell, the new entity, Garrett, was receiving a business with leading products covering a wide range of applications, including passenger cars, commercial vehicles, medium and heavy-duty trucks, and mining equipment. Garrett has also developed electric-boosting technologies targeted for use in electrified powertrains – primarily hybrid and fuel cell vehicles – and it also engineers and provides technologies, products and services that support the growing connected vehicle market focused on automotive cybersecurity and integrated vehicle health management.

55.     In addition to its OEM (Original Equipment Manufacturer) business, Garrett sells components and technologies in the global aftermarket through a distribution network of more than 190 distributors covering 160 countries.   Through this network, Garrett provides approximately 5,300 part-numbers and products to service garages across the globe.   Garrett's comprehensive portfolio of turbocharger, electric boosting and connected vehicle technologies is supported by five research and development centers, 14 close-to-customer engineering facilities and 13 factories, which are strategically located around the world.   Garrett employs 6,750 employees, primarily in Romania, China, Korea, Slovakia, Mexico, Ireland, Switzerland, Japan, the United Kingdom and the United States.

### D.     Garrett's Crucial Relationship with OEMs

56.     Garrett's products and services are highly engineered for each individual platform, requiring close collaboration with customers in the earliest years of powertrain and new vehicle design.   Indeed, Garrett often bids for business 3-5 years prior to the production of vehicles.

57.     As Defendant Rabiller explained during Garrett's November 8, 2019 earnings call, when Garrett brings "new technology to the market place" the Company is "usually working two years in pre-development" and then develops "the engine platform for three years before it reaches production."   Similarly, on Garrett's February 20, 2019 earnings call, Rabiller discussed that their project bids are relating to the expected product mix in 2025, stating: "Considering that bringing the technology to the marketplace you need about two years of predevelopment and three years of development, we are getting slowly but surely this year into the money time.   Meaning whatever program that has not been started into development will not happen by 2025."

58.     Because OEMs must design their vehicles around Garrett's products 3-5 years in advance of production, it is critical that Garrett maintain its relationships with OEMs and other partners and that these partners trust the Company's ability to sustain its business and continue to

innovate.  In other words, because OEMs are entering into long-term commitments with Garrett, if OEMs believe there is a risk Garrett will not survive or will not be financially stable in the future, it undermines Garrett's bids for business.  This is because the OEMs must be confident Garrett will be able to supply the turbochargers in 3-5 years' time, as the turbochargers are central to each vehicles' design and must be incorporated in plans years in advance.  Likewise, Garrett's suppliers also critically analyze Garrett's finances as suppliers must know that Garrett will remain in business prior to producing parts specifically for Garrett's products.

### E.   The Sham Spin-Off Negotiations

59.    From the outset of the planned Spin-Off, Honeywell exercised complete control over the terms of the transaction without regard to the impact on Garrett.  Honeywell appointed its own in-house counsel – Defendant Su Ping Lu – as Garrett's President to paper the Spin-Off with Honeywell.  Defendant Lu acted under Honeywell's direction instead of as an independent fiduciary working in Garrett's best interests.

60.    Defendant Lu, a Honeywell in-house attorney, was deeply conflicted and literally stood on both sides of the Spin-Off transaction.  On paper at least, Defendant Lu was the President and sole director of several of the Garrett entities in September 2018 when the Spin-Off documents and key debt and indemnification agreements were being implemented.  At the same time she was negotiating critical Spin-Off agreements on behalf of Garrett, Defendant Lu simultaneously served as Assistant General Counsel and Assistant Secretary for Honeywell and as director and in an executive capacity on behalf of Honeywell and several Honeywell-affiliated entities.

61.    Significantly, Garrett did not have independent director representation and was even represented by the same law firm and financial advisor that represented Honeywell during the "negotiation" process.  Specifically, the law firm Paul, Weiss, Rifkind, Wharton & Garrison ("Paul Weiss") represented Honeywell before and during the Spin-Off, while at the same time

representing Garrett in the negotiation and execution of the Spin-Off documents.  Confirming the conflict, Paul Weiss is listed as "Notice Counsel" for both parties on several key Spin-Off agreements, and indisputably represented both entities in connection with the Separation and Distribution Agreement that governed critical aspects of the Spin-Off.  Garrett has argued in subsequent litigation that Paul Weiss "*blindly acceded to Honeywell's wishes, regardless of the best interest of their other client, Garrett.*"[6]

62.    Lu and Honeywell further covered up the sham nature of the transaction by obtaining a solvency opinion, issued by financial advisor Duff & Phelps on September 4, 2018 (the "Solvency Opinion"), which purported to represent that Garrett would be able to pay its debts and would have sufficient capital and assets to operate.  However, this Solvency Opinion was fundamentally flawed because it did not properly consider any of the Agreements or the effects the Agreement would have on Garrett's business.[7]  Had Duff & Phelps or another advisor analyzed the Agreements properly, that advisor would have quickly discovered that they massively impacted Garrett's future financial prospects.  That Defendant Lu did not direct Duff & Phelps to conduct an analysis of the Indemnification and related Agreements when issuing its opinion demonstrates that she knew, or was reckless in not knowing, of the impact the Agreements would have on Garrett's future prospects and long-term solvency.

63.    Furthermore, Duff & Phelps had significant conflicts because it purportedly acted, simultaneously, as the independent financial advisor to both Garrett and Honeywell for the Spin-Off.  Garrett has alleged in court filings that Duff & Phelps was "*hopelessly conflicted*" during the

---

[6] Adversary Proceedings, No. 657106/2019 (N.Y. Sup. Ct. Sept. 23, 2020), Doc. No. 17 (Complaint) at ¶ 5.

[7] Adversary Proceedings, No. 657106/2019 (N.Y. Sup. Ct. Sept. 23, 2020), Doc. No. 53 (Notice of Removal).

Spin-Off negotiation process.[8]   Moreover, while the Solvency Opinion was addressed to the "Board of Directors" of Garrett, at that time, Defendant Lu – an employee of Honeywell – was the ***only*** director on Garrett's board.

64.    Garrett has alleged that Duff & Phelps "did not even bother to read or understand the terms of Garrett's single biggest purported liability – the Indemnification Agreement."[9]   As a result, the Solvency Opinion did not properly analyze the wide-ranging impacts the Honeywell debt and indemnity obligations would have on Garrett's finances, business, and operations.   First, the Honeywell Obligations severely restricted Garrett from being able to use existing funds to generate cash flow for capital expenditures or research and development.   Second, the Honeywell Obligations constrained Garrett's ability to grow though debt or equity raises, because (a) the Indemnification Agreement created liabilities that would scare off potential investors, and (b) the Credit Agreement forced Garrett to become highly leveraged with debt.   Third, due to the onerous terms of the Indemnification Agreement, Garrett was limited from growing its business and investing in new technologies by entering complex strategic transactions such as mergers or acquisitions.   Fourth, Garrett's OEM and supplier business partners were reluctant to enter into long-term business deals with Garrett because they would be concerned that, as a result of the Honeywell Obligations, Garrett had a risk of becoming insolvent and putting such business deals in jeopardy.

65.    The very same day that the Solvency Opinion was issued, Defendant Lu, as Garrett's sole director, signed the September 4, 2018 Board of Directors Resolutions of Garrett

---

[8] *Id.*
[9] *Id.*

Motion Inc.   The Resolutions stated that the "members of management of Honeywell have provided their view that the assumptions set forth in the Solvency Opinion are reasonable."[10]

66.      In addition to installing a hopelessly conflicted signatory and similarly conflicted advisors at Garrett, Honeywell deliberately structured the Spin-Off of Garrett to meet the requirements for exemption from formal registration and the attendant filing of an S-1 under the Securities Act.   Instead, Honeywell registered Garrett's common stock under the less-onerous Section 12(g) of the Exchange Act requiring the filing of a Form 10.   Honeywell likewise spun Garrett without conducting an initial public offering of common stock (Honeywell employed these same tactics in connection with the spin-off of Resideo).

67.      These conflicts and structural inequalities allowed Honeywell to implement the sham Spin-Off that imposed significant debt and indemnification liabilities on Garrett.   Garrett has conceded in subsequent court filings that it "*had no choice in entering into*" many of the key Spin-Off agreements, such as the Indemnification Agreement, and conceded in a lawsuit against Honeywell that certain agreements were "*forced upon Garrett as part of a carefully orchestrated scheme to try to create the appearance of propriety.*"[11]

68.      Garrett did not adequately disclose these conflicts in advance of the Spin-Off. Instead, Garrett's Form 10 registration statement filed in August 2018 merely stated as a risk that "we *may* have potential business conflicts of interest with Honeywell with respect to our past and ongoing relationships" and that "[f]ollowing the Spin-Off, certain of our directors and employees *may* have actual or potential conflicts of interest because of their financial interests in Honeywell." Garrett elaborated in the Form 10 that "[b]ecause of their current of former positions with

---

[10] Adversary Proceedings, No. 657106/2019 (N.Y. Sup. Ct. Sept. 23, 2020), Doc. No. 17 (Complaint) at ¶ 86.

[11] *Id.*  at ¶ 75.

Honeywell, certain of our expected executive officers and directors own equity interests in Honeywell.  Continuing ownership of Honeywell shares and equity awards *could* create, or appear to create, potential conflicts of interest if SpinCo and Honeywell face decisions that *could* have implications for both SpinCo and Honeywell."  Clearly, these risk factors did not adequately state that Garrett's only representative negotiating key Spin-Off agreements was simultaneously employed as an associate general counsel at Honeywell.

69.    Honeywell deliberately chose to spin Garrett rather than sell the enterprise because no buyer would voluntarily assume potentially billions of dollars in legacy liabilities, including the Bendix-related asbestos liabilities.  Honeywell knew it would be unable to sell the transportation business that became Garrett because its prior attempt had failed in dramatic fashion.  Specifically, in 2003 Honeywell attempted to offload Bendix-related asbestos liabilities by "selling" Honeywell's Friction Materials and Bendix business to bankrupt Federal-Mogul Corporation in exchange for a permanent channeling injunction requiring all asbestos-related claims to be submitted to a Bendix trust established by Federal-Mogul.  General Motors, Ford and Daimler Chrysler successfully sued to block the Honeywell/Federal-Mogul transaction as a fraudulent transfer.  When Honeywell eventually did sell the Friction Materials business in 2014 to Federal Mogul, Honeywell was forced to retain Bendix-related asbestos liabilities.

### F.    The Spin-Off Agreements Massively Limited Garrett's Financial and Operational Flexibility

70.    Through the sham Spin-Off "negotiations," Lu and Honeywell forced Garrett to assume tremendous liabilities and restrictions on its business through certain onerous agreements (collectively, the "Agreements") favoring Honeywell.

24

### 1. The Separation Agreement

71.     The Separation and Distribution Agreement (the "Separation Agreement") laid the groundwork for Honeywell and its representatives and agents to be on both sides of the Spin-Off. The Separation Agreement provides that "legal and other professional services that have been and will be provided prior to the Distribution (whether by outside counsel, in-house counsel or other legal professionals) have been and will be rendered for the collective benefit of each of the members of the Honeywell Group and the SpinCo Group, and *each of the members of the Honeywell Group and the SpinCo Group shall be deemed to be the client* with respect to such services for the purposes of asserting all privileges which may be asserted under applicable Law in connection therewith."  As a result of this clause, Defendant Lu, legal counsel Paul Weiss, and financial advisor Duff & Phelps claimed the ability to represent both Honeywell and Garrett (which was referred to at the time as "SpinCo Group").

72.     The Separation Agreement was not formally executed until September 27, 2018. Nonetheless, on September 4, 2018, Defendant Lu, in her capacity as sole board member of Garrett, issued a resolution finding the Separation Agreement to be "advisable and in the best interests of the Company and its sole stockholder."  This approval was based on a draft of the Separation Agreement dated August 23, 2018.  Accordingly, the Separation Agreement was "approved" by Garrett's Board (*i.e.*, Defendant Lu) over three weeks before it was finalized and based on a draft that was over a month old by the time it was finally signed on September 27, 2018.

73.     The Separation Agreement had several other functions.  It (a) detailed the transfer of assets and assumption of liabilities that would occur in connection with the Spin-Off, (b) described the actions that would be taken to effect the Spin-Off, such as the formation of subsidiaries and certain internal restructuring actions, (c) purported to release Honeywell from

certain claims arising on or before October 1, 2018, (d) excluded liabilities provided in or resulting from certain contracts, including the Indemnification Agreement, and (e) provided for the distribution of the shares of Garrett's common stock in connection with the Spin-Off.

74.     The Separation Agreement was signed on behalf of Honeywell by Richard Kent, Vice President, Deputy General Counsel, Finance and Assistant Secretary.  Honeywell Assistant General Counsel Defendant Lu signed on behalf of Garrett.  Even though Garrett's post-Spin-Off Chairman, CEO, and CFO were already publicly announced by the time the Separation Agreement was signed, none of these individuals (nor anyone else on Garrett's post-Spin-Off management team or board) signed the Separation Agreement on Garrett's behalf, despite the fact that they, not Defendant Lu, would be the ones dealing with the ramifications of the agreement.

75.     Not only did the Separation Agreement purportedly give permission for the obvious conflicts of interest between Honeywell and Garrett, but it also acted to permit the conflicts of interest by the outside firms "advising" Garrett that stood on both sides of the Spin-Off transaction.

### 2. The Indemnification Agreement

76.     The Indemnification Agreement was executed September 12, 2018 by three parties, all of which were Honeywell entities: (a) Honeywell ASASCO Inc. as "Payor"; (b) Honeywell ASASCO 2 Inc. as "Payee"; and (c) Honeywell International, Inc. as "Claim Manager." Defendant Lu signed the Indemnification Agreement on behalf of both Honeywell ASASCO Inc. and Honeywell ASASCO 2, Inc., while Richard Kent signed on behalf of Honeywell International, Inc.  No Garrett entities were signatories to the Indemnification Agreement.

77.     Garrett only assumed the role of Payor pursuant to the Assignment Agreement, which was executed after the Indemnification Agreement, on September 14, 2018, between

Honeywell ASASCO Inc. and Garrett ASASCO, Inc.   Defendant Lu signed the Assignment Agreement on behalf of both of those parties.

78.     The Indemnification Agreement encumbered Garrett with oppressive liabilities and limitations, as detailed in the paragraphs below.

79.     ***Indemnification for Liability***:  The Indemnification Agreement requires, among other things, that Garrett, through its subsidiary Garrett ASASCO, make payments to Honeywell to reimburse it for 90% of Honeywell's legacy Bendix business in the United States.   The agreement also requires Garrett ASASCO to make certain payments for other environmental-related liabilities and non-United States asbestos-related liabilities.  Specifically, Garrett ASASCO is contractually obligated to indemnify Honeywell for 90% of the covered liabilities, including judgments, settlements, and the legal costs of defense, up to an annual cap of $175 million.

80.     ***Exclusion from the Asbestos Litigation and Settlement Process***:  The Indemnification Agreement excluded Garrett from almost all involvement in the asbestos-related liability claim or settlement process.  As a result, Garrett had no ability to control costs incurred, and was forced to take Honeywell's representations at face value.  As detailed below, after the Spin-Off, Garrett was unable to obtain from Honeywell the limited information it was promised in accordance with the terms of the Indemnification Agreement.

81.     Following the Spin-Off, Garrett repeatedly pressed Honeywell for additional information about such claims, and Honeywell rebuked such requests.   For example, on Friday, October 19, 2018 – less than three weeks after the Spin-Off – Honeywell disclosed in its quarterly report on Form 10-Q for the second quarter that the Division of Enforcement of the SEC opened an investigation into Honeywell's prior accounting for liability for unasserted Bendix-related asbestos claims.  Honeywell also revised certain previously issued financial statements to correct

the time period associated with the determination of appropriate accruals for legacy Bendix asbestos-related liability for unasserted claims.  Despite the close temporal proximity to the Spin-Off, Garrett's subsequently stated that it "was not aware of the SEC's investigation" until Honeywell's Form 10-Q.

82.     ***Indemnification of Punitive Damages***: The Indemnification Agreement required Garrett to reimburse Honeywell for any punitive damages incurred through asbestos-related litigation.  The issue of whether that indemnification for punitive damages is permissible contravene the public policy purpose of punitive damages being incurred by the wrongdoer and is an issue being litigated in the bankruptcy proceedings.

83.     ***Limitations on Strategic Transactions***: The Indemnification Agreement limited Garrett's ability to engage in strategic transactions through various "loan-like covenants and restrictions."  The agreement essentially provided Honeywell with an absolute veto over any Garrett transaction outside of the ordinary course of business.  Similarly, the Indemnification Agreement provided that it cannot be terminated or cashed out in connection with a merger or strategic transaction but must be assumed by any purchaser or surviving company.

84.     ***Thirty-Year Term***: The Indemnification Agreement had a thirty-year term, expiring in 2048.  This thirty-year term will remain in place unless there are three consecutive years during which the amounts owed to Honeywell under the agreement are less than the Euro-equivalent of $25 million.  Given Garrett's yearly exposure of up to $175 million, over the course of thirty years Garrett's total exposure is as much as $5.25 billion.  Notably, the indemnity obligations cannot be prepaid or restructured.

### 3. The Credit Agreement

85.     In connection with the Spin-Off, Garrett also entered into the Credit Agreement, dated September 27, 2018, with secured lenders.  The Credit Agreement forced Garrett to assume significant debt in order to fund an approximate $1.6 billion cash distribution to Honeywell.  In this regard, Honeywell, through its employee Defendant Lu forced Garrett and related affiliates into a Credit Agreement dated September 27, 2018 for approximately $1.45 billion, consisting of (i) a seven-year senior secured first-lien term loan B loan facility, (ii) a five-year senior secured first-lien term loan A facility in an aggregate principal amount of approximately €251.6 million, and (iii) a five-year senior secured first-lien revolving credit facility in an aggregate commitment amount of €430 million, with revolving loans to the Swiss Borrower to be made available in a number of currencies.  The term A facility matures on September 26, 2023 and the term B facility matures on September 27, 2025, and all of the loans bear interest at fluctuating rates.

86.     As of September 20, 2020, the date of Garrett's bankruptcy filing, the outstanding principal amount under the revolving credit facility was $370 million and the outstanding principal amount under the term loan facilities was approximately $1,077 million.

87.     In addition to the credit facility and term loan facilities, during the Spin-Off negotiations Defendant Lu, acting under Honeywell's direction and control, forced Garrett affiliates to issue €350 million in senior notes pursuant to an Indenture dated September 27, 2018. These senior notes bear interest at 5.125% annually and mature on October 15, 2026.

### 4.  The Tax Matters Agreement

88.     Along with the indemnification and debt obligations, Defendant Lu, acting under Honeywell's direction and control, forced Garrett into to a Tax Matters Agreement dated September 12, 2019, requiring Garrett to reimburse Honeywell for certain taxes that Honeywell

determines are attributable to Garrett.  These tax obligations include certain income taxes, sales taxes, VAT and payroll taxes and additional obligations under the Tax Cuts and Jobs Act of 2017. As of September 2020, Honeywell determined that Garrett's payment obligations total $240 million, to be paid in eight annual installments from November 2018 through April 2025.

89.     The above Agreements creating the Honeywell Obligations were not entered into at arms'-length, and many were consummated through Defendant Su Ping Lu who, as noted, was a Honeywell employee and was, at all times, acting under a Honeywell's direction and control.

90.     Defendant Lu signed the Indemnification Agreement on behalf of both the "payor" and "payee" Honeywell ASASCO entities.  She also signed the Assignment Agreement on behalf of both the Garrett "payor" entity and the Honeywell "payee" entity.

91.     Defendant Lu, in her capacity as sole board member of Garrett, issued a resolution finding the Separation Agreement, which allowed Honeywell to be on both sides of the various Agreements, to be "advisable and in the best interests of the Company and its sole stockholder." Similarly, in that same capacity, Defendant Lu issued a resolution finding that the "members of management of Honeywell have provided their view that the assumptions set forth in the Solvency Opinion are reasonable."

### G.     Defendants Knew from Inception That the Structure of the Spin-Off Made It Virtually Impossible for Garrett to Succeed as an Independent Company

92.     By at least the effective date of the Spin-Off, each of the Defendants knew or were reckless in not knowing the above-described debt structure and liabilities made it nearly impossible for the post-spin Garrett to effectively operate and compete as an independent company.  Garrett now admits these known issues crippled the Company throughout its brief two-year history and continue to plague Garrett today.

93.     *First*, according to Garrett's own bankruptcy filings, Garrett's business model and industry position requires constant investment in new technology, both to improve the Company's existing products and to develop new products to meet customer demands.  A failure to invest in technology for any sustained period will result in a loss of customers, market share and margin. Indeed, Garrett's Class Period public filings repeatedly touted the extent of its research and development infrastructure and spending.  Garrett also stated during the Class Period that "[l]eading technology, continuous innovation, product performance and OEM engineering collaboration are central to our customer value proposition and a core part of our culture and heritage."  Garrett now admits that because its balance sheet has been so heavily burdened by debt and the indemnity liability since the Spin-Off, Garrett's ability to fund R&D and make investments in technology (both internally and through acquisitions) to preserve its business for the future has been severely constrained to the point of making the company non-competitive.  (Deason Decl. at ¶¶ 65-66).

94.     *Second*, Defendants knew that Garrett's precarious balance sheet created by the Spin-Off would make it difficult for Garrett to maintain its business and financial relationships with OEMs and suppliers.  (Deason Decl. at ¶¶ 67-68).  As noted above, Garrett's primary business is designing and manufacturing turbochargers, one of the first components considered during vehicle design.  As a result, Garrett bids for business with OEMs up to 3-5 years in advance of when the OEMs begin manufacturing the vehicles.  Because Garrett's business is critical to the vehicle design and its OEM customers need to make a long-term commitment to Garrett, OEMs are particularly concerned with turbocharger suppliers' financial viability and stability.  Likewise, companies that supply Garrett with parts and materials also typically are supplying custom parts

and looked closely at Garrett's finances before investing in new manufacturing lines because they wanted to ensure they would get paid.

95.     Defendants knew since the time of the Spin-Off that because the Company was substantially overleveraged compared to all of its primary competitors (even before considering the effects of the Indemnification Agreement), OEMs and suppliers would have significant concerns about its viability, as well as its growing technological disadvantages due to the Company's inability to spend on R&D.  (Deason Decl. at ¶¶ 67-68).  Indeed, it was well known that Garrett's leverage ratio was well in excess of industry standards and would cause Garrett's customers and suppliers to be nervous about the Company's financial health.  Defendants knew the increasing erosion of Garrett's partnerships would undermine the Company's viability in the long-term.

96.     *Third*, Defendants also knew technological changes and unprecedented disruptions, such as a shift towards electric vehicles, increased competition from new market entrants, and automotive industry consolidation, created significant uncertainty in the automotive industry.  This uncertainty would be nearly impossible to navigate given Garrett's debt and indemnity obligations. (Deason Decl. at ¶¶ 69-70).

97.     Defendants knew since the time of the Spin-Off that Garrett would be unable to compete in the shifting automotive industry.  The Company's ability to negotiate a merger or sale would undoubtedly be undermined by its 30-year indemnity obligations, that purportedly survive all corporate transactions.  Indeed, Garrett has since described these obligations as a "poison pill" in the hands of Honeywell that can prevent Garrett from entering into future business combinations.  (Deason Decl. at ¶ 55).

98.     This risk was not just hypothetical.  Garrett's primary competitor, BorgWarner Inc., announced on January 28, 2020, that it agreed to acquire Delphi Technologies for $3.3 billion. This transaction, which was impossible for Garrett to complete due to its capital structure and the Indemnification Agreement, represented the loss of a significant opportunity for Garrett to a direct competitor that gained an edge in designing electrified propulsion systems for cars and heavy-duty trucks.

99.     *Fourth*, Defendants knew that because of the significant debt already on its books, Garrett would not have access to the equity capital necessary to grow and develop as an independent company.  In other words, it would be extremely unlikely that any investor would contribute new equity capital behind both the Company's funded debt and its indemnity obligations.  (Deason Decl. at ¶ 71).

100.    In summary, since the time of the Spin-Off, it was clear to each of the Defendants that because of the terms of the Spin-Off Garrett had little if any ability to innovate, maintain its partnerships and suppliers, engage in a strategic transaction, or raise its own capital.  (Deason Decl. at ¶ 3).  Accordingly, because of these significant obstacles there was little if any chance the Company would survive long-term following the Spin-Off as an independent company.  Indeed, Garrett lasted less than two years from Spin-Off before filing for bankruptcy.

### H.     Despite the Known Problems Undermining Garrett, Honeywell and Defendant Lu Issue Statements Touting Garrett's Future

101.    None of the above-described issues – all of which Garrett now admits existed from the time of the Spin-Off – were adequately disclosed to investors.  Instead, Honeywell issued positive statements regarding these topics dating back to at least August 23, 2018 – more than a month before the Spin-Off was completed and prior to the start of the Class Period.

102.     Honeywell, through its Assistant General Counsel Defendant Lu, characterized the known and materialized issues as nothing more than potential rather than already materialized risks.   For example, the Registration Statement corresponding to the Spin-Off, signed by Defendant Lu and filed on Form 10 on August 23, 2018 (and amended on September 5, 2018), contained false and misleading statements that mischaracterized the above known and already materialized risks:

> This agreement **may** have material adverse effects on our liquidity and cash flows and on our results of operations, regardless of whether we experience a decline in net sales. The agreement **may** also require us to accrue significant long-term liabilities on our combined balance sheet, the amounts of which will be dependent on factors outside of our control, including Honeywell's responsibility to manage and determine the outcomes of claims underlying the liabilities. As of December 31, 2017, we have accrued $1,703 million of liability in connection with Bendix related asbestos, representing the estimated liability for pending claims as well as future claims expected to be asserted. The liabilities related to the Indemnification and Reimbursement Agreement **may have** a significant negative impact on the calculation of key financial ratios and other metrics that are important to investors, rating agencies and securities analysts in evaluating our creditworthiness and the value of our securities. Accordingly, our access to capital to fund our operations **may be** materially adversely affected and the value of your investment in our company **may** decline.

103.     The so-called risk factors were wholly inadequate where, as here, the risks had already manifested and Defendant Lu either knew, or was reckless in not knowing, that among other things these debt and indemnification obligation made it virtually impossible for Garrett to survive long-term following the Spin-Off.

104.     Honeywell also misled potential Garrett investors about the new Company's financial health at the Gabelli Aerospace Symposium on September 13, 2018.   During Honeywell's presentation – led by Mark Macaluso, Honeywell's Vice President of Investor Relations – it characterized Garrett as having an "Attractive financial profile" and being

"Positioned for Profitable Growth."  Both characterizations were false in light of the known issues that would plague Garrett from the date of the Spin-Off.

## I.    The D&O Defendants Issue False and Misleading Statements Following the Spin-Off

105.    The Class Period begins on October 1, 2018, when the Spin-Off closed and Garrett's stock began trading on the NYSE.  Garrett filed a Form 8-K on the date of the Spin-Off, which, among other things, announced the members of Garrett's management and Board of Directors.  The Garrett board was expanded to consist of seven directors:  (i) Oliver Rabiller; (ii) Carlos Cardoso (Chairman); (iii) Maura Clark; (iv) Courtney Enghauser; (v) Susan Main; (vi) Carsten Reinhard; and (vii) Scott Tozier.  The Form 8-K also disclosed that Defendant Lu resigned as a director of the Company and ceased to serve as President of the Company as of September 30, 2018.  Remarkably, Defendant Lu only served as President and a director for as much time as it took for Honeywell to paper over the sham Spin-Off.

106.    Immediately following the Spin-Off and throughout the Class Period, Garrett and the D&O Defendants made a series of false and misleading statements in press releases, SEC filings, earnings calls and investor presentations.  These statements are set forth in detail in Section V, *infra*, and are summarized below.

107.    ***Statements concerning Garrett's technology and R&D***.  Garrett and its executives repeatedly described Garrett as a technology company and a purported technology leader, while failing to disclose that because of its capital structure the Company could not adequately invest in R&D and acquisition to maintain its position.  For example,  Defendants characterized Garrett as "a cutting-edge technology provider" and "an automotive technology pioneer, inventor and innovator."  Garrett also stated in SEC filings that the Company was a "leading technology company" that had "continuous innovation, product performance and OEM

engineering collaboration are central to our customer value proposition and a core part of our culture and heritage."

108.    Likewise, Garrett's investor presentations frequently discussed its "three stage technology growth strategy," represented that the Company had a "sustainable margin profile driven by technology" and represented that the Company had "a number of launches, but more than launches *we are funding very well our growth vectors that will drive the company not only for the next 5 years but the next 10 to 15 years*."  Garrett's investor presentations also included graphs illustrating a steadily increasing R&D budget.

109.    Garrett's SEC filings also contained false and misleading statements concerning its technology.  For instance, Garrett's 2019 Form 10-K – which was signed by each of Garrett's Board members at the time – included purported risk factors, such as that Garrett's "future growth is largely dependent on [its] ability to develop new technologies and introduce new products with acceptable margins that achieve market acceptance or correctly anticipate regulatory changes."  But these were risks the Company now admits had already materialized when the statements were made.  Nowhere did the Form 10-K disclose that because of Garrett's debt and indemnity obligations the Company and its executives knew the business would not be able to adequately innovate to remain competitive and survive long-term as an independent company.

110.    Relatedly, Garrett and its executives made statements during the Class Period that Garrett's priority was making acquisitions to supplement its own research and development efforts.  For example, Defendant Rabiller stated on Garrett's May 7, 2019 earnings call that a priority for Garrett is looking at "bolt-on acquisition opportunities."  This and similar misstatements were misleading because Garrett's capital structure largely prevented it from engaging in significant mergers or acquisitions.

111.   ***Statements concerning Garrett's liquidity and financial flexibility***.   Throughout the Class Period, Defendants issued a variety of false and misleading statements concerning Garrett's liquidity, cash requirements, financial flexibility and ability to raise capital.  For instance, one of the "risk factors" frequently included in Garrett's SEC filings stated that Garrett believed it "will meet known or reasonably likely future cash requirements" and that if additional liquidity is needed "additional cash requirements would likely be financed through the issuance of debt or equity securities."  Garrett's risk factors also frequently stated "we believe we will be able to meet our short-term liquidity needs for at least the next twelve months."  These types of statements were false and misleading because the D&O Defendants knew, or were reckless in not knowing, it was unlikely Garrett could meet its cash requirements in light of its significant overleverage, and Defendants also knew it was unlikely the Company could raise additional capital because new debt or equity would be subordinated to the Honeywell Obligations.

112.   Garrett and its executives also made various Class Period statements that the Company had "significant financial flexibility."  These statements continued into 2020 – after Garrett retained financial advisors that concluded the opposite – *i.e.*, that Garrett likely did not have the ability to deleverage or engage in strategic options outside of restructuring the Honeywell Obligations through bankruptcy or other means.

113.   ***Statements concerning the Honeywell Obligations***.   Certain of Garrett's SEC filings contained a false and misleading "risk factor" relating to the Indemnification Agreement. This risk factor stated that Garrett is "subject to risks associated with the Indemnification and Reimbursement Agreement, pursuant to which we are required to make substantial cash payments to Honeywell" and that these agreements "***may*** have material adverse effects on our liquidity and cash flows and on our results of operations."  The risk factor continued that the agreement "***may***

impose significant operating and financial restrictions on us and our subsidiaries and limit our ability to engage in actions that may be in our long-term best interests." This statement was false and misleading because, as Garrett has subsequently admitted multiple times, the Indemnification Agreement was extremely restrictive and made it nearly impossible for Garrett to survive long-term as an independent company.  It was misleading to state the Honeywell Obligations merely "may" have an impact when the obligations were one of the primary factors that undermined the Company's viability since the date of the Spin-Off.  These risks began materializing immediately following the Spin-Off.  Customers were not concerned with Garrett's leverage when it was associated with the well-financed Honeywell conglomerate, but once it became an independent company and had a leverage ratio far in excess of industry standards, customers became nervous Garrett would not be able to supply products for vehicles years into the future.

114.    ***Statements concerning Garrett's efforts to deleverage***.  The D&O Defendants made numerous false and misleading statements representing that Garrett was actively working to deleverage its balance sheet.  For example, on May 7, 2019, Defendant Rabiller stated Garrett's "first priority" was to "deleverage."  Similarly, on February 27, 2020, during an earnings call, Defendants Rabiller and Bracke claimed Garrett "***stayed true to our approach and utilizing solid cash flow to deleverage our balance sheet***."  Garrett also made statements that it had "***no large restructuring initiatives planned***."  These and other similar statements were misleading because they implied that Garrett's efforts to deleverage its balance sheet had some modicum of success, when in reality Defendants knew, or were reckless in not knowing, that Garrett would not be able to adequately deleverage without a significant restructuring.

### J.     Garrett Secretly Hires Financial Advisors That Concluded Bankruptcy Was Likely

115.     Unbeknownst to investors, Garrett hired Morgan Stanley & Co. LLC ("Morgan Stanley") and Perella Weinberg Partners ("Perella") to explore strategic alternatives during the fourth quarter of 2019.  At the direction of Garrett's Board of Directors, representatives of Morgan Stanley and Perella conducted preliminary market test conversations on a "no-names basis" with approximately 15 parties regarding a potential merger with, or acquisition of, Garrett.

116.     According to Garrett's bankruptcy filings, no potential strategic buyers expressed interest in exploring a potential transaction, but multiple financial sponsors expressed interest if and only if the potential transaction structures included leaving behind the excessive debt and indemnity liabilities on Garrett's balance sheet (*i.e.* a sale through the bankruptcy court or successfully voiding the indemnification obligations through litigation).[12]   Garrett now acknowledges that these conclusions simply confirmed what they had known since the Spin-Off— that the Honeywell Obligations made Garrett unsustainable as a stand-alone entity.   Significantly, this analysis was conducted prior to the Covid-19 pandemic.

117.     In recognition of the fact that the Honeywell Obligations made Garrett unsustainable as a stand-alone entity, throughout 2019 the Company negotiated with Honeywell regarding the terms of the Indemnification Agreement.  During the Fourth Quarter of 2019, in connection with its review of strategic alternatives, Garrett engaged in a mediation with Honeywell to attempt to limit the burden of the obligations.  As it later argued in Court, Garrett's position was that the Honeywell obligations were unfair and unenforceable.

118.     Despite knowing the Company could not survive under the heavy debt and indemnity obligations and seeking out financial and legal advice on how to proceed, the

---

[12] Deason Decl. at ¶¶ 72-74.

Defendants continued to issue false and misleading statements regarding aspects of the Company it affirmatively knew were unsustainable.  Most notably, on February 27, 2020, Garrett announced its fourth quarter and full year 2019 financial results in a press release, which stated that "*[w]ith significant financial flexibility* combined with the industry's broadest portfolio for LV, commercial vehicle, hybrid, and fuel cell products, *we are well positioned to build upon the progress we achieved during our first full year as an independent company*."  These statements were knowingly false when made—something Defendants now admit.

119.    Garrett issued a Form 8-K on April 1, 2020 announcing that its Board of Directors increased the size of the Garrett board from seven to eight directors and elected Jerome Stoll as the eighth director, effective immediately.

120.    On April 7, 2020, Garrett issued a press release containing certain preliminary first quarter 2020 results, withdrawing the Company's financial guidance for the year ending December 21, 2020 and announcing a business update related to the COVID-19 pandemic.  In the press release, Defendant Rabiller was quoted as saying:

> While our focus has been on safeguarding the health and safety of our employees and supporting our customers and local communities, we are also taking decisive and prudent steps with various stakeholders to *enhance our liquidity and preserve the long-term health of the business*.  Our senior leadership team has navigated downturns in the past and we expect to rely upon our extensive experience and resilient business model to emerge from this crisis as a stronger company.

Nothing was said about the now admitted and long-known problems created by the indemnity and debt obligations, which, if anything, would be exacerbated by the global pandemic.

### K.   Garrett Partially Concedes its Capital Structure is Untenable While Continuing to Make Bullish Statements

121.   On May 11, 2020, Garrett announced its first quarter 2020 financial results partially revealing the truth regarding its capital structure.  During the earnings call that day, Defendant Rabiller admitted that Garrett's "*former parent imposed on us a rigid capital structure* that was unable unless Garrett executed perfectly in a highly favorable macroeconomic and industry environment, meaning *that was really unsustainable* that way unless everything was perfect." Rabiller continued that "[w]ith insight, it is clear that our capital structure was ill suited to cope with any meaningful operating challenges."

122.   Garrett also disclosed in its second quarter 2020 Form 10-Q that there was a substantial doubt concerning Garrett's ability to continue as a going concern.

123.   Following Rabiller's admission and the going concern warning, Garrett's stock price fell $1.15 per share or 17.3% during the May 11, 2020 trading day, from an opening price on May 11, 2020 of $6.66 per share (just minutes after Defendant Rabiller's statements) to close at $5.51 per share.  Garrett's stock price continued to fall an additional $1.03 per share over the next two trading days.

124.    However, despite partially revealing the truth about Garrett's capital structure peril, Rabiller and Garrett's other senior executives continued to mislead investors about the full truth by making positive statements about the Company's financial flexibility, cost structure and continued development of new technologies.  Indeed, on the same day, Defendant Rabiller is quoted in the press release announcing Garrett's first quarter results, stating:

> Our financial results for the first quarter **demonstrate Garrett's flexible operating platform** and global capabilities amid the novel coronavirus outbreak," said Olivier Rabiller, Garrett President and CEO. "Both of our production facilities in China have restarted operations and returned rapidly to full capacity after closing for a portion of the quarter due to the COVID-19 pandemic. We remain

focused on taking aggressive measures in response to this unprecedented crisis with a priority on protecting the health and well-being of our employees and meeting our customer commitments. Last month, we fully drew down on our revolving credit facility *to increase our financial flexibility and started the current quarter with $658 million in total liquidity*. We are also temporarily reducing pay for Garrett's senior leadership team by 20% and postponing future capital expenditures without impacting near-term programs. *By actively managing our cost structure and preserving capital, we expect to generate significant cash savings for the year, and we are evaluating further steps to ensure the continuity of our operations. Garrett's positive business fundamentals remain intact* and we will continue to calibrate production schedules in the near term and *flex our cost structure to maintain our agility and strengthen our position for long-term success.*

125.    Likewise, during the related earnings call, Defendants Rabiller and Bracke discussed the Company's investor presentation, which listed as a "GTX Priority" that the Company would "leverage [its] flexible and resilient business model."  Rabiller stated that Garrett would "maintain our focus on developing our new technologies" and the Company remained "well positioned to accelerate our cutting-edge technologies to the market and drive long-term success." Defendants Rabiller and Bracke, along with the other D&O Defendants, knew none of those things were true.

126.    Garrett announced amendments to certain of its credit agreements on June 12, 2020 and continued to include false and misleading statements regarding the Company's purported financial flexibility.  Defendant Rabiller stated in the press release announcing the amendments that "[t]he modifications to our Credit Agreement significantly *enhance Garrett's financial flexibility* to weather the current pandemic-induced economic slowdown."  Rabiller further stated that "Despite the near-term disruption across the automotive industry and global economy, it is important to remember that the *positive long-term fundamentals of our business remain intact*. Garrett has *excelled as an industry leader for over 65 years, delivering critical cutting-edge*

*technologies to major automakers worldwide.  Going forward, automakers will likely encounter even tougher regulations and technical challenges after the crisis, and Garrett will bring them a wide range of differentiated products and solutions*."

127.    On the earnings call to discuss Garrett's second quarter earnings on July 30, 2020, Defendants Rabiller, Deason and Bracke answered analyst questions.   Despite COVID-19 weighing on the business, Defendant Rabiller reported "$63 million adjusted EBITDA for a margin of 13.2%" and continued that the crisis "highlights the strong fundamentals of Garrett . . . combined with a *variable cost model that helps preserve cash* and an attractive margin profile . . . *but at the same time exposes the ill-suited capital structure that the company inherited from its former parent Spinoff*."   Defendant Rabiller also touted "the resiliency of [Garrett's] operating structure."   Defendant Rabiller also discussed that Garrett "obtained near-term covenant relief" by further postponing payments to Honeywell, but that it "creates a significant cash burden for 2023 and beyond."   Nothing was said about the now admittedly known issues that would force the Company into bankruptcy just a few months later.   Indeed, as part of its second quarter earnings filings, Garrett removed the "substantial doubt" language raised in its previous 10-Q regarding the Company's ability to continue as a going concern, misleadingly portraying optimism that the Company could survive despite the admitted indemnity and debt obligation-related problems that had been undermining the Company since the Spin-Off.

128.    On August 26, 2020, before market open, Garrett publicly announced for the first time that it would explore alternatives to address balance sheet concerns (despite the fact its financial advisors had confirmed months before what Defendants already knew – that any such effort outside of bankruptcy was doomed to failure because of the indemnity and debt related issues).   Garrett also advised for the first time, what it now admits it had known since the Spin-

Off, that its "leveraged capital structure poses significant challenges to its overall strategic and financial flexibility and may impair its ability to gain or hold market share in the highly competitive automotive supply market, thereby putting Garrett at a meaningful disadvantage relative to its peers."  The press release also stated that "Garrett's high leverage is exacerbated by significant claims asserted by Honeywell against certain Garrett subsidiaries under the disputed subordinated asbestos indemnity and tax matters agreement."

129.    Following the August 26, 2020 press release, Garrett's stock price fell by approximately 44%, from $6.88 per share to $3.84 per share at close on August 26, 2020.  Garrett's stock price fell an additional $0.56 per share the following trading day to close at $3.28 per share as the market further digested the news.

**L.     Garrett Files for Bankruptcy Protection and Concedes Its Capital Structure Has Undermined its Viability Since the Spin-Off**

130.    On September 17, 2020, *The Wall Street Journal* reported that Garrett was nearing a sale through bankruptcy to KPS.  On this news, the price of Garrett's common stock fell from $2.41 per share on September 17, 2020 to $2.01 per on September 18, 2020.

131.    Garrett filed for Chapter 11 bankruptcy protection on Sunday, September 20, 2020, with a 'stalking horse' bid of $2.1 billion from a new company formed by KPS Capital Partners, LP.  Garrett's bankruptcy filings admitted that Defendants had known from the outset that the Honeywell Obligations made it impossible for the Company to fund needed R&D, maintain relationships with OEMs and suppliers, raise capital or to pursue alternative strategies outside of bankruptcy—all of which made it clear from the start Garrett would not survive as an independent Company.  This admission bares the falsity of the myriad statements to the contrary made by Defendants beginning before the Spin-Off.  Following news of the bankruptcy filings, Garrett's

stock price started trading under the symbol "GTXMWQ" and fell to $1.76 per share at close on September 22, 2020.

## V.   DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS OF MATERIAL FACTS

### A.   Pre-Spin Off False and Misleading Statements By Defendant Lu

132.   On August 23, 2018, Honeywell employee Defendant Lu caused Garrett to file with the SEC a Form 10 that was subsequently amended on September 5, 2018.  Both versions of the Form 10 were signed by Defendant Lu, who was denominated by Honeywell as Garrett's President and lone director at the time.   The registration contained numerous false and misleading statements, such as a risk factor that warned:

> *We are subject to risks associated with the Indemnification and Reimbursement Agreement, pursuant to which we will be required to make substantial cash payments to Honeywell, measured in substantial part by reference to estimates by Honeywell of certain of its liabilities.*
>
> *       *       *
>
> *This agreement may have material adverse effects on our liquidity and cash flows and on our results of operations, regardless of whether we experience a decline in net sales. The agreement may also require us to accrue significant long-term liabilities on our combined balance sheet*, the amounts of which will be dependent on factors outside of our control, including Honeywell's responsibility to manage and determine the outcomes of claims underlying the liabilities. *As of December 31, 2017, we have accrued $1,703 million of liability in connection with Bendix related asbestos, representing the estimated liability for pending claims as well as future claims expected to be asserted.* The liabilities related to the Indemnification and Reimbursement Agreement *may have* a significant negative impact on the calculation of key financial ratios and other metrics that are important to investors, rating agencies and securities analysts in evaluating our creditworthiness and the value of our securities. Accordingly, our access to capital to fund our operations may be materially adversely affected and the value of your investment in our company may decline. Moreover, the payments that we will be

required to make to Honeywell pursuant to that agreement will not
be deductible for U.S. federal income tax purposes.

133.    The Form 10 also disclosed that there was a material weakness in internal control over financial reporting.  Specifically, the Form 10 stated: "***There is a material weakness in internal control over financial reporting related to the estimation of our liability for unasserted Bendix-related asbestos claims which has resulted in a restatement of our previously issued financial statements.***"

134.    The statements in the Form 10 regarding the debt and indemnity obligations were materially false and misleading when made.  It was misleading for Defendant Lu to sign the Form 10 discussing the impact of the debt and indemnity obligations and stating they "may have" a negative impact on the Company, when Defendant Lu knew, or was reckless in not knowing, that the debt and indemnity obligations made it nearly impossible for Garrett to be viable long-term as an independent company.  In other words, the purported risk that there "may" be a negative impact had already materialized.

135.    The Form 10 signed by Defendant Lu also contained risk factors regarding Garrett's potential conflicts with Honeywell.  Specifically, the Form 10 stated "we may have potential business conflicts of interest with Honeywell with respect to our past and ongoing relationships" and that "[f]ollowing the Spin-Off, certain of our directors and employees ***may have*** actual or potential conflicts of interest because of their financial interests in Honeywell."  The Form 10 elaborated that "[b]ecause of their current or former positions with Honeywell, certain of our expected executive officers and directors own equity interests in Honeywell.  Continuing ownership of Honeywell shares and equity awards could create, or appear to create, potential conflicts of interest in SpinCo and Honeywell face decisions that ***could have*** implications for both SpinCo and Honeywell."

136.    The statements in the Form 10 regarding conflicts were materially false and misleading when made.   It was misleading for Defendant Lu to sign a document warning there *may* be a conflict of interest that *could* have implications, when at the time there were significant actual known conflicts.   Indeed, at the time the Form 10 was signed, Defendant Lu served as Garrett's President and sole director, while *at the same time* being employed by Honeywell as an associate general counsel.   Garrett has conceded in Court filings that Defendant Lu, as well as Garrett's legal and financial advisors, were conflicted leading up to the Spin-Off.[13]

137.    On September 5, 2018, Defendant Lu caused Garrett to file Amendment 1 to Form 10, which was again signed by Defendant Lu.   The amendment stated, among other things, that "Following the Spin-Off, Honeywell and SpinCo will each have a more focused business that will be ***better positioned to invest more in growth opportunities*** and execute strategic plans best suited to address the distinct market trends and opportunities for its business.   Given that SpinCo is the only Honeywell business primarily focused on the automotive industry, ***SpinCo will be better positioned as an independent company to properly channel and fund investments to capitalize on long-term industry needs.***"

138.    The above referenced statement in the Amendment 1 to Form 10 was false and misleading when made.   Specifically, it was false for the amendment to state SpinCo (i.e. Garrett) would be "better positioned" as an independent company to "properly channel and fund investments" when at the time Defendant Lu already knew, or was reckless in not knowing, that the capital structure and Indemnification Agreement imposed on Garrett through the Spin-Off made it virtually impossible for Garrett to succeed as an independent company, because, among

---

[13] *See* Adversary Proceedings, No. 657106/2019 (N.Y. Sup. Ct. Sept. 23, 2020), Doc. No. 17 (Complaint) and Doc No. 53 (Notice of Removal).

other reasons, Garrett would not have the ability to properly invest in R&D to maintain its position as a technology leader.

**B.     D&O Defendants' 2018 Class Period False and Misleading Statements**

139.     On October 1, 2018, Garrett filed two Form 8-Ks announcing the completion of the Spin-Off.  In one of the attached press releases, Defendant Rabiller stated that Garrett was "an automotive ***technology pioneer, inventor and innovator***" and had "***established a strong position for providing differentiated technologies*** that are in demand."

140.     The statements by Defendant Rabiller on October 1, 2018 were materially false and misleading when made.  It was misleading for Defendant Rabiller to discuss Garrett's technology and innovation strengths, when at the time Defendant Rabiller knew, or was reckless in not knowing, that the capital structure and Indemnification Agreement imposed on Garrett through the Spin-Off undermined Garrett's ability to continue to invest in R&D and remain a technology leader, which would make it nearly impossible for Garrett to survive as an independent company.

141.     On November 6, 2018, Garrett filed a press release announcing its Third Quarter 2018 Results.  In the press release, the Company described itself as "a ***cutting-edge technology provider***."  Also in the press release, Defendant Rabiller is quoted, stating he is "pleased that Garrett successfully ***raised the financing at favorable rates, to become a strong independent company*** and we look forward to continued advance in our growth vectors in software and electrification."  The press release also states that the Company's "Research and Development expenses were $29 million in the third quarter of 2018, a decrease of $1 million from the third quarter of 2017 . . . ***For the first nine months of 2018, R&D expenses increased 8%*** to $96 million as compared with $89 million in the same period last year."

142.     The above-referenced statements in the November 6, 2018 press release were materially false and misleading when made.  Specifically, it was misleading for Garrett and

Defendant Rabiller to describe the Company as:  (i) a "cutting-edge technology provider"; (ii) to state the Company's spending on R&D was increasing; and (iii) to discuss Garrett's ability to raise financing at favorable rates, when at the time Garrett and Defendant Rabiller knew, or were reckless in not knowing, that the debt and indemnity obligations imposed by Honeywell undermined Garrett's ability to continue to invest in developing technology through R&D. Likewise, Defendant Rabiller already knew that Garrett's capital structure, particularly the Honeywell indemnity obligations, would make it extremely difficult for Garrett to raise additional financing.

143.    On November 6, 2018, Defendants Rabiller and Gili held an earnings call with investors and analysts to discuss Garrett's third quarter 2018 earnings.  Defendants Rabiller and Gili repeatedly discussed Garrett's purported technology-focused growth strategy. For example, Defendant Rabiller started the call by discussing Garrett's first few months as an independent company, touting Garrett's "strong organic growth driven by new product launches."  Likewise, Defendant Rabiller's opening remarks discussed Garrett's "*three stage technology growth strategy*" and Garrett's presentation accompanying the call listed "sustainable margin profile *driven by technology*" as one of its "Key Q3 and 9M 2018 Takeaways."

144.    During the question-and-answer session, Defendant Rabiller was asked about Garrett's R&D cost being down year-over year.  Defendant Rabiller stated:

> *This is not us managing our EBITDA to make the quarter* so that we are very clear, that would be that would not be something very smart to do. *So we're obviously investing in our R&D all year long according to the target we have for the full year* that can vary a bit one quarter to the other quite frankly. When we look at the R&D expense the comparison to the previous quarter over quarter is nothing like either way we look at it.  But we think about this as being pretty well on track is what we said in spend for the year and the guidance we did give in terms of percentage of R&D spend for the next 5 years. *R&D is a mix and extremely important part of our*

> ***strategy***. ***We are a technology company.*** We are investing
> differentiated technologies. We have a number of launches, but
> more than launches we are funding very well our growth vectors that
> will drive the company not only for the next 5 years but the next 10
> to 15 years.

145.   The statements by Defendants Rabiller and Gili on the November 6, 2018 earnings

call were materially false and misleading when made.  It was misleading for Defendants Rabiller

and Gili to discuss Garrett's technology growth strategy and R&D efforts, when at the time

Defendants Rabiller and Gili knew, or were reckless in not knowing, that the capital structure and

Indemnification Agreement imposed on Garrett through the Spin-Off prevented Garrett from

adequately investing in these areas and remaining competitive with its peers, a failure which would

make it nearly impossible for Garrett to survive as an independent company.

146.   On November 6, 2018, Garrett filed its Third Quarter 2018 Form 10-Q with the

SEC.  The Form 10-Q was signed by Defendants Rabiller and Gili.  The Form 10-Q incorporated

by reference the risk factors from Garrett's Form 10.  In addition, the Form 10-Q stated:

> Our ability to fund our operating needs will depend on our future
> ability to continue to generate positive cash flow from operations
> and raise cash in the capital markets. Based upon our history of
> generating strong cash flows, we believe we will be able to meet our
> short-term liquidity needs for at least the next twelve months. **We
> believe we will meet known or reasonably likely future cash
> requirements, through the combination of cash flows from
> operating activities, available cash balances and available
> borrowings through our debt agreements.** We expect that our
> primary cash requirements in 2018 will primarily be to fund capital
> expenditures and to meet our obligation under the debt instruments
> and the Indemnification and Reimbursement Agreement described
> below, as well as the Tax Matters Agreement. If these sources of
> liquidity need to be augmented, **additional cash requirements
> would likely be financed through the issuance of debt or equity
> securities**; however, there can be no assurances that we will be able
> to obtain additional debt or equity financing on acceptable terms in
> the future.

147. The Form 10-Q also included statements regarding capital expenditures and R&D, including that "*We expect to continue investing to expand and modernize our existing facilities and invest in our facilities to create capacity for new product development*."

148. The above-referenced statements in Garrett's Form 10-Q filed on November 6, 2018, were materially false and misleading when made.  It was misleading for the Form 10-Q to state Garrett was "reasonably likely" to meet its cash requirements and that Garrett would "likely" finance additional cash requirements through the issuance of debt or equity securities, when at the time Garrett and the Defendants that signed the Form 10-Q knew, or were reckless in not knowing, that the capital structure and Indemnification Agreement imposed on Garrett through the Spin-Off undermined Garrett's ability to maintain sufficient liquidity and made it nearly impossible for Garrett to raise additional cash through issuing debt or equity because any further financing would be subordinated to the Honeywell Obligations.  Moreover, it was misleading for Garrett to state it would continue investing to expand and modernize its facilities to create new products because Defendants already knew the Company's capital structure prevented Garrett from adequately investing in R&D.

149. On December 6, 2018, Garrett published a media post on its website titled "Driving Technology Forward."  The post stated that "*Garrett remains committed to providing state-of-the-art automotive technology*" and discussed the Company's 1,400 patents.  The post continued by discussing "*The Garrett Technology Road Map*," which noted that the automotive "industry today is evolving at a rapid pace."  Garrett stated that it "*is already pioneering the solutions that will capitalize on these macro trends*, with highly-engineered products deeply integrated with our customers."

150.   Garrett's December 6, 2018 media post was false and misleading when made.  It was misleading for Garrett and its executives to tout the Company's technology expertise and state it was already working on solutions to industry trends, when its senior executives (i.e. the Defendants in this action) knew, or were reckless in not knowing, that the capital structure and Indemnification Agreement imposed on Garrett through the Spin-Off undermined Garrett's ability to adequately invest in technology and R&D to remain competitive with its peers, which would make it nearly impossible for Garrett to survive as an independent company.  Indeed, in contrast to "already pioneering the solutions," in reality Garrett was already *falling behind* its peers because of its inability to invest in R&D and technology.

### C.   D&O Defendants' 2019 Class Period False and Misleading Statements

151.   Defendant Rabiller presented at the 2019 Deutsche Bank Global Auto Industry Conference on January 15, 2019 in Detroit.  Garrett's presentation at the conference included a slide on "***R&D Supporting Growth***."  On the slide, the Company represented its ***investment capacity in growth will increase from 50% to 100% of R&D budget in 4 years***, and that Garrett has "***investment capacity available to support growth and innovation***."

152.   The above-referenced statements in Garrett's January 15, 2019 presentation were false and misleading when made.  It was misleading for Garrett to state that its R&D investment would support the Company growth, when Garrett and Defendant Rabiller knew, or were reckless in not knowing, that the capital structure and Indemnification Agreement imposed on Garrett through the Spin-Off undermined Garrett's ability to adequately invest in technology and R&D and remain competitive with its peers, which would make it nearly impossible for Garrett to survive as an independent company.

153.   On February 20, 2019, Garrett announced its fourth quarter and full year 2018 financial results in a press release.  The press release described Garrett as a "***cutting-edge***

*technology provider*."  Also in the press release, Defendant Rabiller was quoted as stating "[w]e remain well positioned for future growth as *we continue to benefit from our global scale and develop the next generation of technology focused on electrification and software*.  By working closely with our customers, we can accelerate *our differentiated technology solutions* to the market and help solve their challenges by redefining and advancing motion."

154.    The above-referenced statements by Defendant Rabiller in the February 20, 2019 press release were materially false and misleading when made.  It was misleading for Defendant Rabiller to discuss Garrett's development of "next generation" technology and accelerating the Company's "differentiated technology solutions," when at the time Defendant Rabiller knew, or was reckless in not knowing, that the capital structure imposed on Garrett through the Spin-Off, prevented Garrett from adequately investing in technology and R&D, which would make it nearly impossible for Garrett to survive as an independent company.

155.    Garrett's press release further quoted Defendant Rabiller, stating "Our solid cash generation has already enabled us to reduce debt and begin to deleverage our financial profile, providing a strong start upon completion of our initial quarter as an independent company."  On the related earnings call, Defendant Gili was asked the Company's 2020 year-end leverage target. Gili responded that "[t]here's a higher cash generation in our structure today by the end of the year, which means that also *the deleverage is going to most likely take place by the end of the year*. And when I talk the leverage I mean gross debt going down."

156.    The above-referenced statements on February 20, 2019 by Defendants Rabiller and Gili were false and misleading when made.  It was misleading for Defendant Rabiller to state Garrett had "already" begun to "deleverage" and Defendant Gili to state "the deleverage is going to most likely take place by the end of the year" because it implied that Garrett's efforts to

deleverage were succeeding.  However, Defendant Rabiller and Defendant Gili knew, or were reckless in not knowing, that Garrett would not be able to adequately deleverage in light of the Honeywell Obligations imposed on it through the Spin-Off.

157.    Also on the February 20, 2019 earnings call, Defendant Rabiller stated Garrett's "*cost structure [] enables us to improve our operational performance.*"  Defendants Rabiller and Gili also discussed the Company's R&D, stating "[w]e are *uniquely positioned as a company when it comes to resourcing the development of our new growth vectors and innovation pipeline*.  Considering that our R&D spend as a percentage of sales is flat, *our 4% to 6% revenue growth per year converts into a direct increase of the resources available to our engineers*."  Defendants Rabiller and Gili again discussed R&D on the call, stating "the R&D intensity required to support our technology differentiation in our core business is not increasing.  Although the turbo penetration is increasing at a healthy rate, the number of engine programs that DOEs are working on is quite stable.  It is in fact production volumes associated with each of this program that is increasing.  And therefore looking at the difference between the two, we are generating a disproportionate amount of money that we can allocate to resource our growth vectors."

158.    During the earnings call, Defendants Rabiller and Gili referred to an investor presentation.  The presentation included a slide titled "*Increasing R&D Supports Emerging Growth Vectors*."  On the slide, the Company noted *investment capacity in new growth will increase from 50% to 100% of R&D budget in 4 years* and that Garrett has "investment capacity available to support growth and innovation."  The presentation also illustrated a *steadily increasing R&D budget*.

159.    The statements by Defendants Rabiller and Gili during the February 20, 2019 earnings call and the accompanying investor presentation were materially false and misleading

when made.  It was misleading for Defendants Rabiller and Gili to tout the Company's "cost structure," "technology growth strategy" and increasing R&D budget, when at the time Defendants Rabiller and Gili knew, or were reckless it not knowing, that the debt and indemnity obligations imposed on Garrett through the Spin-Off undermined Garrett's ability to adequately invest in technology and R&D and remain competitive with its peers, which would make it nearly impossible for Garrett to survive as an independent company.

160.    On March 1, 2019, Garrett filed its annual report on Form 10-K for the period ended December 31, 2018.  The 2018 Form 10-K was signed by Defendants Rabiller, Gili, James, Cardoso, Clark, Enghauser, Main, Reinhardt, and Tozier.   The Form 10-K described Garrett as a "***global technology leader***." The Form 10-K further stated "[***l]eading technology, continuous innovation, product performance and OEM engineering collaboration are central to our customer value proposition and a core part of our culture and heritage***."  The Form 10-K further stated that Garrett had "***led the revolution in turbocharging technology over the last 60 years and maintains a leading technology portfolio of more than 1,400 patents and patents pending***."  The 2018 Form 10-K included numerous risk factors, such as that Garrett's "future growth is ***largely dependent on [its] ability to develop new technologies and introduce new products*** with acceptable margins that achieve market acceptance or correctly anticipate regulatory changes."

161.    The Form 10-K contained additional statements regarding technology, such as "***We expect to continue to invest in product innovations and new technologies and believe that we are well positioned to continue to be a technology-leader in the propulsion of electrified vehicles.***"   The Form 10-K also included a statement that Garrett's "***regional research, development and manufacturing capabilities are a key advantage*** in helping us to supply OEMs as they expand geographically and shift towards standardized engines and vehicle platforms

globally."  Finally, Garrett stated in the Form 10-K that "*[w]e continue to conduct research to determine key areas of the market where we are best positioned to leverage our existing technology platforms and capabilities* to serve our customers."

162.    The above-referenced statements in Garrett's 2018 Form 10-K were false and misleading when made.  It was misleading for Garrett's to make statements about investing in new technologies, R&D, and growth when the Defendants that signed for Form 10-K knew, or were reckless it not knowing, that the capital structure imposed on Garrett through the Spin-Off prevented Garrett from adequately investing in R&D, which would make it fall behind its peers with respect to new technologies and ultimately would make it nearly impossible for Garrett to survive as an independent company.

163.    Garrett's 2018 Form 10-K also included statements regarding its capital and liquidity.  Specifically, the Form 10-K included a risk factor that "*we may not be able to obtain additional capital that we need in the future on favorable terms or at all.*"  The risk factor elaborated:

> We *may* require additional capital in the future to finance our growth and development, upgrade and improve our manufacturing capabilities, implement further marketing and sales activities, fund ongoing R&D activities, satisfy regulatory and environmental compliance obligations, satisfy indemnity obligations to Honeywell, and meet general working capital needs. Our capital requirements will depend on many factors, including acceptance of and demand for our products, the extent to which we invest in new technology and R&D projects and the status and timing of these developments. *If our access to capital were to become constrained significantly*, or if costs of capital increased significantly, due to lowered credit ratings, prevailing industry conditions, the solvency of our customers, a material decline in demand for or our products, the volatility of the capital markets or other factors, our financial condition, results of operations and cash flows could be adversely affected. *These conditions may adversely affect our ability to obtain targeted credit ratings*.

164.    The Form 10-K also further stated the following regarding Garrett's capital structure and liquidity:

> *We believe we will meet our known or reasonably likely future cash requirements through the combination of cash flows from operating activities, available cash balances and available borrowings through our debt agreements*. If these sources of liquidity need to be augmented, *additional cash requirements would likely be financed through the issuance of debt or equity securities*; however, there can be no assurances that we will be able to obtain additional debt or equity financing on acceptable terms in the future. Based upon our history of generating strong cash flows, *we believe we will be able to meet our short-term liquidity needs for at least the next twelve months*.

165.    The above-referenced statements in Garrett's Form 10-K were false and misleading when made.  It was misleading to state that Garrett merely may need additional cash and that additional capital would likely be financed through the issuance of debt or equity, when the Defendants signing the Form 10-K knew, or were reckless in not knowing, that the debt and indemnity obligations imposed on Garrett through the Spin-Off made it nearly certain that Garrett would need additional capital – and that it would be nearly impossible for Garrett to raise additional capital in light of its capital structure, particularly because any additional debt or equity would be subordinated to the Honeywell obligations.

166.    The Form 10-K also contained a risk factor that "we are subject to risks associated with the Indemnification and Reimbursement Agreement, pursuant to which we are required to make substantial cash payments to Honeywell, measured in substantial part by reference to estimates by Honeywell of certain of its liabilities."  The risk factor stated that: "[t]his agreement *may have* material adverse effects on our liquidity and cash flows and on our results of operations, regardless of whether we experience a decline in net sales.  The *agreement may also require us to accrue significant long-term liabilities* on our consolidated and combined balance sheet, the

amounts of which will be dependent on factors outside of our control, including Honeywell's responsibility to manage and determine the outcomes of claims underlying the liabilities."  The risk factor further stated the agreements "***may impose significant operating and financial restrictions on us*** and our subsidiaries and limit our ability to engage in actions that may be in our long-term best interests."

167.    The statements in the above-referenced risk factor were false and misleading when made.  It was misleading for Garrett to state the Honeywell Obligations "may have" adverse effects on liquidity and cash flows, and that the agreement "may" require Garrett to accrue significant liabilities, when the Defendants that signed the Form 10-K knew, or were reckless it not knowing, that the debt and indemnity obligations imposed on Garrett through the Spin-Off would certainly undermine Garrett's viability as an independent company because Garrett would not be able to adequately invest in new technologies, would not be able to make acquisitions, would not be viewed as favorably by its customers because of its leverage, and would not be able to raise additional capital.

168.    On May 7, 2019, Garrett announced its first quarter 2019 financial results in a press release.  The press release again described Garrett as a "***cutting-edge technology provider***."  Garrett also released an investor presentation, which discussed Garrett's "***Technology Growth Strategy***."

169.    On the related earnings call, Defendant Rabiller continued to discuss Garrett's technology as a strength.  In his opening remarks, Defendant Rabiller attributed the positive first quarter results to the "high technology content of our products."  Defendant Rabiller likewise discussed the Company's "technology project pipeline" and stated that "***Garrett is a technology company***, operating into the automotive industry and our technology growth strategy depicted here

remains a key priority for the long-term success of our company."  Defendant Rabiller also stated on the earnings call that Garrett's "***first priority for the business is to de-leverage*** and ***then we'll look at bolt-on acquisition opportunities***, if the opportunity occurs."  During the same May 7, 2019 earnings call, analyst John Sykes asked what Garrett plans to do with its approximately $100 million of free cash flow for the year.  Defendant Gili confirmed Garrett's plan was to pay down debt, elaborating that "I think we've been public since the beginning that ***our key target is to de-leverage***."

170.    The statements by Defendants Rabiller and Gili on May 7, 2019, including in Garrett's press release, investor presentation, and earnings call, were materially false and misleading when made.  It was misleading for the Defendants Rabiller and Gili to discuss Garrett's technology growth strategy and "bolt-on acquisition opportunities," when at the time Defendants Rabiller and Gili knew, or were reckless in not knowing, that the capital structure imposed on Garrett through the Spin-Off prevented Garrett from adequately investing in R&D and technology and prevented Garrett from engaging in acquisitions, one of its primary sources of obtaining new technologies.  It was also misleading for Garrett to state it was going to "deleverage" because Defendants Rabiller and Gili knew that it was impossible for Garrett to deleverage enough to solve its capital structure issues and avoid bankruptcy.  The statements by Defendants Rabiller and Gili were misleading because they incorrectly implied the planned deleverage was working.  Defendants failed to disclose the whole truth – that because of its capital structure, Garrett would be unable to avoid restructuring through bankruptcy.

171.    On May 8, 2019, Garrett filed its first quarter 2019 Form 10-Q, incorporating by reference the false and misleading risk factors from Garrett's 2018 Form 10-K.  The Form 10-Q was signed by Defendants Rabiller and Gili.  The Form 10-Q also stated that it was "subject to a

number of important factors that ***could*** cause actual results to differ materially from those forward-looking statements."

172.    The above-referenced statements in the May 8, 2019 Form 10-Q were false and misleading when made.  It was misleading for the Defendants Rabiller and Gili to state in the Form 10-Q that the debt and indemnity liability *could* impact Garrett's results, including its ability to develop new technology, when Defendants Rabiller and Gili already knew, or were reckless in not knowing, that the capital structure and Indemnification Agreement imposed on Garrett through the Spin-Off were already undermining Garrett's ability to adequately invest in developing technology and to make related new technology bolt-on acquisitions, making it nearly impossible for Garrett to compete and survive as an independent company.

173.    Garrett's First Quarter 2019 Form 10-Q also discussed the Company's Liquidity. Specifically, the Form 10-Q stated, in relevant part:

> We expect that our primary cash requirements in the remainder of 2019 will primarily be to fund operating activities, working capital, and capital expenditures, and to meet our obligations under the debt instruments and the Indemnification and Reimbursement Agreement described below, as well as the Tax Matters Agreement. In addition, we engage in repurchases of our debt and equity securities from time to time. ***We believe we will meet our known or reasonably likely future cash requirements through the combination of cash flows from operating activities, available cash balances and available borrowings through our debt agreements. If these sources of liquidity need to be augmented, additional cash requirements would likely be financed through the issuance of debt or equity securities; however, there can be no assurances that we will be able to obtain additional debt or equity financing on acceptable terms in the future. Based upon our history of generating strong cash flows, we believe we will be able to meet our short-term liquidity needs for at least the next twelve months.***

174.    The above-referenced statement in Garrett's Form 10-Q was false and misleading when made.  It was misleading to state that Garrett believed it would meet known cash

requirements and that Garrett would likely be able to raise additional capital, when Defendants Rabiller and Gili knew, or were reckless in not knowing, that the capital structure and Indemnification Agreement imposed on Garrett would make it nearly impossible for Garrett to survive as an independent company, and that it would be very unlikely it could raise additional capital in light of the Honeywell Obligations.

175.   On July 30, 2019, Garrett filed a press release and investor presentation announcing the Company's second quarter 2019 financial results.  These documents again described Garrett as a "***cutting-edge technology provider***" and touted the Company's "***Technology Growth Strategy***."  During Garrett's earnings call on the same day, Rabiller stated that "Garrett is a ***leading technology company*** operating in the automotive industry" and emphasized its "***technology led growth strategy [] remains a key priority for long-term success***."  Garrett's investor presentation regarding the results contained a slide titled "Key Q2 2019 Takeaways."  The slide represented that Garrett's "positive long-term business fundamentals remain intact" and that the Company that it made "continued progress in core and new growth factors."  The presentation also stated that Garrett "remains well positioned to drive future results."

176.   The statements by Defendants Rabiller and Gili on July 30, 2019, including in Garrett's press release, investor presentation, and earnings call, were false and misleading when made.  It was misleading for the Defendants Rabiller and Gili to discuss Garrett's technology growth strategy as being "positive" or "long-term," when at the time Defendants Rabiller and Gili knew, or were reckless in not knowing, that the capital structure imposed on Garrett through the Spin-Off prevented Garrett's ability to adequately invest in developing technology and remaining competitive with its peers, which would make it impossible for Garrett to survive as an independent company.

177.    Also on July 30, 2019, Garrett filed its Form 10-Q for the second quarter, again incorporating by reference the risk factors from Garrett's 2018 Form 10-K.  The Form 10-Q was signed by Defendants Rabiller and Gili.  The Form 10-Q also stated that Garrett was "subject to a number of important factors that **could** cause actual results to differ materially from those forward-looking statements."

178.    The above-referenced statements in Garrett's second quarter 2019 Form 10-Q were false and misleading when made.  It was misleading for the Defendants Rabiller and Gili to state in the Form 10-Q that the debt and indemnity liability *could* impact Garrett's results, including its ability to develop new technology, when Defendants Rabiller and Gili already knew, or were reckless it not knowing, that the capital structure and Indemnification Agreement imposed on Garrett through the Spin-Off were already undermining Garrett's ability to continue to invest in developing technology and remain competitive with its peers (making it nearly impossible for Garrett to compete and survive as an independent company).

179.    During Garrett's earnings call, Defendant Gili stated that "***We remain focused on utilizing our cash generation to deleverage our balance sheet.***"  Relatedly, Garrett's Second Quarter 2019 Form 10-Q also discussed the Company's Liquidity.  Specifically, the Form 10-Q stated, in relevant part:

> We expect that our primary cash requirements in the remainder of 2019 will primarily be to fund operating activities, working capital, and capital expenditures, and to meet our obligations under the debt instruments and the Indemnification and Reimbursement Agreement described below, as well as the Tax Matters Agreement. In addition, we engage in repurchases of our debt and equity securities from time to time. ***We believe we will meet our known or reasonably likely future cash requirements through the combination of cash flows from operating activities, available cash balances and available borrowings through our debt agreements. If these sources of liquidity need to be augmented, additional cash requirements would likely be financed through the issuance of***

*debt or equity securities; however, there can be no assurances that we will be able to obtain additional debt or equity financing on acceptable terms in the future. Based upon our history of generating strong cash flows, we believe we will be able to meet our short-term liquidity needs for at least the next twelve months.*

180.    The above-referenced statements during Garrett's earnings call and in Garrett's Form 10-Q were false and misleading when made.  It was misleading to state that Garrett believed it would meet known cash requirements and that Garrett would likely be able to raise additional capital, when Defendants Rabiller and Gili knew, or were reckless in not knowing, that the capital structure and Indemnification Agreement imposed on Garrett would make it nearly impossible for Garrett to survive as an independent company, and that it would be very unlikely Garrett could raise additional capital in light of the Honeywell Obligations.  It was likewise misleading for Defendant Gili to discuss Garrett's focus on using its cash flow to deleverage its balance sheet, when Defendant Gili knew, or was reckless in not knowing, that it would be nearly impossible for Garrett to adequately deleverage without restructuring the Honeywell Obligations.

181.    On September 9, 2019, Garrett issued a press released titled "Garrett Motion to Showcase Electric Turbocharger For First Time at IAA 2019."  The press release described Garrett as a "***leading differentiated technology provider***" and stated the Company will "showcase its latest products and technology applications" at an upcoming Motor Show in Frankfurt.  The press release quoted Defendant Rabiller discussing Garrett's electrified engine technology, stating it "will be key in meeting industry challenges for increased energy efficiency and new global regulatory emission targets while still meeting consumer demands for better vehicle performance and affordability."

182.    The above-referenced statements in Garrett's press release were false and misleading when made.  It was misleading for Defendant Rabiller to discuss Garrett's new

technology and to describe Garrett as a differentiated technology leader, when Defendant Rabiller knew, or was reckless in not knowing, that the capital structure and Indemnification Agreement imposed on Garrett through the Spin-Off were already undermining Garrett's ability to adequately invest in R&D and remaining competitive with its peers, which would make it nearly impossible for Garrett to survive as an independent company.

183.    On September 10, 2019, Garrett's senior management presented at the Deutsche Bank IAA Cars Conference.  In Garrett's presentation, it included a slide concerning "***Financial Flexibility*** and Efficiency" where it represented it had a "***highly variable cost structure*** to support the business" and "low working capital needs."  Garrett further stated it had a "well-invested capacity base to ***support continued growth***."  On a slide titled "Key Investor Takeaways," the Company represented its "[s]trong financial foundation ***supports new growth vectors and innovation pipeline***."  The presentation concluded that Garrett was "well positioned to create enduring value for shareholders."

184.    The above-referenced statements were false and misleading when made.  It was misleading for Garrett to discuss its "financial flexibility" and "growth vectors" when it was clear to the Company and Defendants, or they were reckless in not knowing, that the capital structure, including the Indemnification Agreement, imposed on Garrett through the Spin-Off was highly restrictive and made it nearly impossible for Garrett to raise additional capital or engage in acquisitions, factors that would make it nearly impossible for Garrett to survive as an independent company.  Likewise, the Honeywell Obligations and capital structure prevented Garrett from adequately investing in R&D and remaining competitive with its peers from a technology perspective.

185.    On October 17, 2019, Garrett issued a press releasing "confirming its development of the world's first 'E-Turbo' for mass market passenger vehicles expected to launch in 2021." The press release, which continued to describe Garrett as a "***differentiated technology leader***" discussed Garrett's "E-Turbo" technology and "***next generation software***."

186.    The statements in the above-referenced press release were false and misleading when made.  It was misleading for the press release to discuss Garrett's new technology, when Garrett's senior executives knew, or were reckless in not knowing, that the capital structure and Indemnification Agreement imposed on Garrett through the Spin-Off were undermining Garrett's ability to adequately invest in developing technology and remaining competitive with its peers, which would make it impossible for Garrett to survive as an independent company.

187.    On November 8, 2019, Garrett announced its third quarter 2019 financial results through a press release.  The press release continued to describe Garrett as "a ***cutting-edge technology provider***."  On the same day, Defendants Rabiller and Bracke both participated on the earnings call announcing the Company's second quarter results.  On the earnings call, Rabiller stated "Garrett remains well positioned to benefit from the positive long-term macros as we ***continue to provide advanced technology*** to the global auto industry to help it meet more stringent regulations and set new benchmarks in vehicle performance" and that "we believe our broad and balanced portfolio positions Garrett well to drive long-term value for shareholders."  Defendant Bracke also stated that "***we remain focused on utilizing our strong cash generation to deleverage our balance sheet.***"  Similarly, Defendant Rabiller stated that "Garrett produced solid cash flow generation in the [] quarter and ***we maintain our focus on deleveraging our balance sheet, making notable progress in reducing net debt***."

188.    The above-referenced statements were false and misleading when made.  It was misleading for Defendants Rabiller and Bracke to discuss Garrett's technology growth strategy, when at the time Defendants Rabiller and Bracke knew, or were reckless in not knowing, that the capital structure and Indemnification Agreement imposed on Garrett through the Spin-Off undermined Garrett's ability to adequately invest in developing technology and the Company would not be able to remain competitive with its peers, which would make it nearly impossible for Garrett to survive as an independent company.  It was also misleading for Defendants Rabiller and Bracke to discussing deleveraging Garrett's balance sheet, as it created the false impression this would solve Garrett's capital structure problem, when in reality these Defendants knew it would be nearly impossible for Garrett to survive without restructuring the Honeywell Obligations through bankruptcy or litigation.

189.    On November 8, 2019, Defendants Rabiller and Bracke held an earnings call to discuss the Company's third quarter results.  On the call Defendant Bracke stated "We remain focused on utilizing our strong cash generation to deleverage our balance sheet."  It was misleading for Defendant Bracke to discuss Garrett's focus on using its cash flow to deleverage its balance sheet, when Defendant Bracke knew, or was reckless in not knowing, that it would be nearly impossible for Garrett to adequately deleverage without restructuring the Honeywell Obligations.

190.    Also on November 8, 2019, Garrett filed its 2019 Form 10-Q with the SEC.  The Form 10-Q incorporated by reference the risk factors from Garrett's 2018 Form 10-K.  The Form 10-Q was signed by Defendants Rabiller and Bracke.  The Form 10-Q also stated that Garrett was "subject to a number of important factors that could cause actual results to differ materially from those forward-looking statements."  One of these factors included Garrett's "ability to develop

new technologies and products, and the development of either effective alternative turbocharger or new replacement technologies."

191.    The 2019 Form 10-Q also stated that:

> *We believe we will meet our known or reasonably likely future cash requirements* through the combination of cash flows from operating activities, available cash balances and available borrowings through our debt agreements. If these sources of liquidity need to be augmented, *additional cash requirements would likely be financed through the issuance of debt or equity securities*; however, there can be no assurances that we will be able to obtain additional debt or equity financing on acceptable terms in the future. *Based upon our history of generating strong cash flows, we believe we will be able to meet our short-term liquidity needs for at least the next twelve months.*

192.    The above-referenced statements in Garrett's Form 10-Q were false and misleading when made.  It was misleading for Garrett to discuss that it might not adequately develop new technologies as merely being a "risk" and to discuss that it "would likely" be able to raise additional capital through issuing debt or equity, when Defendants Rabiller and Bracke knew, or were reckless in not knowing, that the capital structure imposed on Garrett through the Spin-Off prevented it from adequately investing in new technologies and made it very unlikely it could raise new capital because the terms of the Honeywell Obligations, both factors that made it nearly impossible for Garrett to survive as an independent company.

193.    Defendant Rabiller presented at a Barclays Global Automotive Conference on November 20, 2019.  In the presentation, Garrett was described as a "*cutting edge technology provider*."  On a slide concerning "*Financial Flexibility and Efficiency*," Garrett represented it had a "[*h*]*ighly variable cost structure* to support the business" and "low working capital needs." Garrett also represented it had a "well-invested capacity base to *support continued growth*."

194.     Defendant Rabiller's statements at the Barclays conference were false and misleading when made.  It was misleading for Defendant Rabiller to discuss Garrett's "cutting edge technology" and "financial flexibility," when Defendant Rabiller knew, or was reckless in not knowing, that the capital structure imposed on Garrett through the Spin-Off prevented Garrett from adequately investing in R&D and remaining competitive from a technology perspective, and that the Company was overleveraged and had little if any financial flexibility.  Indeed, by November 20, 2019, Defendant Rabiller had worked with Garrett's financial advisors, who confirmed it was very unlikely Garrett could engage in a merger or significant transaction without restructuring the Honeywell Obligations through bankruptcy or other means.

**D.     D&O Defendants' 2020 Class Period False and Misleading Statements**

195.     On February 27, 2020, Garrett announced its fourth quarter and full year 2019 financial results in a press release.  The press release stated that ***"[w]ith significant financial flexibility combined with the industry's broadest portfolio for LV, commercial vehicle, hybrid, and fuel cell products, we are well positioned to build upon the progress we achieved during our first full year as an independent company***."

196.     The above-referenced statement in Garrett's February 27, 2020 press release and Form 10-K was materially false and misleading when made.  It was misleading for Garrett and its senior executives to discuss the Company's "financial flexibility," when at the time each of the Defendants knew, or was reckless in not knowing, that the capital structure and Indemnification Agreement imposed on Garrett through the Spin-Off made Garrett extremely overleveraged relative to its peers, prevented it from adequately investing in R&D, made it difficult for Garrett to engage in acquisitions and to raise capital, all of which made it nearly impossible for Garrett to survive as an independent company.  Indeed, by this point Garrett had already met with financial

advisors and concluded it was unlikely Garrett could engage in a significant corporate transaction without restructuring the Honeywell Obligations through bankruptcy or other means.

197.   Also on February 27, 2020, Garrett released an investor presentation and held an earnings call.  During the earnings call, Defendants Rabiller and Bracke again discussed the "***Technology Growth Strategy***" repeatedly highlighted in the Company's investor presentations. Defendant Rabiller also discussed in his opening remarks how Garrett "maintained [its] ***strong financial position***" and "stayed true to [its] approach in utilizing [its] solid cash flow to ***deleverage*** [its] balance sheet."  Rabiller later stated that Garrett had a "***flexible and resilient business model***" that provided "***significant flexibility*** to help mitigate the impact from any short-term fluctuations in the underlying macro environment[.]"  Rabiller also stated that "[g]oing forward, we plan to continue to ***utilize our strong free cash flow generation to reduce net debt and deleverage our balance sheet***."

198.   The above-referenced statements by Defendants Rabiller and Bracke on February 27, 2020 were materially false and misleading when made.  It was misleading for Defendants Rabiller and Bracke to discuss Garrett's "flexibility" to weather short-term fluctuations, its "strong financial position" and that it was working to "deleverage our balance sheet," when at the time Defendants Rabiller and Bracke knew, or were reckless in not knowing, that capital structure imposed on Garrett through the Spin-Off made Garrett significantly overleveraged compared to its peers and provided it virtually no options to raise additional capital or engage in a significant strategic transaction.  Moreover, the statements about Garrett's efforts to deleverage its balance sheet created the false impression that these efforts would be adequate to prevent the Company from requiring a restructuring of the Honeywell Obligations through bankruptcy or other means.

199.    The same day, Garrett filed its annual report on Form 10-K with the SEC for the period ended December 31, 2019.  The 2019 Form 10-K was signed by Defendants Rabiller, Bracke, James, Cardoso, Clark, Enghauser, Main, Reinhardt and Tozier.  Garrett's Form 10-K described the Company as "*a global technology leader*" and noted its "*technology leadership*."

200.    It was misleading for the Defendants that signed the Form 10-K to discuss Garrett's technology growth strategy and that a "risk" to the Company was not developing new technologies and products, when at the time Garrett's executives and directors knew, or were reckless in not knowing, that the capital structure and Indemnification Agreement imposed on Garrett through the Spin-Off undermined Garrett's ability to adequately invest in developing technology and the Company would not be able to remain competitive with its peers, which would make it nearly impossible for Garrett to survive as an independent company.

201.    The Form 10-K included the following language regarding liquidity and capital expenditures:

> We expect that our primary cash requirements in 2020 will primarily be to fund operating activities, working capital, and capital expenditures, and to meet our obligations under the debt instruments and the Indemnification and Reimbursement Agreement described below, as well as the Tax Matters Agreement. In addition, we may engage in repurchases of our debt and equity securities from time to time. *We believe we will meet our known or reasonably likely future cash requirements through the combination of cash flows from operating activities, available cash balances and available borrowings through our debt agreements. If these sources of liquidity need to be augmented, additional cash requirements would likely be financed through the issuance of debt or equity securities; however, there can be no assurances that we will be able to obtain additional debt or equity financing on acceptable terms in the future. Based upon our history of generating strong cash flows, we believe we will be able to meet our short-term liquidity needs for at least the next twelve months.*

202.    The above-referenced statements in Garrett's Form 10-K were false and misleading when made.  It was misleading for Garrett to discuss that it might not adequately develop new technologies as merely being a "risk" and to discuss that it "would likely" be able to raise additional capital through issuing debt or equity, when Defendants Rabiller and Bracke knew, or were reckless in not knowing, that the capital structure and Indemnification Agreement imposed on Garrett through the Spin-Off prevented it from adequately investing in new technologies and made it very unlikely it could raise new capital because the terms of the Honeywell Obligations, both factors that made it nearly impossible for Garrett to survive as an independent company.

203.    On April 7, 2020, Garrett issued a press release concerning the impact of the COVID-19 pandemic.  In the press release, Defendant Rabiller is quoted, stating "[w]hile our focus has been on safeguarding the health and safety of our employees and supporting our customers and local communities, we are also taking decisive and prudent steps with various stakeholders to ***enhance our liquidity and preserve the long-term health of the business***.  Our senior leadership team has navigated downturns in the past and we expect to rely upon our extensive experience and resilient business model to emerge from this crisis as a stronger company."

204.    The above-referenced statements by Defendant Rabiller on April 7, 2020 were materially false and misleading when made.  It was misleading for Defendant Rabiller to state Garrett was taking steps to "enhance our liquidity and preserve the long-term health of the business" and discuss its business model when it "emerge[s] from the crisis," when at the time Defendant Rabiller knew, or was reckless in not knowing, that the capital structure and Indemnification Agreement imposed on Garrett through the Spin-Off made Garrett substantially overleveraged, prevented it from investing in new technologies, and made it nearly impossible for

it to raise additional capital or engage in a major corporate transaction, all of which made it nearly impossible for Garrett to survive as an independent company.

205.    On May 11, 2020, Garrett announced its first quarter 2020 financial results in a press release.  In the press release, Garrett was again described as a "cutting-edge technology provider."  Despite disclosing in its Form 10-Q that there was a substantial doubt concerning Garrett's ability to continue as a going concern, Defendant Rabiller is quoted in the press release stating:

> "Our financial results for the first quarter *demonstrate Garrett's flexible operating platform* and global capabilities amid the novel coronavirus outbreak," said Olivier Rabiller, Garrett President and CEO. "Both of our production facilities in China have restarted operations and returned rapidly to full capacity after closing for a portion of the quarter due to the COVID-19 pandemic. We remain focused on taking aggressive measures in response to this unprecedented crisis with a priority on protecting the health and well-being of our employees and meeting our customer commitments. Last month, we fully drew down on our revolving credit facility to increase our financial flexibility and started the current quarter with $658 million in total liquidity. We are also temporarily reducing pay for Garrett's senior leadership team by 20% and postponing future capital expenditures without impacting near-term programs. *By actively managing our cost structure and preserving capital, we expect to generate significant cash savings for the year, and we are evaluating further steps to ensure the continuity of our operations. Garrett's positive business fundamentals remain intact* and we will continue to calibrate production schedules in the near term and *flex our cost structure to maintain our agility and strengthen our position for long-term success.*"

206.    The Form 10-Q filed on the same day included the following statement regarding Garrett's cash flows and liquidity:

> We have historically funded our cash requirements through the combination of cash flows from operating activities, available cash balances and available borrowings through our debt agreements. If these sources of liquidity need to be augmented, *additional cash requirements would likely be financed through the issuance of*

*debt or equity securities*; however, there can be no assurances, particularly in light of the volatility in global financial markets as a result of the COVID-19 pandemic, that we will be able to obtain additional debt or equity financing on acceptable terms in the future or at all. Based upon our history of generating strong cash flows, and subject to any acceleration of the obligations under our Credit Agreement by and among us, certain of our subsidiaries, the lenders and issuing banks party thereto and JPMorgan Chase Bank, N.A., as administrative agent (the "Credit Agreement"), or our other agreements, as discussed below*, we believe we will be able to meet our short-term liquidity needs for at least the next twelve months*.

207.    During an earnings call the same day, Defendants Rabiller and Bracke discussed the Company's investor presentation.   The first substantive slide of the investor presentation highlighted that Garrett "maintained business continuity" in light of the pandemic, and that the Company took actions to obtain "*increased financial flexibility*."   The presentation listed as a "GTX Priority" that the Company would "*leverage [its] flexible and resilient business model*" and noted that it had "increased cash on hand to withstand current market conditions."   Garrett's presentation also touted that its "*long-term technology growth strategy remains intact*" and noted it had a "pipeline of proof-of-concept opportunities with additional customers."

208.    The above-referenced statements in Garrett's first quarter 2020 earnings press release, earnings call and Form 10-Q were false and misleading when made.  It was misleading for Defendants Rabiller and Bracke to discuss Garrett's "financial flexibility," "long-term technology growth strategy," meeting "short-term liquidity needs" and the possibility of raising new capital, when at the time Defendants Rabiller and Bracke knew, or were reckless in not knowing, that the capital structure and Indemnification Agreement imposed on Garrett through the Spin-Off made Garrett substantially overleveraged, preventing it from raising additional capital or engaging in a major corporate transaction, all of which made it nearly impossible for Garrett to survive long-term as an independent company.

209.    Garrett's Form 10-Q filed on May 11, 2020 also incorporated by reference the risk factors from Garrett's 2019 Form 10-K.  The Form 10-Q further warned that a number of important factors "could" impact its results, including "our ability to develop new technologies and products, and the development of either effective alternative turbochargers or new replacement technologies."   On the related earnings call, Defendant Rabiller stated that Garrett (i) would "maintain our focus on developing our new technologies,"(ii) the Company remained "**well positioned to accelerate our cutting-edge technologies to the market and drive long-term success**," and (iii) that Garrett was a "**technology leader poised for above market growth in the short, mid and long term**[.]"

210.    The above-referenced statements in Garrett's Form 10-Q and earnings call were false and misleading when made.  It was misleading for Garrett to discuss that it might not adequately develop new technologies as merely being a "risk" and to discuss that it "would likely" be able to raise additional capital through issuing debt or equity, when Defendant Rabiller knew, or was reckless in not knowing, that the capital structure and Indemnification Agreement imposed on Garrett through the Spin-Off prevented it from adequately investing in R&D and developing new technologies, which made it nearly impossible for Garrett to survive as an independent company.

211.    During the May 11, 2020 earnings call, Defendant Rabiller stated with respect to cash flows and financial flexibility:

> We have implemented numerous actions to adjust our operations, reduce our costs, optimize our cash position and strengthen Garrett's financial flexibility. During the first quarter and into early April, we fully drew down on our 470 million revolving credit facility.  Our total liquidity was approximately 665 million at the start of the second quarter positioning us to better withstand the substantial disruption across the global automotive industry and economies worldwide.

74

> We continue to preserve capital by implementing strict cost controls and cash management actions, including significantly reducing discretionary expenses of temporarily reducing pay for Garrett's senior leadership team. On the CapEx side as most of our capital expenditure is related to volume growth, we are also reducing or postponing commitments for 2020 by up to 40%, while preserving our new product launches of both the near and long term.

212.    In addition, after summarizing actions taken to mitigate the impacts of the pandemic, Rabiller stated that "we expect to generate significant cash savings for the year and we are evaluating further steps to bolster our liquidity."  Later in the call, Defendant Bracke stated that "[w]e truly believe that even today, middle of May, *we still have the very substantial liquidity position starting from the 658 [million] that we started the quarter with*."

213.    The above-referenced statements by Defendants Rabiller and Bracke on the May 11, 2020 earnings call were false and misleading when made.  It was misleading for Defendants Rabiller and Bracke to discuss Garrett's liquidity in detail when these Defendants knew, or were reckless it not knowing, that Garrett's capital structure and Indemnification Agreement imposed on it through the Spin-Off made it substantially overleveraged and that it did not have sufficient cash flows and liquidity in light of the Honeywell Obligations.

214.    Also on the May 11, 2020 earnings call, during the question-and-answer portion of the call, an analyst asked about covenant relief and lending relationships.  Defendant Rabiller responded, reminding investors that Garrett was spun-out from Honeywell only six quarters ago, and stating:  "*Our former parent imposed on us a rigid capital structure that was unable unless Garrett executed perfectly in a highly favorable macroeconomic and industry environment, meaning that was really unsustainable that way unless everything was perfect. With insight, it is clear that our capital structure was ill suited to cope with any meaningful operating challenges*."

215.   Defendant Rabiller's statement regarding Garrett's capital structure is a partial admission of the truth – that the Defendants had long known Garrett's capital structure made it nearly impossible for the Company to survive as an independent company.   Indeed, Rabiller admitted that the Company was only sustainable if:  (i) it executed perfectly, ***and*** (ii) there was a highly favorable macroeconomic and industry environment.   Rabiller further conceded that the Company was "ill suited to cope with any meaningful operational challenges" – almost directly the opposite of the "financial flexibility" Rabiller had recently touted when discussing that the Company was poised to continue growing as an independent entity.   However, Defendant Rabiller's statement was also false and misleading when made.   The statement was literally false because Garrett's viability as an independent company was not sustainable even if it executed perfectly because, among other things, its capital structure and Indemnification Agreement prevented the Company from adequately investing in R&D and competing in the rapidly shifting automotive industry.   The statement was likewise misleading because it failed to disclose that because of its capital structure Garrett was already failing and it had concluded with the help of financial advisors that it would likely not be viable without a restructuring.

216.   On June 12, 2020, Garrett announced amendments to certain of its credit agreements.  Defendant Rabiller stated in the press release announcing the amendments that "[t]he modifications to our Credit Agreement ***significantly enhance Garrett's financial flexibility*** to weather the current pandemic-induced economic slowdown."  Rabiller further stated that "Despite the near-term disruption across the automotive industry and global economy, it is important to remember that the ***positive long-term fundamentals of our business remain intact***.  Garrett has excelled as an industry leader for over 65 years, delivering critical cutting-edge technologies to major automakers worldwide.   Going forward, automakers will likely encounter even tougher

regulations and technical challenges after the crisis, and Garrett will bring them a wide range of differentiated products and solutions."

217.    Defendant Rabiller's statements on June 12, 2020 were materially false and misleading when made.  It was misleading for Defendant Rabiller to state Garrett has "financial flexibility" and "positive long-term fundamentals" when at the time Defendant Rabiller knew, or was reckless in not knowing, that the debt and indemnity obligations imposed on Garrett through the Spin-Off undermined Garrett's ability to survive as an independent Company and that bankruptcy was likely.  Indeed, by this time Garrett had already retained financial advisors to evaluate its capital structure and potential mergers and acquisitions and determined that these options were not feasible without restructuring the Honeywell Obligations.

218.    On July 30, 2020, Garrett announced its second quarter 2020 financial results through a press release, Form 10-Q and investor presentation.  The Form 10-Q was signed by Defendants Rabiller and Deason.  In the press release, Garrett described itself as "***a leading differentiated technology provider***" and in its investor presentation touted its "***Long-Term Technology Growth Strategy***."  In the press release, Defendant Rabiller is quoted, stating "Garrett's proven track record in operational excellence has helped us navigate the current pandemic-induced downturn.  Although the market environment remains highly uncertain, we continue to benefit from our robust infrastructure and agile working capabilities as we execute on our ***long-term strategy and lead the evolution of advanced turbocharging, electric-boosting, and software solutions for the global automotive industry***."

219.    On the earnings call to discuss Garrett's second quarter earnings, Defendants Rabiller, Deason and Bracke answered analyst questions.  Despite COVID-19 weighing on the business, Defendant Rabiller was "pleased to report in Q2, Garrett general $63 million adjusted

EBITDA for a margin of 13.2% . . . ."  Rabiller continued that the crisis "highlights the strong fundamentals of Garrett . . . [b]ut at the same time exposes the ill-suited capital structure that the company inherited from its former parent Spinoff."

220.    As part of its second quarter earnings filings with the SEC, Garrett removed the "substantial doubt" language raised in its previous Form 10-Q regarding the Company's ability to continue as a going concern, portraying optimism that the Company could survive despite the COVID-19 pandemic and the debt/indemnity obligations that had been undermining the Company since the Spin-Off.

221.    The above-referenced statements by Defendants Rabiller and Deason on July 30, 2020 were materially false and misleading when made.  It was misleading for these Defendants to discuss the Company's technology growth strategy as having "strong fundamentals," and remove its "substantial doubt" language, when at the time Defendants Rabiller and Deason knew, or should have known, that the debt and indemnity obligations imposed on Garrett through the Spin-Off undermined Garrett's ability to survive as an independent company and that Garrett would soon be forced to seek bankruptcy protection.  Indeed, because of the capital structure, Garrett was unable to properly invest in R&D, raise additional capital, engage in merger and acquisitions necessary in light of the rapidly shifting automotive industry, and was not viewed favorably by its customers because of its overleveraged balance sheet.

## VI.    DEFENDANTS ACTED WITH SCIENTER

222.    Each of the Defendants were culpable participants in the fraud alleged herein, as evidenced by their knowingly reckless issuance and/or ultimate authority over the materially false or misleading statements, as demonstrated by the allegations above, and the additional substantial direct and circumstantial facts and evidence below collectively supporting a strong inference of scienter.

### A. Defendants Had Actual Knowledge Their Public Statements Were False and Misleading When Made

223.    As detailed above, at all relevant times Defendants possessed *actual knowledge* that Garrett's overleveraged capital structure precluded it from making adequate technology R&D investments necessary to maintain its position as a "cutting-edge technology provider," "pioneer" and "innovator."  Defendants also knew Garrett had no financial flexibility, could not meet short-term liquidity needs or access additional capital raises absent a restructuring through bankruptcy. Garrett's own bankruptcy filings demonstrate Defendants knew about these and other fatal issues at the latest on the effective date of the Spin-Off, yet concealed these facts from investors during the Class Period.

224.    *First*, Garrett's admissions in the Chapter 11 Case demonstrate the D&O Defendants knew during the Class Period that the debt obligations and provisions of the Indemnification Agreement made it nearly impossible for Garrett to maintain its technology advantage, relationships with OEMs and suppliers, retain sufficient liquidity, and raise additional capital.

225.    Upon information and belief, members of Garrett's senior management and Board of Directors frequently reviewed Garrett's financials and were aware of Garrett's capital structure at the time of the Spin-Off in 2018, including the fact that Garrett's leverage ratio grossly exceeded industry-standard criteria and that they were subject to constraints in the Indemnification Agreement that, unbeknownst to the public but known to Defendants, severely constrained their ability to operate independently and competitively.  It is well understood that customers and suppliers in the automotive industry pay close attention to the financial health of companies in the industry to ensure their partners will be sustainable and able to meet long-term obligations. Furthermore, the procurement of the sham Solvency Opinion, which did not properly analyze the

impact of the Agreements on Garrett's business, further demonstrates that Defendants knew, or were reckless in not knowing, of the impact that the indemnity and debt obligations would have on Garrett.

226.     Garrett's Bankruptcy Court filings candidly admitted that Garrett's preordained "highly leveraged capital structure" was attributable to a "***financially extraordinary indemnity contract***" (*i.e.*, the Indemnification Agreement) and that the "***inherited capital structure is not sustainable***."[14]   In connection with Garrett's bankruptcy filing, Defendant Rabiller similarly remarked "the financial strains of a heavy debt load and liabilities we inherited in the spinoff from Honeywell – all exacerbated by COVID-19 – have created a significant long-term burden on our business."  The core contributing factors to the bankruptcy – Garrett's leveraged "inherited capital structure" and the related "financially extraordinary indemnity contract" – both existed at the outset of the Class Period, did not change during the Class Period and were unquestionably known to Defendants, yet never adequately disclosed to investors.

227.     *Second*, Defendants knew from the time of the spin, the seriousness of Garrett's liquidity problems caused by the Company's overleveraged capital structure, but never disclosed these facts to investors and instead continued to tout Garrett's supposed "significant financial flexibility" well in to 2020.   While the D&O Defendants were making these and other misstatements to investors, they had already engaged financial advisors (in the fourth quarter of 2019) and initiated a year-long strategic portfolio review culminating in Garrett's bankruptcy filing.

228.     The Bankruptcy Proceedings also revealed for the first time Garrett's Board of Directors had – in the fourth quarter of 2019 – directed Morgan Stanley and Perella Weinberg to

---

[14] *See* Deason Decl. at ¶ 3.

conduct preliminary market test conversations with 15 potential parties regarding a potential strategic transaction.  The results of the market test (which was carried out prior to the onset of the COVID-19 pandemic) indicated none of the potential bidders were receptive to a potential transaction unless Garrett could excise the Honeywell Obligations through a sale in bankruptcy or by voiding them through litigation.  Put another way, these conclusions confirmed to the Board early on what they only later publicly acknowledged – that the Honeywell Obligations were the albatross around Garrett's neck and made it unsustainable as a stand-alone entity.

229.    Morgan Stanley and Perella Weinberg also explicitly informed the Board that the Garrett bankruptcy was inevitable absent an immediate restructuring of the Honeywell Obligations.  The same strategic review initiated by the Board ultimately caused the Company to adopt the below express findings:

- "the Company's long-term prospects are severely hindered by its capital structure, which exposes the Company to potential insolvent liquidation in response to market shocks and, even in a stable market, hampers the ability of the Company to compete for customers, business partners, talent and capital";

- "the value of the Company is likely maximized by a cash sale to a financial sponsor, who can deleverage the Company and invest new equity capital to preserve the Company's people, assets and operations"; and

- "potential financial sponsors or other equity investors will be unwilling to invest in the Company without a solution to its problematic balance sheet, high leverage and Honeywell-imposed legacy liabilities."[15]

230.    *Third*, while Defendants publicly touted Garrett as a "cutting-edge technology provider" that was "funding very well [its] growth vectors that will drive the company not only for the next 5 years but the next 10 to 15 years," the Defendants knew from the time of the Spin-Off

---

[15] Deason Decl. at ¶ 5.

that owing to its inherited capital structure the Company was unable to make the R&D investments

necessary to secure Garrett's future as a viable stand-alone enterprise.  As Garrett admitted in the

Bankruptcy Court, the Company knew from the time of the Spin-Off that it was unable to "make

the investments in technology necessary to preserve its business for the future," had "no access to

incremental debt to fund R&D or capital expenditures given its high leverage" and that its "current

balance sheet constrains its ability to make the investments in technology necessary to preserve its

business for the future."

231.    *Fourth*, Defendants knew that Garrett's overleveraged capital structure as it existed

at the time of the Spin-Off would adversely affect its relationship and business prospects with

OEMs, who are sensitive to the long-term financial viability of vendors given the duration of

customer contracts.  As Garrett explained in the Bankruptcy proceedings:

> The Company sells products to OEMs pursuant to long-term
> arrangements in which the OEMs order essential components from
> the Company years in advance of the production of vehicles. The
> OEMs rely on the Company to be in a position to perform these
> long-term commitments. Similarly, the Company has long-term
> commitments to its own suppliers, and the Company typically
> carries a substantial negative working capital balance based on
> suppliers' understanding of the ability and willingness of the
> Company to perform its commitments as a core part of the
> automobile industry's value chain. [16]

232.    Garrett also admitted in the Bankruptcy Proceedings that "the balance sheet

problems have made" maintaining OEM relationships difficult and "concerns among OEMs and

suppliers will grow as the Company's technological advantages decline with underinvestment." [17]

Defendants therefore knew that Garrett's capital structure created problems with critical long-term

commitments to both OEMs and Garrett's own suppliers from the outset of the Spin-Off.

---

[16] Deason Decl. at ¶ 67.

[17] Deason Decl. at ¶ 68.

233.     *Fifth*, Defendants knew Garrett's capital structure as it existed following the Spin-Off would prove toxic to suitors for a potential merger transaction, because no rational buyer would voluntarily purchase assets that were encumbered with billions of dollars in asbestos liabilities. For the first time in Garrett's bankruptcy filings, Garrett characterized the related provision in the Indemnification Agreement as a "poison pill" that effectively precluded any merger transaction.

234.     *Sixth*, Defendants knew no investor would contribute equity capital in the face of Garrett's capital structure which Garrett later acknowledged trapped free cash flow and sent it to Honeywell.   Indeed, any additional equity or debt would be subordinate to the Honeywell Obligations.

### B. Defendants Were Aware of Garrett's Overleveraged Capital Structure by Virtue of Their Positions at Honeywell

235.     It was well known among Honeywell's executives that the enormous debt and indemnity obligations forced upon Garrett would make it extremely difficult for the Company to be viable long-term.  Defendants Lu, Rabiller and Bracke (and other Garrett executives) each held senior positions at Honeywell prior to their roles at Garrett and through those roles had knowledge of the facts alleged herein including that Garrett would be unable to remain competitive as an independent company.   Indeed, these Defendants had access to a multitude of confidential information concerning the business units that would become Garrett, Garrett's anticipated capital structure by virtue of their employment at Honeywell preceding the Spin-Off.

236.     Defendant Rabiller previously served as President and Chief Executive Officer of Honeywell Transportation Systems (the location of the Garrett business within Honeywell pre spin) from July 2016 to the Spin-Off and had worked in various capacities for Honeywell Transportation Systems since 2002.  At the time of the Spin-Off, Honeywell held out Rabiller as "well-respected" in the automotive industry and acknowledged he played a "key role" in the past

performance of the Transportation Systems business.  Accordingly, Defendant Rabiller knew, or was severely reckless in not knowing, that his statements concerning Garrett's ability to:  (1) sufficiently capitalize R&D spend; (2) maintain existing OEM and supplier relationships; (3) retain sufficient liquidity and raise additional working capital; and (4) deleverage the business, were false and misleading when made.

237.    As the former Chief Financial Officer of Honeywell Transportation Systems, Defendant Bracke had access to confidential information pertaining to the turbocharger business that would become Garrett.  Defendant Bracke knew, or was severely reckless in not knowing, that his statements concerning Garrett's ability to:  (1) sufficiently capitalize R&D spend; (2) retain sufficient liquidity and raise additional working capital; and (3) deleverage the business, were false and misleading when made.

238.    Acting in a deeply conflicted role, Defendant Lu was concurrently a Honeywell assistant general counsel and the President and Director of Garrett during the pre-Spin process. Defendant Lu was instrumental in orchestrating the Spin-Off scheme and it can be inferred she was aware that Garrett's debt obligations and the Honeywell Obligations undermined Garrett's ability to maintain its technology advantage by investing in R&D, maintain its relationships with OEMs and suppliers, retain sufficient liquidity and raise additional capital.

**C.  Additional Allegations of Defendant Lu's Scienter**

239.    At all relevant times, Honeywell Assistant Attorney General Defendant Lu acted with scienter in presiding over a scheme to rid Honeywell of the Bendix asbestos liabilities by spinning them off into Garrett.

240.    ***Defendant Lu stood on both sides of the Spin-Off and was employed by Honeywell and Garrett simultaneously.***  Defendant Lu served as Honeywell's assistant general

counsel when she was appointed as President and sole member of the Garrett Board in the run up to the Spin-Off.

241. ***Conflicted Defendant Lu Executes Onerous Agreements Purportedly on Garrett's Behalf.***   As Garrett's President and sole director, Defendant Lu signed the Indemnification Agreement on behalf of ASASCO 2 Inc. (the initial indemnitee) at the direction of Honeywell without any change to assess its terms and without having read the agreement in full.  Indeed, Garrett's Board (of which Defendant Lu was the sole member) purported to authorize entering into the Indemnification Agreement on September 4, 2018 based on a Solvency Opinion issued that same day.

242. Among other things, the Indemnification Agreement restricts Garrett's ability to engage in corporate transactions, incur significant debt, make investments, dispose of assets, pay dividends and amend material agreements that would be adverse to Honeywell.

243. Defendant Lu also executed the Credit Agreement which forced Garrett to assume approximately $1.45 billion in senior secured financing and notes – the proceeds of which were all used to fund a cash distribution of approximately $1.6 billion to Defendant Lu's employer, Honeywell.

### D.  Special Compensation Arrangements Motivated the Defendants to Inflate Garrett's Stock Price

244. The D&O Defendants' compensation arrangements – including a multitude of special benefits provided by Honeywell immediately prior to the Spin-Off – support an inference that the D&O Defendants had the motive and opportunity to commit securities fraud and inflate the price of Garrett stock, and that their false and misleading statements were knowingly made.

245. Prior to the Spin-Off, Honeywell entered into extraordinary employment agreements with Defendants Rabiller and Gili that provided millions of dollars' worth of

"Founder's Grants" contingent upon the successful completion of the Spin-Off that would not vest until Garrett's fourth year as a publicly-traded Company.  Defendant Rabiller was awarded a Founder's Grant of $4.3 million, while Defendant Gili was awarded at least 1'450'000.00 CHF.

246.    In addition to generous Founder's Grants, Honeywell took the unusual step of tying the compensation of Defendants Rabiller and Gili from their time at Honeywell to Garrett's stock price performance by:

- Replacing all unvested Honeywell stock grants issued prior to 2018 with Garrett restricted stock units;

- Prematurely exercising Honeywell stock options granted in 2018 and converting those units to Garrett restricted stock units;

- Replacing unvested Honeywell 2016 performance restricted stock units with Garrett restricted stock units; and

- Replacing unvested Honeywell 2017-2019 Performance Plan stock units with Garrett restricted stock units.

247.    Honeywell awarded Defendant Gili, who began working for Honeywell just months before the Spin-Off, 12,300 Honeywell restricted stock units with a two-year vesting schedule that were replaced with Garrett restricted stock units following the Spin-Off.  The following chart reflects publicly disclosed remuneration received by Defendants Rabiller and Gili in connection with the Spin-Off and until Garrett's bankruptcy filing:

| Name and Principal Position | Sign-On Long-Term Incentive Award | |
| --- | --- | --- |
| | Founder's Grant | Vesting Schedule |
| Olivier Rabiller, President and Chief Executive Officer | $4,300,000 | 50% year 3; 50% year 4 |
| Alessandro Gili, Chief Financial Officer | 1450000 CHF | 50% year 3; 50% year 4 |

248.     At the outset, the special compensation arrangements in place for Garrett's executives implemented by Honeywell encouraged them to serve the interests of Honeywell in completing the Spin-Off – and to stay the course, conform and look the other way when Garrett began life as an overleveraged, under-capitalized concern with massive unfunded liabilities to Honeywell.

249.     After the Spin-Off, the D&O Defendants' base compensation and bonuses increased significantly in Garrett's first year as a publicly-traded Company – even though Defendants admittedly knew Garrett was overleveraged and its obligations to Honeywell meant it could not survive.

250.     Given that the D&O Defendants' founder's grants would not fully vest until four years after the Spin-Off, and the entirety of their preexisting Honeywell restricted stock and options holdings had been converted to Garrett restricted stock, the D&O Defendants had a huge financial incentive to maintain the charade of Garrett's solvency and ability to continue as a going concern.

## VII.     LOSS CAUSATION

251.     Defendants' wrongful conduct as alleged herein directly and proximately caused Lead Plaintiffs and the Class to suffer substantial losses.

252.     As the risks concealed by Defendants' misrepresentations and material omissions materialized in news Garrett was nearing and ultimately did file for bankruptcy protection, and facts concealed by Defendants' misrepresentations and omissions were revealed to the market by a series of partial corrective disclosures, the price of Garrett's common stock and securities declined, removing the artificial inflation.

253.     As a result of purchasing Garrett's common stock and related securities during the Class Period, Lead Plaintiffs and the Class were damaged when the price of Garrett's common

stock declined when the truth was revealed through a series of partial corrective disclosures and/or the undisclosed risks regarding Garrett's viability materialized.  The price of Garrett's common stock and related securities significantly declined when Defendants' misrepresentations and/or omissions and/or the materialization of undisclosed risks were revealed.

254.    On May 11, 2020, just before market open, Garrett held an earnings call to discuss its first quarter 2020 results.  During the question-and-answer portion of the call, an analyst asked about covenant relief and lending relationships.  Defendant Rabiller responded, reminding investors that Garrett was spun out from Honeywell only six quarters ago, and stating:  "Our former parent imposed on us a rigid capital structure that was unable unless Garrett executed perfectly in a highly favorable macroeconomic and industry environment, meaning that was really unsustainable that way unless everything was perfect.  With insight, it is clear that our capital structure was ill suited to cope with any meaningful operating challenges."  Defendant Rabiller's statement came just before the market opened on May 11, 2020.  Garrett's stock price fell $1.05 per share during the trading day, from $6.66 per share at open to $5.61 per share at close, a decline of approximately 16%.  On the same day, the price of the S&P 500 index was flat, rising just 0.01%.  Garrett's stock price continued to decline, closing at $5.07 per share on May 12th and at $4.58 per share on May 13th (a total decline of an additional $1.03 per share) as the market further considered the significance of Defendant Rabiller's statements.

255.    On August 26, 2020, before market open, Garrett announced it would explore alternatives to address balance sheet concerns.  Garrett also stated that its "leveraged capital structure poses significant challenges to its overall strategic and financial flexibility and may impair its ability to gain or hold market share in the highly competitive automotive supply market, thereby putting Garrett at a meaningful disadvantage relative to its peers."  The press release also

stated that "Garrett's high leverage is exacerbated by significant claims asserted by Honeywell against certain Garrett subsidiaries under the disputed subordinated asbestos indemnity and tax matters agreement."  Following the August 26, 2020 press release, Garrett's stock price fell by approximately 44%, from $6.88 per share to $3.84 per share at close on August 26, 2020.  On the same day, the price of the S&P 500 index rose 0.1%.  Garrett's stock price fell an additional $0.56 per share the following trading day to close at $3.28 per share as the market further digested the news.

256.    The truth was further disclosed on September 17, 2020, when *The Wall Street Journal* reported that Garrett was nearing a sale through bankruptcy.  Among other things, the article revealed that Garrett's bankruptcy filing was imminent.  On this news, the price of Garrett's common stock fell from $2.41 per share on September 17, 2020 to $2.01 per on September 18, 2020.  On the same day, the price of the S&P 500 index fell only 0.1%.

257.    The full truth was revealed on September 20, 2020 when Garrett filed for chapter 11 bankruptcy protection.  According to its filings, after a robust bidding process, the Company selected a winning bid of $2.1 billion from a new company formed by KPS Capital Partners, LP as a stalking horse bid.  Following this news, Garrett's stock price started trading under the symbol "GTXMQ" and fell from $2.01 per share on Friday, September 18, 2020 to $1.76 per share at close on September 22, 2020.  During the same two-day period, the S&P 500 was flat, falling just 0.01%.

## VIII.   PRESUMPTION OF RELIANCE

258.    At all relevant times, the market for Garrett's common stock was efficient for the following reasons, among others:

> (a)  Garrett common stock met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient and automated market;

(b) As a regulated issuer, Garrett filed periodic reports with the SEC;

(c) Garrett regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d) Garrett was followed by numerous securities analysts employed by major brokerage firms, who wrote reports which were distributed to those brokerage firms' sales force and certain customers. Each of these reports was publicly available and entered the public marketplace.

259. As a result of the foregoing, the market for Garrett common stock and related securities promptly digested current information regarding Garrett from all publicly available sources and reflected such information in the price of Garrett's common stock. All purchasers of Garrett securities during the Class Period suffered similar injury through their purchase of Garrett securities at artificially inflated prices, and a presumption of reliance applies.

260. A Class-wide presumption of reliance is also appropriate in this action under the United States Supreme Court holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the claims asserted herein against Defendants are, in party, predicated upon omissions of material fact for which there is a duty to disclose.

## IX. INAPPLICABILITY OF THE STATUTORY SAFE HARBOR AND BESPEAKS CAUTION DOCTRINE

261. The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pled in this complaint. The specific statements alleged herein to be false and misleading were not identified as "forward looking statements" when made. To the extent there were any forward-looking statements, there

were no meaningful cautionary statements identifying important facts that could cause actual results to differ materially from those in the purportedly forward-looking statements.

262.  Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by the Defendant who knew that those statements were false when made.

263.  Lastly, at the time the statements were made any risks warned of had already materialized and were well known to the Defendants at the time the false statements and omissions were made.

## X.    CLASS ACTION ALLEGATIONS

264.  Lead Plaintiffs bring this action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf individuals or entities, excluding Defendants, that received Garrett common stock through the Spin-Off, or purchased or otherwise acquired Garrett securities during the period October 1, 2018 through September 18, 2020, inclusive and were damaged thereby.

265.  There are questions of law and fact that are common to the Class, which predominate over any individual issues, including:

(a)    whether Defendants misrepresented material facts;

(b)    whether Defendants knew or recklessly disregarded that their statements and/or omissions were false and misleading;

(c)    whether the price of Garrett's common stock and related securities were artificially inflated;

(d)    whether Defendants are liable as "controlling persons" under §20(a) of the Exchange Act; and

(e)     whether Plaintiffs and the other members of the Class were injured as a result of Defendants' misconduct.

266.    Lead Plaintiffs' claims are typical of the claims of the other members of the Class because Lead Plaintiffs and the Class sustained damaged from Defendants' wrongful conduct.

267.    Lead Plaintiffs are committed to prosecuting this action and have retained competent counsel experienced in litigation of this nature.  Lead Plaintiffs have the same interests as the other members of the Class.  Accordingly, Lead Plaintiffs are adequate representatives of the Class and will fairly and adequately protect the interests of the Class.

268.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## XI.     CLAIMS FOR RELIEF

### COUNT I
### For Violations of Section 10(b) of the Exchange Act and Rule 10b-5
### Against the D&O Defendants

269.    Lead Plaintiffs repeat, incorporate and reallege each and every allegation contained above as if fully set forth herein.

270.    During the Class Period, D&O Defendants Olivier Rabiller, Alessandro Gili, Peter Bracke, Sean Deason, Russell James, Carlos Cardoso, Maura Clark, Courtney Enghauser, Susan Main, Carsten Reinhardt and Scott Tozier each made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading in an effort to maintain artificially high market prices for Garrett's securities in violation of Section 10(b) of the Exchange Act, 15 U.S.C. §§ 78j(b), and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5.

271.    The D&O Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and

participated in a continuous course of conduct to conceal adverse material information about the Company's financial well-being, operations, and prospects.

272.    The D&O Defendants made the false and misleading statements specified above, which they knew or recklessly disregarded to be false or misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

273.    The D&O Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or recklessly disregarded the true facts that were available to them.  The D&O Defendants engaged in this misconduct to conceal Garrett's true condition from the investing public and to support the artificially inflated prices of the Company's common stock.

274.    As described above, the D&O Defendants acted with scienter in committing the wrongful acts and omissions alleged herein in that they either had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and disclose the true facts, even though such facts were available to them.

275.    Lead Plaintiffs and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Garrett's common stock and related securities.  Lead Plaintiffs and the Class would not have purchased the Company's securities at the prices they paid, or at all, had they been aware that the market prices for Garrett's securities had been artificially inflated by D&O Defendants' fraudulent course of conduct.

276.     As a direct and proximate result of the D&O Defendants' wrongful conduct, Lead

Plaintiffs and the Class suffered damages in connection with their purchases of Garrett securities

during the Class Period.

**COUNT II**
**For Violations of Section 20(a) of the Exchange Act**
**Against the D&O Defendants**

277.     Lead Plaintiffs repeat, incorporate and reallege each and every allegation set forth

above as if fully set forth herein.

278.     This Count is asserted against D&O Defendants Olivier Rabiller, Alessandro Gili,

Peter Bracke, Sean Deason, Russell James, Carlos Cardoso, Maura Clark, Courtney Enghauser,

Susan Main, Carsten Reinhardt and Scott Tozier for violations of Section 20(a) of the Exchange

Act, 15 U.S.C. § 78t(a).

279.     As alleged above, the D&O Defendants each violated Section 10(b) and Rule

10b-5 thereunder by their acts and omissions as alleged in this Complaint.

280.     By virtue of their high-level positions, participation in and/or awareness of the

Company's operations, direct involvement in the day-to-day operations of the Company, and/or

intimate knowledge of the Company's actual performance, and their power to control the

materially false and misleading public statements about Garrett during the Class Period, each of

the D&O Defendants named in this Count had the power and ability to control the actions of

Garrett and its employees.

## COUNT III

**For Violations of Section 10(b) of the Exchange Act, and SEC Rule 10b-5(a), (b) and (c)
Promulgated Thereunder, and Section 20(a) of the Exchange Act Against Defendant Lu**

281.   Lead Plaintiffs repeat, incorporate and reallege each and every allegation set forth above as if fully set forth herein.

282.   This Count is asserted against Defendant Su Ping Lu and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rules 10b-5(a), (b) and (c) promulgated thereunder by the SEC, and Section 20(a) of the Exchange Act.

283.   Defendant Lu violated Section 10(b) of the Exchange Act and Rule 10b-5(a), (b) and (c) in that she:  (i) employed devices, schemes, and artifices to defraud; (ii) engaged in acts, practices and a course of business that operated as a fraud or deceit upon Plaintiffs and others similarly situated in connection with their purchase or acquisition of Garrett securities during the Class Period; and (iii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading.

284.   Defendant Lu's wrongdoing under this count includes, inter alia, that she engaged in deceptive or manipulative acts by engaging in a scheme regarding a sham Spin-Off of Garrett. Theses deceptive and manipulative acts included:  (a) drafting and executing unconscionable Agreements on Garrett's behalf, often with Defendant Lu signing for both sides of the transaction, (b) procuring, and then approving, a sham, fundamentally flawed "Solvency Opinion" created by a "hopelessly conflicted" financial advisor that failed to take into account the impact of the Agreements on Garrett's balance sheet and future prospects, (c) using Section 12(g), and filing on Form 10, to avoid regulatory scrutiny of the sham transaction, and (d) misrepresenting the true nature Garrett's future business prospects in various pre-Spin-Off public statements.

285.    These acts were done in furtherance of a scheme to defraud (a) investors who received shares of Garrett securities pursuant to the Spin-Off, and (b) investors who purchased or otherwise acquired Garrett securities during the Class Period.

286.    Defendant Lu acted with scienter in that she had actual knowledge of the truth regarding the sham nature of the Spin-Off and the true risks faced by Garrett, and she intended to deceive Lead Plaintiffs and the other members of the Class, or, in the alternative, acted with reckless disregard for the truth when they employed the devices, schemes, and artifices to defraud; and/or engaged in the acts, practices and a course of business described above.

287.    As a result of the foregoing, the market price of Garrett securities was artificially inflated both at the time of the Spin-Off and during the rest of the Class Period.

288.    In ignorance of the falsity of Defendants' statements, and the schemes, acts and practices described above, Lead Plaintiffs and the other members of the Class relied on the statements described above and/or the integrity of the market price of Garrett securities during the Class Period in purchasing or acquiring Garrett securities at prices that were artificially inflated as a result of Defendant Lu's schemes, acts, and practices.

289.    Had Lead Plaintiffs and the other members of the Class been aware that the market price of Garrett securities had been artificially and falsely inflated by Defendant Lu, (a) the market price for shares converted during the Spin-Off would not be as high as it was; and/or (b) investors would not have purchased Garrett securities at the artificially inflated prices that they did, if at all.

290.    As a result of the wrongful conduct alleged herein, Lead Plaintiffs and other members of the Class have suffered damages in an amount to be established at trial.  By reason of

the foregoing, Defendant Lu violated Section 10(b) of the Exchange Act and Rules 10b-5(a), (b) and (c) promulgated thereunder, and are liable to Lead Plaintiffs and the Class.

291.     In addition, Defendant Lu is liable to Lead Plaintiffs and the Class under Section 20(a) of the Exchange Act.  By virtue of her status as Garrett's sole officer and director prior to the Spin-Off, Defendant Lu had the power to control the materially false and misleading public statements about Garrett prior to the Spin-Off and had the power and ability to control the actions of Garrett.

## XII.    PRAYER FOR RELIEF

WHEREFORE, Lead Plaintiffs pray for judgment as follows:

A.     Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

B.     Awarding compensatory damages in favor of Lead Plaintiffs and other Class members against all Defendants, jointly and severally, for all damages sustained as a result of the Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.     Awarding Lead Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including attorneys' fees and expert fees; and

D.     Awarding such equitable/injunctive or other further relief as the Court may deem just and proper.

## XIII.  JURY DEMAND

292.     Lead Plaintiff hereby demands a trial by jury.

DATED:  February 25, 2021                Respectfully Submitted,
         New York, New York


                                         */s/ Andrew J. Entwistle*
                                         Andrew J. Entwistle
                                         **ENTWISTLE & CAPPUCCI LLP**
                                         Frost Bank Tower
                                         401 Congress Avenue
                                         Suite 1170
                                         Austin, TX 78701
                                         Telephone: (512) 710-5960
                                         aentwistle@entwistle-law.com

                                         -and-

                                         Vincent R. Cappucci
                                         Joshua K. Porter
                                         Andrew M. Sher
                                         230 Park Avenue, 3rd Floor
                                         New York, New York 10169
                                         Telephone:  (212) 894-7200
                                         vcappucci@entwistle-law.com
                                         jporter@entwistle-law.com
                                         asher@entwistle-law.com

                                         *Lead Counsel for the Class*