UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X
                                              :

                                              :                 20 Civ. 7992 (JPC)

IN RE GARRETT MOTION INC.           :

SECURITIES LITIGATION              :               OPINION AND

                                              :                   ORDER

                                              :
-------------------------------------------------------------------X

JOHN P. CRONAN, United States District Judge:

      In October 2018, Honeywell International Inc. spun off its technology and automotive division into a separate company, Garrett Motion Inc., to avoid billions of dollars in asbestos-related liability.  As a result, Garrett was saddled with a $1.6 billion credit agreement and nearly $250 million in tax liabilities.  To be sure, reasonable people may disagree as to the propriety of the move of spinning off a company to skirt asbestos-related liability.  But that is not at issue in this case.

      The first issue in this consolidated class action is whether Garrett, along with its named directors and officers (collectively, the "Garrett Defendants"), violated federal securities laws and regulations in their disclosure of Honeywell's liabilities to investors.  The problem for Plaintiffs is that they have failed to adequately plead that the Garrett Defendants acted with scienter, *i.e.*, an intent to deceive, manipulate, or defraud investors.  The Court therefore grants the Garrett Defendants' motion to dismiss.  But because at oral argument Plaintiffs appeared to advance a theory of liability different from what they allege in the Second Amended Complaint, the dismissal as to the Garrett Defendants is without prejudice and Plaintiffs are granted leave to amend if they so choose.

      The second issue involves Plaintiffs' claims against Su Ping Lu, a former Garrett officer who played a central role in the spin-off.  All of Lu's alleged misstatements occurred before the

class period, however.  A defendant is only liable for statements made during the class period.  *See*

*Lattanzio v. Deloitte & Touche LLP*, 476 F.3d 147, 153 (2d Cir. 2007).  And because Garrett fully

disclosed the terms of its spin-off from Honeywell, Plaintiffs cannot show scheme liability.  The

Court therefore grants Lu's motion to dismiss and does so with prejudice as amendment would be

futile.

## I.   Background[1]

### A.   The Parties

Lead Plaintiffs are three mutual funds managed by Gabelli Funds, LLC, and an investment

manager, GAMCO Asset Management Inc.  SAC ¶¶ 22-25.  By the end of the class period, which

runs from October 1, 2018, until September 18, 2020 ("Class Period"), Lead Plaintiffs and their

affiliated entities ("Plaintiffs") owned more than 1.1% of Garrett's common stock.  *Id.* ¶¶ 16, 26.

Plaintiffs claim to have lost more than $9.9 million from investing in Garrett securities during the

Class Period.  *Id.* ¶ 26.

Garrett is a Delaware corporation, incorporated on March 14, 2018 with its headquarters

in Switzerland, and was spun-off from Honeywell on October 1, 2018.  *Id.* ¶¶ 27, 53.  Garrett

---

[1] The Court takes these allegations from Plaintiffs' Second Amended Complaint.  *See* Dkt. 43 ("SAC").  Notwithstanding the "[e]xacting pleading requirements" of the Private Securities Litigation Reform Act that apply in this case, "as with any motion to dismiss for failure to plead a claim on which relief can be granted," the Court must "accept all factual allegations in the complaint as true." *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 313, 322 (2007).  The Court at this stage "may also consider any written instrument attached to the complaint, statements or documents incorporated into the complaint by reference, legally required public disclosure documents filed with the [U.S. Securities and Exchange Commission ("SEC")], and documents possessed by or known to the plaintiff upon which it relied in bringing the suit." *Tongue v. Sanofi*, 816 F.3d 199, 209 (2d Cir. 2016) (quotations omitted).  "The Court also considers facts drawn from the news releases, financial reports, and transcripts of earnings calls that contain the statements that Plaintiff alleges were false or misleading, and which are incorporated into the Complaint by reference." *In re Fed Ex Corp. Sec. Litig.*, 517 F. Supp. 3d 216, 221 (S.D.N.Y. 2021).

produces and sells highly engineered turbochargers and electric-boosting and connected vehicle technologies for original equipment manufacturers ("OEMs"). *Id.* ¶¶ 53, 59. Given the specialized nature of Garrett's business, it regularly bids for work three-to-five years before a vehicle is manufactured. *Id.* ¶ 59. Garrett also sells automotive components and technologies to the automotive aftermarket—the secondary market of the automotive industry for replacement parts and products after the original sale of a car. *Id.* ¶ 58. Through selling aftermarket parts to distributors, Garrett provides 5,300 part numbers and products to service garages across the world. *Id.*

In addition to Garrett, Plaintiffs have sued several of the company's current and former directors and officers (the "Director and Officer Defendants"):

| Individual | Position | Timeframe |
|---|---|---|
| Olivier Rabiller | President and Chief Executive Officer ("CEO") | Class Period |
| Alessandro Gili | Chief Financial Officer ("CFO") | October 1, 2018 to September 2, 2019 |
| Peter Bracke | Vice President and Chief Transformation Officer | June 2020 to June 2021 |
| | Interim CFO | September 5, 2019 to June 2020 |
| | Vice President for Financial Planning and Analysis and Business Finance | Before September 5, 2019 |
| Sean Deason | CFO | June 8, 2020 to Present[2] |
| Russell James | Principal Accounting Officer and Controller | October 1, 2018 to Present |
| Carlos Cardoso | Director | October 1, 2018 to April 30, 2021 |
| Maura Clark | Director | October 1, 2018 to April 30, 2021 |
| Courtney Enghauser | Director | October 1, 2018 to April 30, 2021 |
| Susan Main | Director | October 1, 2018 to April 30, 2021 |
| Carsten Reinhardt | Director | October 1, 2018 to April 30, 2021 |
| Scott Tozier | Director | October 1, 2018 to April 30, 2021 |

---

[2] "Present" refers to the date of the Second Amended Complaint, July 22, 2021.

Besides Garrett and the Director and Officer Defendants (collectively the "Garrett Defendants"), Plaintiffs also have sued Lu, a lawyer in Honeywell's General Counsel's office. *Id.* ¶ 42. Leading to the spin-off, Lu also served in many roles at Garrett and its subsidiaries, including as Garrett's President, sole board member, director, manager, and authorized signatory. *Id.*

**B.     The Spin-Off**

The lengthy and complicated background of this case begins in 1939 when the Bendix Corporation started manufacturing brakes containing asbestos. *Id.* ¶ 43. Bendix kept using asbestos until 1983, despite knowing its dangers and the United States Environmental Protection Agency classifying asbestos as a human carcinogen in 1971. *Id.*

On April 1, 1985, Bendix merged into Allied Corporation, which later merged into AlliedSignal Inc. *Id.* ¶ 44. On December 4, 1999, AlliedSignal Inc. merged with Honeywell Inc. *Id.* As part of the merger, Honeywell Inc. ceased to exist as a legal entity and AlliedSignal Inc. changed its name to Honeywell International Inc. ("Honeywell"). *Id.*

Honeywell has faced significant liability from the Bendix asbestos-related claims. *Id.* ¶ 45. For instance, the Second Amended Complaint alleges that Honeywell estimated in its 2004 annual report that "it resolved 71,000 Bendix-related asbestos claims from 1981 through 2004." *Id.* But despite resolving so many claims, Honeywell estimated that it was still facing over 20,000 unresolved claims as of 2012. *Id.* And Honeywell estimated that, as of December 31, 2017, these asbestos-related liabilities were projected to cost the company $1.7 billion through 2059. *Id.* ¶ 46.

Discontent with holding so much liability, Honeywell began trying to offload its Bendix-related asbestos liability. *Id.* ¶ 72. In 2003, Honeywell tried to sell its "Friction Materials and Bendix business to bankrupt Federal-Mogul Corporation in exchange for a permanent channeling injunction requiring all asbestos-related claims to be submitted to a Bendix trust established by

Federal-Mogul." *Id.* But this early attempt to offload the asbestos liability failed after "General Motors, Ford and Daimler Chrysler successfully sued to block the Honeywell/Federal-Mogul transaction as a fraudulent transfer." *Id.*

Then in 2017, facing increasing pressure from shareholders to improve performance, Honeywell sought to simplify its portfolio by disposing of underperforming assets through spin-offs and divestitures. *Id.* ¶¶ 47, 49-52. After reviewing its businesses, Honeywell chose to spin off its Transportation Systems business, which would become Garrett. *Id.* ¶ 52.

To facilitate the spin-off, Honeywell incorporated Garrett in Delaware as a wholly-owned subsidiary. *Id.* ¶ 53. Honeywell then appointed its in-house counsel, Lu, to serve as Garrett's President and lone board member during the spin-off negotiations. *Id.* ¶¶ 62-63. Lu would keep this role throughout the spin-off negotiations, resigning on September 30, 2018—one day before the spin-off closed, Garrett's stock began publicly trading, and the Class Period began. *Id.* ¶ 108.

Besides sharing Lu's representation, Garrett and Honeywell used the same law firm and the same financial advisor. *Id.* ¶ 64. Garrett would later claim that the law firm "blindly acceded to Honeywell's wishes, regardless of the best interest of" Garrett, and that the financial advisor was "hopelessly conflicted" during the spin-off negotiations. *Id.* ¶¶ 64, 66.

As part of the spin-off, Garrett took on liabilities and restrictions pursuant to a Separation Agreement, an Indemnification Agreement, a Credit Agreement, and a Tax Matters Agreement (collectively, the "Honeywell Obligations"). *Id.* ¶¶ 72-91. The Separation Agreement "detailed the transfer of assets and assumption of liabilities" post-spin-off, described the spin-off steps, released Honeywell from certain claims, excluded liabilities from certain contracts including the Indemnification Agreement, and specified how Garrett's common stock would be distributed. *Id.* ¶ 76. It also explained who represented Garrett and Honeywell during the spin-off:

> [L]egal and other professional services that have been and will be provided prior to the [spin-off] (whether by outside counsel, in-house counsel or other legal professionals) have been and will be rendered for the collective benefit of each of the members of the Honeywell Group and [Garrett], and each of the members of the Honeywell Group and [Garrett] shall be deemed to be the client with respect to such services for the purposes of asserting all privileges which may be asserted under applicable Law in connection therewith.

*Id.* ¶ 74.  While the Separation Agreement was not executed until September 27, 2018, Garrett's board approved it three weeks beforehand after Lu found it "advisable and in the best interests of [Garrett]" based on an August 23, 2018 draft.  *Id.* ¶ 75.

The Indemnification Agreement encumbered Garrett with 90% of Honeywell's Bendix-related liabilities in the United States and required Garrett to pay other liabilities, up to $175 million yearly.  *Id.* ¶ 82.  The Indemnification Agreement also required Garrett to reimburse Honeywell for any asbestos-related punitive damages it incurred through asbestos-related litigation.  *Id.* ¶ 85.  Despite saddling Garrett with the asbestos liabilities, the Indemnification Agreement prohibited Garrett's involvement in nearly all asbestos-related litigation or settlements, hampering Garrett's ability to control costs.  *Id.* ¶ 83.  And the Indemnification Agreement "essentially provided Honeywell with an absolute veto over any Garrett transaction outside of the ordinary course of business."  *Id.* ¶ 86.

Through the Indemnification Agreement, Honeywell also minimized the possibility of it reassuming the Bendix-related liabilities.  The Indemnification Agreement required any purchaser or surviving company of Garrett's to assume the Indemnification Agreement.  *Id.*  The Indemnification Agreement also did not expire until 2048, unless the balance of debt Garrett owed Honeywell was less than the Euro-equivalent of $25 million for three straight years, in which case the Indemnification Agreement would terminate at the end of the three years.  *Id.* ¶ 87.  And the Indemnification Agreement prevented Garrett from prepaying or restructuring the liabilities.  *Id.*

On September 12, 2018, "[t]he Indemnification Agreement was executed . . . by three parties, all of which were Honeywell entities: (a) Honeywell ASASCO Inc. as 'Payor'; (b) Honeywell ASASCO 2 Inc. as 'Payee'; and (c) Honeywell International, Inc. as 'Claim Manager.'" *Id.* ¶ 79. Lu signed the Indemnification Agreement on behalf of Honeywell ASASCO Inc. and Honeywell ASASCO 2, Inc., while Richard Kent, Honeywell's Vice President, Deputy General Counsel, Finance and Assistant Secretary, signed on behalf of Honeywell International, Inc. *Id.*; *see also id.* ¶ 77. On September 14, 2018, Lu assigned Garrett as payor under the Indemnification Agreement, signing on behalf of both Honeywell ASACO Inc. and Garrett. *Id.* ¶ 80.

Next, Garrett entered into a Credit Agreement with secured lenders on September 27, 2018. *Id.* ¶ 88. The Credit Agreement assumed "significant debt . . . to fund an approximate $1.6 billion cash distribution to Honeywell." *Id.* The loans matured on September 26, 2023 and September 27, 2025. *Id.* At the end of the Class Period—when Garrett filed for bankruptcy—Garrett owed about $1.447 billion on the Credit Agreement loans. *Id.* ¶ 89.[3]

Lastly, Garrett signed a Tax Matters Agreement with Honeywell on September 12, 2018. *Id.* ¶ 91; Dkt. 59 ("Carlinsky Decl."), Exh. A ¶ 61, Exh. E ("November 2018 Form 10-Q") at 4. This Tax Matters Agreement required Garrett to reimburse Honeywell for certain taxes that Honeywell attributed to Garrett, including the transition tax obligations that Honeywell incurred under the Tax Cuts and Jobs Act of 2017. SAC ¶ 91; November 2018 Form 10-Q at 4. As of September 2020, Garrett owed Honeywell approximately $240 million from the Tax Matters

---

[3] Besides the Credit Agreement loans, Lu "forced Garrett affiliates to issue €350 million in senior notes," with a 5.125% interest rate and maturity date of October 15, 2026. *Id.* ¶ 90.

Agreement, which Garrett was required to pay in eight annual installments.  *Id.*; Carlinsky Decl., Exh. H ("July 2019 Form 10-Q") at 4.

In August 2018, during the lead up to the spin-off, Lu filed on behalf of Garrett an SEC Form 10-12B, which is a form to register securities in a spin-off under the Securities Exchange Act of 1934 ("Exchange Act").  *Id.* ¶ 105.  The Form 10-12B said that:

> Th[e] [Honeywell] agreement[s] ***may*** have material adverse effects on [Garrett's] liquidity and cash flows and on [Garrett's] results of operations, regardless of whether [Garrett] experience[s] a decline in net sales . . . [and] ***may*** also require [Garrett] to accrue significant long-term liabilities on [its] combined balance sheet, the amounts of which will be dependent on factors outside of [its] control, including Honeywell's responsibility to manage and determine the outcomes of claims underlying the liabilities.  As of December 31, 2017, [Garrett] [has] accrued $1,703 million of liability in connection with Bendix related asbestos, representing the estimated liability for pending claims as well as future claims expected to be asserted.  The liabilities related to the Indemnification and Reimbursement Agreement ***may have*** a significant negative impact on the calculation of key financial ratios and other metrics that are important to investors, rating agencies and securities analysts in evaluating [Garrett's] creditworthiness and the value of [its] securities.  Accordingly, [Garrett's] access to capital to fund [Garrett's] operations ***may be*** materially adversely affected and the value of [an investor's] investment in [the] company ***may*** decline.

*Id.* (emphases in the Second Amended Complaint); Dkt. 56 ("Morris Decl."), Exh. 1 at 32 ("Form 10-12B"); *see also* "Carlinsky Decl., Exh. B ("Form 10-12B/A") at 6 (same).

The Form 10-12B included details about the Indemnification Agreement, Credit Agreement, and Tax Matters Agreement.  It disclosed that the spin-off would bind Garrett to the Indemnification Agreement, thus requiring Garrett to pay 90% of Honeywell's uninsured asbestos liability, up to $175 million per year.  Form 10-12B at 31.  And as quoted above, the Form also detailed that Honeywell had accrued $1.7 billion in asbestos-related liability, explained that "access to capital to fund [Garrett's] operations may be materially adversely affected" by the liability, which meant that "the value of [an investor's] investment in [the] company may decline," and that Honeywell's control over Garrett would "significantly limit [Garrett's] ability to engage

in . . . equity and debt financings . . . [and] mergers, acquisitions, joint ventures and other strategic transactions." *Id.* at 32.  Garrett also estimated, as a consequence of the Tax Matters Agreement, its liability to Honeywell over eight years to total between $200 million to $400 million.  *Id.* at 36.

On September 5, 2018, Garrett filed an Amended Form 10-12B (known as a Form 10-12B/A).  SAC ¶ 151; Form 10-12B/A.  Among other things, the Form 10-12B/A modified the original Form 10-12B by adding to the end of the paragraph quoted above that "[f]ollowing the Spin-Off, Honeywell and [Garrett] will each have a more focused business that will be better positioned to invest more in growth opportunities and execute strategic plans best suited to address the distinct market trends and opportunities for its business."  Form 10-12B/A at 10; SAC ¶ 151.  The Form 10-12B/A also attached the Indemnification Agreement, Credit Agreement, and Tax Matters Agreement.  *See* Carlinsky Decl., Exh. C at 4.

On September 4, 2018, the financial advisor issued a solvency opinion ("Solvency Opinion") concluding that Garrett could manage to pay its debts and have enough capital and assets to operate.  SAC ¶ 65.  The financial advisor concluded this despite not analyzing the Indemnification Agreement, which again required Garrett to cover up to $175 million of certain Honeywell liabilities for thirty years, yielding a total exposure of up to $5.25 billion over the period.  *Id.* ¶¶ 5, 65, 87.  On that same day, Lu signed a resolution saying that Honeywell management thought that "the assumptions . . . in the Solvency Opinion are reasonable."  *Id.* ¶ 68.  A few days later, in a September 13, 2018 presentation at an Aerospace Symposium, Honeywell characterized Garrett as having an "[a]ttractive financial profile" and being "[p]ositioned for [p]rofitable [g]rowth."  *Id.* ¶ 107.

**C.       Post Spin-Off**

Garrett successfully spun off from Honeywell on October 1, 2018.  *Id.* ¶¶ 2, 52. Recognizing the burdens that the Honeywell Obligations put on its business, Garrett tried to renegotiate the terms of the Indemnification Agreement with Honeywell, including through mediation.  *Id.* ¶ 120.  After the parties failed to agree, Garrett sued Honeywell in New York state court, *Garrett Motion Inc. v. Honeywell Int'l Inc.*, No. 657106/2019, claiming that the Honeywell Obligations were unfair and unenforceable.  *See id.*; Carlinsky Decl., Exh. I.

In late 2019, Garrett hired financial advisors to explore "strategic alternatives" for the company, including potential mergers or acquisitions.  SAC ¶¶ 118-119.  Garrett did not, however, disclose to investors that it hired financial advisors.  *Id.* ¶¶ 117-118.  The financial advisors spoke with several parties about potentially merging or acquiring Garrett.  *Id.* ¶ 118.  But no buyers expressed interest in a merger or acquisition with Garrett with its current financial situation.  *Id.* ¶ 119.  Instead, multiple financial sponsors expressed interest in a merger or acquisition only if Garrett could discharge its debts and liabilities.  *Id.*

The next year, on August 26, 2020, Garrett publicly announced that it would explore alternatives to address the company's financial concerns.  *Id.* ¶ 131.  The press release said that Garrett's "leveraged capital structure poses significant challenges to its overall strategic and financial flexibility and may impair its ability to gain or hold market share in the highly competitive automotive supply market, thereby putting Garrett at a meaningful disadvantage relative to its peers."  *Id.*  It also explained how the Honeywell Obligations affected its leverage: "Garrett's high leverage is exacerbated by significant claims asserted by Honeywell against certain Garrett subsidiaries under the disputed subordinated asbestos indemnity and tax matters agreement."  *Id.*

That trading day, Garrett's common stock price dropped from $6.88 per share to $3.84 per share. *Id.* ¶ 132.

A few weeks later, on September 17, 2020, *The Wall Street Journal* reported that Garrett neared a bankruptcy sale to KPS Capital Partners, LP. *Id.* ¶¶ 12, 133. The common stock dropped from $2.41 per share on September 17, 2020 to $2.01 per share on September 18, 2020. *Id.* ¶ 133.

Then on September 20, 2020, Garrett filed for Chapter 11 bankruptcy. *Id.* ¶¶ 27, 134. Because of the bankruptcy, Garrett changed its trading symbol from GTX to GTXMQ. *Id.* ¶ 271. Garrett had an initial bid on its assets of $2.1 billion from a company formed by KPS Capital Partners, LP. *Id.* ¶¶ 134, 271. Between September 18, 2020 and September 22, 2020, Garrett's common stock price fell from $2.01 per share to $1.76 per share. *Id.* ¶¶ 134, 271.

In announcing the bankruptcy, Rabiller, Garrett's CEO, said that "[a]lthough the fundamentals of [Garrett] are strong and [Garrett has] continued to try to develop [its] business strategy, the financial strains of the heavy debt load and liabilities [it] inherited in the spinoff from Honeywell – all exacerbated by COVID-19 – have created a significant long-term burden on [the] business." *Id.* ¶ 13. And in a signed declaration for the bankruptcy, Deason, then Garrett's CFO, said that Garrett's "inherited capital structure is not sustainable. It puts the Company at a substantial disadvantage to its competitors when dealing with OEMs and other business partners, reduces the Company's ability to invest in new technologies, eliminates access to new debt and equity capital, and limits the Company's ability to absorb adverse market conditions." *Id.* ¶ 14 (emphasis omitted); *accord* Carlinsky Decl., Exh. A ("Deason Decl.") ¶ 3.

Garrett emerged from Chapter 11 bankruptcy on April 30, 2021. SAC ¶ 40.

### D.     Alleged Misrepresentations or Omissions

Plaintiffs allege that Defendants made several misrepresentations or omissions before and during the Class Period, *i.e.*, from October 1, 2018 to September 18, 2020.   For the Garrett Defendants, these alleged misstatements or omissions fall into four main categories: (1) financial flexibility and underlying business fundamentals, (2) research and development ("R&D") spending and technology capabilities, (3) liquidity and ability to obtain financing, and (4) balance sheet deleveraging.   Plaintiffs also allege that Lu made false or misleading statements prior to the Class Period.   A table of all the alleged misstatements is in the Appendix attached to this Opinion and Order.[4]   The Court will therefore only summarize the misstatements here.

#### 1.   Statements Involving Garrett's Financial Flexibility

The first category of statements that Plaintiffs allege were false or misrepresentations involve Garrett's financial flexibility and underlying business fundamentals.   In a presentation at a conference on September 10, 2019, Garrett used a slide titled "Financial Flexibility and Efficiency."   *Id.* ¶ 197; Stmt. #33.   In this slide, Garrett represented that it maintained a "highly variable cost structure" and "low working capital needs."   SAC ¶ 197; Stmt. #33.   Garrett also claimed that it could "support continued growth."   SAC ¶ 197; Stmt. #33.   On a separate slide, titled "Key Investor Takeaways," Garrett claimed that its "[s]trong financial foundation supports new growth vectors and innovation."   SAC ¶ 197 (first alteration in original); Stmt. #33.   Garrett ended the presentation by asserting that it was "well positioned to create enduring value for shareholders."   SAC ¶ 197; Stmt. #33.   The Garrett Defendants used similar language about its

---

[4] For this fact section, the Opinion and Order will cite the Statement Number in the Appendix as "Stmt. #" along with citing the Second Amended Complaint.   The Opinion and Order's discussion section will cite only the Statement Number.

financial flexibility and business fundamentals in other conferences, presentations, press releases, and calls.  *See, e.g.*, SAC ¶¶ 189, 207, 209, 211, 219, 233; Stmts. #28, #39, #40, #41, #45, #53.

In discussing its financial flexibility and business, Garrett's 2018 Form 10-K[5] said that the Honeywell Obligations could hamper its financial flexibility by potentially "impos[ing] significant operating and financial restrictions" on it and its subsidiaries.  SAC ¶ 180.  It recognized that the obligations might "limit [Garrett's] ability to engage in actions that may be in [its] long-term best interests."  *Id.*  Later Forms 10-K and 10-Q[6] similarly reminded investors about the restrictions that the Indemnification Agreement created, including disclosing its outstanding liabilities, how those liabilities "may have material adverse effects on [Garrett's] liquidity and cash flows and on [its] results of operations," and payments it had made to meet those liabilities.  November 2018 Form 10-Q at 4, 6-7; Carlinsky Decl., Exh. F ("2019 Form 10-K") at 3-6, 8; *id.*, Exh. G ("May 2019 Form 10-Q") at 3; July 2019 Form 10-Q at 4.

The COVID-19 pandemic exacerbated the company's financial issues.  *See* SAC ¶¶ 219-221.  But on an earnings call on May 11, 2020, Rabiller and Bracke claimed that Garrett "maintained business continuity" and acted to ensure "increased financial flexibility."  *Id.* ¶ 221; Stmt. #47.  They also claimed that Garrett would "leverage [its] flexible and resilient business model" to "withstand" the pandemic.  SAC ¶ 221; Stmt. #47 (alteration in original).  Still, these Defendants emphasized in the call that "it has become increasingly difficult to quantify the impact [of the pandemic] on [its] business" and that the second quarter of 2020 would be "significant[ly]

---

[5] A Form 10-K is a comprehensive financial report that public companies must file annually with the SEC.  *See* 15 U.S.C. § 78m; 17 C.F.R. § 249.310.

[6] A Form 10-Q is a comprehensive financial report that public companies must file with the SEC at the end of the first three quarters of each fiscal year.  *See* 15 U.S.C. § 78m; 17 C.F.R. § 294.308a.

more challenging than [the first quarter of 2020]."  Carlinsky Decl., Exh. L at 7.[7]  The Garrett Defendants continued to disclose increasingly dire warnings to investors on how COVID-19 could affect its business model, especially with the Indemnification Agreement impeding its "ability to pay dividends and repurchase capital stock."  *Id.*, Exh. J ("2020 Form 10-K") at 3-11; *see also id.*, Exh. K ("May 2020 Form 10-Q") at 3, 6, 8; *id.*, Exh. N ("July 2020 Form 10-Q") at 3, 5-7.

Rabiller and Bracke also claimed that Garrett took steps during the pandemic to "strengthen [its] financial flexibility," including accessing $470 million in credit that helped yield $675 million in liquidity at the beginning of the second quarter of 2020.  SAC ¶ 225; Stmt. #49.  They said that Garrett also "implement[ed] strict cost controls and cash management actions, including significantly reducing discretionary expenses . . . [and] pay for Garrett's senior leadership."  SAC ¶ 225; Stmt. #49.  They also claimed that Garrett reduced or postponed capital expenditure commitments for 2020 by up to 40%, all while Garrett adhered to its agenda for product launches. SAC ¶ 225; Stmt. #49.  By June 12, 2020, Rabiller claimed that Garrett had modified its credit agreements, "significantly enhanc[ing] Garrett's financial flexibility" to deal with the pandemic. SAC ¶ 230; Stmt. #51.

### 2. Statements Involving Garrett's Research and Development Spending and Technology Capabilities

Plaintiffs allege that the Garrett Defendants made materially false or misleading statements about Garrett's R&D spending and technological capabilities.  This includes an October 2018 press release, in which Rabiller described Garrett as "an automotive technology pioneer, inventor[,] and innovator" that "had established a strong position for providing differentiated technologies that are

---

[7] On the earnings call, Rabiller and Bracke also disclosed the Honeywell Obligations, including discussing the total amount of financial liability that the Obligations subjected Garrett to.  *See* Carlinsky Decl., Exh. L at 9, 11-12.

in demand." SAC ¶ 153 (emphasis omitted); Stmt. #1. In another press release on November 6, 2018, Rabiller characterized Garrett as a "cutting-edge technology" company. SAC ¶ 155; Stmt. #2. On an earnings call that same day, Rabiller also highlighted Garrett's "strong organic growth driven by new product launches" and its "sustainable margin profile driven by technology," when discussing the company's "three stage technology growth strategy." SAC ¶ 157; Stmt. #5. In response to a question about R&D expenditures being down year-over-year, Rabiller clarified that Garrett was a "technology company" and that R&D is an "extremely important part of [its] strategy." SAC ¶ 158; Stmt. #6. The Garrett Defendants used similar language at other points to describe Garrett as a technology leader that relies on technology for its business. *See, e.g.*, SAC ¶¶ 167, 174, 182-183, 189, 195, 199, 201, 207, 209, 213, 219, 223; Stmts. #11, #16, #24, #28, #32, #34, #35, #39, #40, #42, #45, #48.

Garrett underscored its commitment to R&D and developing its technology during a presentation at a conference on January 15, 2019. SAC ¶ 165; Stmt. #10. There, Rabiller represented that Garrett's investment capacity would increase from 50% to 100% of its R&D budget in four years. SAC ¶ 165; Stmt. #10. He also said that Garrett had "investment capacity available to support growth and innovation." SAC ¶ 165; Stmt. #10. In an earnings call on February 20, 2019, Rabiller said that although Garrett's R&D expenditures were flat as a percentage of sales, its 4% to 6% annual revenue growth amounted to "a direct increase" in the resources available to its engineers. SAC ¶ 171; Stmt. #14. In its 2019 Form 10-K, the Garrett Defendants underscored that Garrett's "future growth [was] largely dependent on [its] ability to develop new technologies." SAC ¶ 174 (second alteration in original); Stmt. #17. And in an October 2019 press release, Garrett confirmed that it was developing the "world's first 'E-Turbo' for mass market passenger vehicles" with an expected 2021 launch. SAC ¶ 199; Stmt. #34.

### 3.   Statements Involving Garrett's Credit Availability and Liquidity

Next, Plaintiffs allege that the Garrett Defendants gave false or misleading statements about Garrett's credit availability and liquidity.  For example, a November 2018 press release said that Rabiller was "pleased that Garrett successfully raised the financing at favorable rates, to become a strong independent company."  SAC ¶ 155; Stmt. #3.  In the Form 10-Q filed that same day, Rabiller and Gili also claimed that they "believe[d] [Garrett would] meet known or reasonably likely future cash requirements, through the combination of cash flows from operating activities, available cash balances and available borrowings through [its] debt agreements."  SAC ¶ 160; Stmt. #7.  They cautioned, however, that "there [could] be no assurances that [Garrett would] be able to obtain additional . . . financing on acceptable terms in the future."  SAC ¶ 160; Stmt. #7.  Similar statements appeared in other SEC filings.  *See, e.g.*, SAC ¶¶ 187, 204, 215, 220; Stmts. #27, #38, #43, #46.

In its 2018 Form 10-K, the Garrett Defendants also warned that Garrett might "require additional capital in the future to finance [its] growth" and that "[i]f [Garrett's] access to capital w[as] to become constrained significantly," Garrett's results "could be adversely affected," limiting its "ability to obtain targeted credit ratings."  SAC ¶ 177; Stmt. #21.  They added that Garrett had "risks associated with [its Honeywell Obligations], pursuant to which [it was] required to make substantial cash payments to Honeywell," dependent on Honeywell estimates of specific liabilities.  SAC ¶ 180; Stmt. #23.  At the same time, the Garrett Defendants said that they "believe[d] [Garrett would] be able to meet [its] short-term liquidity needs for at least the next twelve months."  SAC ¶ 178; Stmt. #22.

In response to the COVID-19 pandemic, Garrett sought to increase its liquidity.  SAC ¶ 217; Stmt. #44.  In an April 2020 press release, Rabiller said that Garrett was "taking decisive and prudent steps with various stakeholders to enhance [its] liquidity and preserve the long-term

health of the business." SAC ¶ 217; Stmt. #44.  And in an earnings call a month later, Rabiller claimed that Honeywell imposed "a rigid capital structure" on Garrett that was "unsustainable . . . unless everything was perfect."  SAC ¶ 228; Stmt. #50.  He added that "[w]ith insight, it is clear that [Garrett's] capital structure was ill suited to cope with any meaningful operating challenges." SAC ¶ 228; Stmt. #50.

Because of these challenges, in April 2020, Rabiller claimed that Garrett "fully drew down on [its] revolving credit facility to increase [its] financial flexibility and started the [second] quarter [of 2020] with $658 million in total liquidity."  SAC ¶ 219; Stmt. #45.  He also said that Garrett reduced the pay of its senior leadership by 20% and "postpon[ed] future capital expenditures without impacting near-term programs."  SAC ¶¶ 219, 225; Stmts. #45, #49.  A few months later, in the July 2020 Form 10-Q, Rabiller and Deason removed language (that had appeared in the May 2020 Form 10-Q) about there being a "substantial doubt" about Garrett's ability to survive.  SAC ¶ 234; Stmt. #54.

### 4.  Statements Involving Garrett's Ability to Deleverage

Plaintiffs also allege that the Garrett Defendants made many false statements or misrepresentations about Garrett's ability to deleverage.  For instance, in a February 2019 press release, Rabiller claimed that Garrett's "solid cash generation ha[d] already enabled [it] to reduce debt and begin to deleverage [its] financial profile."  SAC ¶ 169; Stmt. #12.  On the earnings call that same day, Gili, then Garrett's CFO, claimed that "the deleverage is going to most likely take place by the end of the year."  SAC ¶ 169; Stmt. #13.  Gili clarified that when he referenced deleveraging, he "mean[t] gross debt going down."  SAC ¶ 169; Stmt. #13.  And in a November 2019 earnings call, Rabiller said that Garrett made "notable progress in reducing net debt" by "maintain[ing] [its] focus on deleveraging [its] balance sheet."  SAC ¶ 201; Stmt. #36.  In that

same call, Bracke, then Garrett's Interim CFO, said that Garrett would "remain focused on utilizing [its] strong cash generation to deleverage [its] balance sheet."  SAC ¶ 203; Stmt. #37.

### 5.  Miscellaneous Statements

A few statements do not fit perfectly into any of the four prior categories.  *See* SAC ¶¶ 180, 185, 191; Stmts. #23, #26, #29.  These statements mainly involve the Garrett Defendants warning investors about the risks that the Honeywell Obligations have on Garrett.  For example, the March 2019 10-K explained that the Honeywell Obligation "may have material adverse effects on [Garrett's] liquidity and cash flows and on [its] results of operations" that could "require [Garrett] to accrue significant long-term liabilities."  SAC ¶ 180; Stmt. #23.

### 6.  Lu's Statements

Lastly, Plaintiffs allege that Lu made several misrepresentations before the spin-off.  These claims focus on alleged misrepresentations in the Form 10-12B and the Form 10-12B/A that Lu signed in August and September 2018.

First, in August 2018, Lu signed the Form 10-12B registration statement.  That form claimed that the Honeywell Obligations "may have material adverse effects" on Garrett and "may require [Garrett] to accrue significant long-term liabilities[,] . . . the amounts of which will be dependent on factors outside [Garrett's] control."  SAC ¶¶ 105, 146-151; Stmts. #56, #57, #58, #59.  It then disclosed the more than $1.7 billion in liabilities resulting from the Honeywell Obligations.  SAC ¶ 146; Stmt. #56.  It also disclosed a "material weakness in internal control over financial reporting."  SAC ¶ 147; Stmt. #57.

A few weeks later, on September 5, 2018, Lu signed the Form 10-12B/A, which said that "[f]ollowing the Spin-Off, Honeywell and [Garrett] will each have a more focused business that will be better positioned to invest more in growth opportunities and execute strategic plans best suited to address the distinct market trends and opportunities for its business."  SAC ¶ 151; Stmt.

#60.  The Form 10-12B/A also claimed that Garrett would "be better positioned as an independent company to properly channel and fund investments to capitalize on long-term industry needs." SAC ¶ 151; Stmt. #60.

**E.    Alleged Scheme Liability**

In addition to claiming that Lu made material misstatements and omissions, Plaintiffs allege that she participated in a scheme to defraud investors through deceptive or manipulative acts in the spin-off.  SAC ¶ 308.  In performing these acts, Lu allegedly knew, or recklessly disregarded the truth, that Garrett would inevitably fail because of the risks that Garrett faced from the Honeywell Obligations.  *Id.* ¶ 311.  The alleged conduct here is largely redundant of Plaintiffs' allegations about Lu's alleged misstatements.   Plaintiffs allege that the scheme "included: (a) drafting and executing unconscionable Agreements on Garrett's behalf, often with Defendant Lu signing for both sides of the transaction, . . . [(b)] using Section 12(g), and filing on Form 10-12B], to avoid regulatory scrutiny of the sham transaction, and [(c)] misrepresenting the true nature Garrett's future business prospects in various pre-Spin-Off public statements."  *Id.* ¶ 309.

Plaintiffs also allege that the scheme included "procuring, and then approving, a sham, fundamentally flawed 'Solvency Opinion' created by a 'hopelessly conflicted' financial advisor that failed to take into account the impact of the Agreements on Garrett's balance sheet and future prospects."  *Id.*  The Solvency Opinion, which was issued by the financial advisor on September 4, 2018, allegedly was flawed because it did not properly consider the Honeywell Obligations or their effects on Garrett's business.  *Id.* ¶¶ 65-66.  Lu, as Garrett's sole director, signed a Board of Directors Resolution on September 4, 2018, which presented the view of Honeywell's management that the assumptions in the Solvency Opinion were reasonable.  *Id.* ¶ 68.

### F.     Procedural History

The Court now turns to this case's procedural history.  Different investors brought three related cases alleging that Garrett and several of its representative made false or misleading statements and omissions about Garrett's Honeywell asbestos liabilities: *Husson v. Garrett Motion Inc.*, No. 20 Civ. 7992 (JPC) ("*Husson* action"); *Gabelli Asset Fund v. Lu*, No. 20 Civ. 8296 (JPC) ("*Gabelli* action"); and *Froehlich v. Rabiller*, No. 20 Civ. 9279 (JPC) ("*Froehlich* action").  The complaints all alleged that Garrett's agreement with Honeywell "made it impossible for Garrett to sustain its business and thus doomed the company from the start." Dkt. 27 at 3.  These alleged misrepresentations allegedly violated "§§ 10(b) and 20(a) of the Securities Exchange Act and Rule 10b-5." *Id.*   After multiple individuals and entities filed motions in the *Husson* action for appointment as lead plaintiff and approval of their selection of lead counsel, the Court appointed the Gabelli Entities[8] as lead plaintiff in the class action, approved Entwistle & Cappucci as lead counsel, and consolidated the three cases. *Id.* at 3-9.  Plaintiffs then twice amended the complaint. *See* Dkt. 32; SAC.  Like the original complaints, the Second Amended Complaint alleges that (1) Defendants violated section 10(b) of the Exchange Act and Rule 10b-5 and (2) the Director and Officer Defendants and Lu violated section 20(a) of the Exchange Act.  SAC ¶¶ 283-300, 308-316.  For Lu, Plaintiffs also allege that she is subject to scheme liability under Rule 10b-5(a), (c). *Id.* ¶¶ 308-315.

The Garrett Defendants and Lu have moved to dismiss the entire Second Amended Complaint.  Dkts. 54, 55, 57, 58 ("Garrett Motion").  Plaintiffs oppose both motions.  Dkts. 66 ("Opposition to Lu Motion"), 69 ("Opposition to Garrett Motion").  The Garrett Defendants also

---

[8] The Gabelli Entities consist of The Gabelli Asset Fund, The Gabelli Dividend & Income Trust, The Gabelli Value 25 Fund Inc., and GAMCO Asset Management Inc.  *See* Dkt. 27 at 3.

requested oral argument on their motion to dismiss.  Dkt. 76.  The Court held oral argument on Defendants' motions on March 28, 2022.

## II.  Legal Standard

To survive a motion to dismiss, a complaint typically need only plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  Securities fraud claims, however, "are subject to heightened pleading requirements that the plaintiff must meet to survive a motion to dismiss." *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 99 (2d Cir. 2007).  One source of these higher standards is Federal Rule of Civil Procedure 9(b), which requires a plaintiff to "state with particularity the circumstances constituting fraud."  Fed. R. Civ. P. 9(b).  Another source is the Private Securities Litigation Reform Act ("PSLRA"), which Congress enacted in 1995 "to curb perceived abuses of the § 10(b) private action—nuisance filings, targeting of deep-pocket defendants, vexatious discovery requests and manipulation by class action lawyers." *Tellabs*, 551 U.S. at 320 (quotations omitted).  Under the PSLRA, "the complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed."  15 U.S.C. § 78u-4(b)(1).

## III.  Discussion

### A.    Section 10(b) of the Exchange Act and Rule 10b-5(b)

The Court first considers Plaintiffs' claims under section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.  Section 10(b) makes it unlawful "[t]o use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, . . . any manipulative or deceptive device." 15 U.S.C. § 78j(b).

Rule 10b-5 implements that statute by prohibiting "mak[ing] any untrue statement of a material fact or [omitting] to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, . . . in connection with the purchase or sale of any security."  17 C.F.R. § 240.10b-5(b).

To state a claim under section 10(b) and Rule 10b-5, "a plaintiff must allege (1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation."  *IWA Forest Indus. Pension Plan v. Textron Inc.*, 14 F.4th 141, 145 (2d Cir. 2021) (quotations omitted).  Because this type of claim alleges securities fraud, it must meet the heightened pleading standards under Rule 9(b) and the PSLRA.

### 1.  The Garrett Defendants

The Garrett Defendants do not contest that Plaintiffs properly allege three of the elements to state a claim under section 10(b) and Rule 10b-5: a connection between the alleged misrepresentation or omission and buying or selling a security, reliance on that alleged misrepresentation or omission, and economic loss.  But the Garrett Defendants contend that Plaintiffs fail to properly allege a material misrepresentation or omission, scienter, and loss causation.  Garrett Motion at 18-38.  The Court agrees that Plaintiffs fail to adequately allege scienter, so the Court need not address whether Plaintiffs adequately allege a material misrepresentation or omission and loss causation.

In the section 10(b) and Rule 10b-5 context, scienter is "a mental state embracing intent to deceive, manipulate, or defraud."  *Tellabs*, 551 U.S. at 319 (quotations omitted).  Under the heightened pleading standard applicable here, the complaint must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind" for each

alleged misstatement or omission.  15 U.S.C. § 78u-4(b)(2)(A).  The PSLRA's "strong inference standard unequivocally raised the bar for pleading scienter." *Tellabs*, 551 U.S. at 321 (quotations and alteration omitted).  Given the substantial costs that securities fraud litigation can impose, the "strong inference" standard reflects Congress's attempt to halt early on securities litigation that lacks merit or is even abusive, while allowing plaintiffs with potentially winning claims to proceed to discovery.  *See id.* at 323-24.

Acknowledging these interests, the Supreme Court has held that under the PSLRA's "strong inference" standard, a complaint will survive a motion to dismiss "only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged."  *Id.* at 324.  So to survive a motion to dismiss, the complaint must allege "facts to show either (1) that defendants had the motive and opportunity to commit fraud, or (2) strong circumstantial evidence of conscious misbehavior or recklessness." *ECA, Loc. 134 IBEW Joint Pension Tr. of Chi. v. JP Morgan Chase Co.*, 553 F.3d 187, 198 (2d Cir. 2009).  To raise a strong inference of a motive and opportunity to defraud, "Plaintiffs must allege that [the company or its officers] benefitted in some concrete and personal way from the purported fraud."  *Id.* (quotations omitted).

With these principles in mind, the Court turns to the scienter analysis.  Plaintiffs' core theory is that the Garrett Defendants made false and misleading statements about whether Garrett would fail because they "knew since the time of the Spin-Off that the Company's capital structure and Indemnification Agreement would make it impossible for the Company to succeed."  SAC ¶ 8.[9]  That is the theory of falsity on which the Second Amended Complaint attacks the Garrett

---

[9] *See also, e.g.*, SAC ¶ 1 ("[T]he Garrett Defendants admitted they knew from the start that Garrett was not viable as a going concern from the date it became a stand-alone company because

Defendants' various statements about Garrett's future: based on its asbestos obligations, the Garrett Defendants "possessed *actual knowledge* that Garrett's overleveraged capital structure precluded it from making adequate technology R&D investments necessary to maintain its position as a 'cutting-edge technology provider,' 'pioneer' and 'innovator.'" SAC ¶ 237. Plaintiffs similarly allege the Garrett Defendants knew since the spin-off that "Garrett had no financial flexibility, could not meet short-term liquidity needs or access additional capital raises absent a restructuring through bankruptcy." *Id.*

But during oral argument, Plaintiffs' theory for the case shifted. They argued that the Honeywell Obligations created "an evolving situation." Dkt. 80 ("Oral Argument Tr.") at 21, 25. This evolving situation meant that the Garrett Defendants' knowledge of the devastating impact that the Honeywell Obligations had on Garrett "grew during the class period" to a point at which they knew that the company would inevitably fail. *Id.* at 21. In Plaintiffs' view, this meant that the Garrett Defendants were at the very least reckless in making positive statements about the

---

Garrett's 'inherited capital structure [was] not sustainable' and put the Company 'at a substantial disadvantage to its competitors.'" (alteration in original and emphases removed)); *id.* ¶ 3 ("Garrett's senior executives and directors knew since the date of the Spin-Off that Garrett's capital structure and onerous obligations to Honeywell from the Spin-Off made it nearly impossible for Garrett to operate."); *id.* ¶ 6 ("Defendants . . . knew since the inception of the Spin-Off . . . that the Indemnification Agreement and debt made it virtually impossible for Garrett to remain competitive as an independent company or to function as a going concern."); *id.* at p. 31("Defendants knew from inception that the structure of the spin-off made it virtually impossible for Garrett to succeed as an independent company[.]" (capitalizations changed)); *id.* ¶ 237 ("Defendants knew about . . . fatal issues at the latest on the effective date of the Spin-Off . . . ."); *id.* ¶ 241 ("[T]he Garrett Defendants knew from the time of the Spin-Off the seriousness of Garrett's liquidity problems caused by the Company's overleveraged capital structure . . . ."); *id.* ¶ 244 ("[T]he Garrett Defendants knew from the time of the Spin-Off that owing to its inherited capital structure the Company was unable to make the R&D investments necessary to secure Garrett's future as a viable stand-alone enterprise."); *id.* ¶ 245 ("Defendants knew that Garrett's overleveraged capital structure as it existed at the time of the Spin-Off would adversely affect its relationship and business prospects with OEMs."); *id.* ¶ 246 ("Defendants . . . knew that Garrett's capital structure created problems with critical long-term commitments to both OEMs and Garrett's own suppliers from the outset of the Spin-Off.").

company as time went on.  The Court will not, however, consider this argument in deciding the Garrett Defendants' motion to dismiss because the Second Amended Complaint does not include these allegations and the parties have not briefed it.  Instead, the Court will consider only Plaintiffs' core theory in the Second Amended Complaint that the Garrett Defendants made false and misleading statements about whether Garrett would fail because they knew at the time of the spin-off "that Garrett's overleveraged capital structure" would inevitably cause it to fail.  SAC ¶ 237.

These allegations encounter an immediate motive problem: why would the Garrett Defendants promise the market that Garrett would continue to innovate and remain a cutting-edge technology company if they knew the company "was doomed to failure" because it was "nearly impossible for Garrett to survive as an independent company"?  SAC ¶¶ 131, 159.  This theory depends on the inference that the Garrett Defendants would rather keep the stock price high for a time and then face the music once the inevitable problem surfaced.  That theory might work if the Garrett Defendants had sought to profit from this scheme in the interim, such as by "sell[ing] their own shares at a profit" or selling the company at a premium.  *ECA*, 553 F.3d at 198; *accord Nguyen v. Endologix, Inc.*, 962 F.3d 405, 415 (9th Cir. 2020) ("If defendants had sought to profit from this scheme in the interim, such as by selling off their stock or selling the company at a premium, the theory might have more legs.").  But there are no allegations like that here.

Instead, the Second Amended Complaint simply points to the Director and Officer Defendants' compensation packages to "support an inference that the Director and Officer Defendants had the motive and opportunity to commit securities fraud and inflate the price of Garrett stock."  SAC ¶ 258.  But this allegation does not meet the scienter requirement.  "Motives that are common to most corporate officers, such as the desire for the corporation to appear profitable and the desire to keep stock prices high to increase officer compensation, do not

constitute motive for purposes of this inquiry." *ECA*, 553 F.3d at 198 (quotations omitted); *accord Novak v. Kasaks*, 216 F.3d 300, 307 (2d Cir. 2000).  That makes sense: if "scienter could be pleaded" through incentive compensation "alone, virtually every company in the United States that experiences a downturn in stock price could be forced to defend securities fraud actions." *Kalnit v. Eichler*, 264 F.3d 131, 140 (2d Cir. 2001) (quotations omitted).

And here, the incentive structure actually disincentives the alleged fraud under Plaintiffs' theory that the Garrett Defendants knew Garrett would inevitably fail.  The Second Amended Complaint acknowledges that Rabiller and Gili had a compensation package "that provided millions of dollars' worth of 'Founder's Grants' contingent upon the successful completion of the Spin-Off that would not vest until Garrett's fourth year as a publicly-traded Company."  SAC ¶ 259.  But why would these executives tie their compensation to Garrett surviving for four years, if, as Plaintiffs allege, they knew that Garrett had "fatal issues"?  *Id.* ¶ 237.  This claim "defies economic reason," *Kalnit*, 264 F.3d at 140, and "does not resonate in common experience" on how people would choose to be compensated, *Nguyen*, 962 F.3d at 415.  *See Davidoff v. Farina*, No. 04 Civ. 7617 (NRB), 2005 WL 2030501, at *11 n.19 (S.D.N.Y. Aug. 22, 2005) (finding absence of scienter when it would have "made no economic sense for defendants to invest literally billions of dollars in a venture that they knew would fail").

Without a motive, Plaintiffs must show strong circumstantial evidence of conscious behavior or recklessness.[10]  "To plead recklessness through circumstantial evidence, Plaintiffs

---

[10] Plaintiffs may not, however, use recklessness for forward-looking statements.  Under the heightened pleading standard of the PSLRA, forward-looking statements are not actionable unless shareholders can "prove that the forward-looking statement . . . was made with actual knowledge . . . that the statement was false or misleading."  15 U.S.C. § 78u–5(c)(1)(B).  Thus, "the scienter requirement for forward-looking statements is stricter than for statements of current fact," so   liability "attaches only upon proof of knowing falsity."  *Slayton v. Am. Express Co.*, 604 F.3d 758, 773 (2d Cir. 2010) (quotations omitted).

would have to show, at the least, conduct which is highly unreasonable and which represents an extreme departure from the standards of ordinary care." *ECA*, 553 F.3d at 202-03 (quotations omitted). The danger must either be "known to the defendant or so obvious that the defendant must have been aware of it." *Id.* (quotations omitted). Stated simply, there is a "significant burden on the plaintiff in stating a fraud claim based on recklessness." *Chill v. Gen. Elec. Co.*, 101 F.3d 263, 270 (2d Cir. 1996). After all, "there is no motive," so "the strength of the circumstantial allegations must be correspondingly greater." *ECA*, 553 F.3d at 199.

In this analysis, "[a]t least four circumstances may give rise to a strong inference of the requisite scienter: where the complaint sufficiently alleges that the defendants (1) benefitted in a concrete and personal way from the purported fraud; (2) engaged in deliberately illegal behavior; (3) knew facts or had access to information suggesting that their public statements were not accurate; or (4) failed to check information they had a duty to monitor." *Id.* (quotations omitted). None of these four circumstances are present here.

To begin with, Plaintiffs heavily rely on the bankruptcy proceedings to impute knowledge onto the Garrett Defendants *before* those proceedings took place. SAC ¶¶ 237-243. Plaintiffs point to Deason's statement that Garrett's "inherited capital structure is not sustainable [because] [i]t puts the Company at a substantial disadvantage to its competitors." Deason Decl. ¶ 3; Opposition to Garrett Motion at 32. Plaintiffs also point to similar statements involving the Garrett Defendants' views about the Honeywell restrictions that were made *during* the bankruptcy proceeding. *See, e.g.*, *id.* at 32 ("Defendant Rabiller remarked 'the financial strains of a heavy debt load and liabilities we inherited in the spinoff from Honeywell – all exacerbated by COVID-19 – have created a significant long-term burden on our business.'"); *see* SAC ¶ 240. But the Garrett Defendants' knowledge about Garrett's financial strains *during* the bankruptcy

proceedings has little bearing on their knowledge when they made the allegedly misleading statements *prior to* those proceedings.  Rule 10b-5 assuredly does not impose this fraud-by-hindsight liability.  *See Hutchinson v. Perez*, No. 12 Civ. 1073 (HB), 2012 WL 5451258, at *7 (S.D.N.Y. Nov. 8, 2012) ("This case is therefore analogous to a host of cases in which courts have dismissed, as 'fraud in hindsight,' complaints filed after a company's bankruptcy based on the conclusory allegation that defendants had or should have been aware of the 'liquidity crisis.'"), *amended*, 2013 WL 93171 (S.D.N.Y. Jan. 8, 2013).  Plaintiffs' allegations with respect to Defendants' statements during the bankruptcy thus fail to meet the burden.

Next, Plaintiffs argue that Garrett "retaining financial advisors that concluded bankruptcy was likely without a restructuring of the Honeywell Obligations gives rise to an inference of scienter" because a few weeks later during an earnings statement call "Rabiller made statements directly to the contrary boasting about Garrett's purported 'financial flexibility.'"  Opposition to Garrett Motion at 35-36.  These events, according to Plaintiffs, mean that Rabiller was "*at least* reckless in making positive statements about Garrett's financial flexibility in the face of the inevitability of bankruptcy."  *Id.* at 36.

But to start with, allegations about retaining financial advisors, which allegedly occurred in the fourth quarter of 2019, has little bearing on the Garrett Defendants' scienter for statements made before retaining those advisors.  *See* SAC ¶ 7 (alleging that Garrett first retained the "financial advisors in the fourth quarter of 2019").  And the Garrett Defendants not disclosing that Garrett had retained financial advisors, standing alone, does not raise an inference of scienter: "No multi-billion dollar company would file for bankruptcy without first engaging in internal deliberations regarding its course of action."  *In re Tower Auto. Sec. Litig.*, 483 F. Supp. 2d 327, 348 (S.D.N.Y. 2007).

Nor, as currently alleged, did Garrett's failure to disclose its bankruptcy planning make Rabiller reckless in making positive statements about Garrett's financial flexibility.  Plaintiffs do not allege that the financial advisors ever opined that Garrett's only option forward was bankruptcy.  Instead, Plaintiffs allege that the financial advisors told Garrett that it would need to "restructur[e] the Honeywell Obligations through bankruptcy or other means."  SAC ¶ 115; *see also id.* ¶¶ 7, 208, 229, 231.  But when Rabiller made the challenged statements in May 2020, *see* Stmts. #45, #47, #49, Garrett had sued Honeywell, which provided Garrett a potential way to get out of the Honeywell Obligation, *see* SAC ¶ 7.  It would therefore not be "highly unreasonable and . . . represent[ing] an extreme departure from the standards of ordinary care," *ECA*, 553 F.3d at 203, for Rabiller to say "that the Company took actions to obtain 'increased financial flexibility,'" Stmt. #47; *see also* Stmt. #49.

Plaintiffs also urge the Court to infer scienter because "the untenable post-Spin-Off capital structure" affected "at least four core aspects of Garrett's business."  Opposition to Garrett Motion at 33.  In other words, Plaintiffs ask the Court to rely on the core operations theory to find scienter.  Under that doctrine, when "alleged misstatements concern information critical to the core function of a business, knowledge of such information is properly attributable to the company and its senior executives."  *In re AT&T/DirecTV Now Sec. Litig.*, 480 F. Supp. 3d 507, 533 (S.D.N.Y. 2020) (quotations omitted).  Courts, however, "have cast doubt on the continued viability of the doctrine, which pre-dates the PSLRA by several years."  *Id.*

Yet even if the doctrine did survive the PSLRA, Plaintiffs' claims would still fail.  Courts have recognized that "[a]llegations regarding core operations . . . are not, on their own, sufficient to allege scienter."  *In re Aegean Marine Petroleum Network, Inc. Sec. Litig.*, 529 F. Supp. 3d 111, 171 (S.D.N.Y. 2021) (collecting cases); *accord In re Ferrellgas Partners, L.P., Sec. Litig.*, No. 16

Civ. 7840 (RJS), 2018 WL 2081859, at *19 (S.D.N.Y. Mar. 30, 2018) ("[W]hile allegations

regarding core operations may factor into a court's holistic assessment of scienter allegations, they

are not independently sufficient to raise a strong inference of scienter." (quotations omitted)),

*aff'd,* 764 F. App'x 127 (2d Cir. 2019).  Instead, "courts in this circuit have generally invoked the

doctrine only to bolster other evidence of scienter, rather than relying on it as an independently

sufficient basis." *In re AT&T/DirecTV Now Sec. Litig.*, 480 F. Supp. 3d at 533.  Because Plaintiffs

have failed to allege scienter for any Defendants, none of the allegations involving core operations

properly plead scienter.  *See In re Aegean Marine Petroleum Network, Inc. Sec. Litig.*, 529 F. Supp.

3d at 171-72 ("As lead plaintiff has failed to allege scienter as to the . . . Defendants on any other

ground, none of these allegations [involving the core operations theory] suffice either.").[11]

### 2.  Lu

Turning to Plaintiffs' section 10(b) claim against Lu, Plaintiffs allege that she "had the

requisite scienter about the falsity of her statements *at the time the statements were made* – either

by actual knowledge or reckless reliance on the false Solvency Opinion."  Opposition to Lu Motion

at 13.  But these allegedly knowing misstatements all happened before the Class Period, which is

fatal to the claim.

---

[11] To the extent that the Second Amended Complaint tries to impute scienter on the Director and Officer Defendants from statements by other Defendants, the Second Amended Complaint also fails for group pleading.  Under Rule 9(b) and the PSLRA, "plaintiffs must plead circumstances providing a factual basis for scienter for each defendant; guilt by association is impermissible." *In re DDAVP Direct Purchaser Antitrust Litig.*, 585 F.3d 677, 695 (2d Cir. 2009). The Second Amended Complaint therefore could only try to impute scienter to Garrett from statements by its officers and directors.  *See In re Moody's Corp. Sec. Litig.*, 599 F. Supp. 2d 493, 515-16 (S.D.N.Y. 2009) ("There is no formulaic method or seniority prerequisite for employee scienter to be imputed to the corporation, but scienter by management-level employees is generally sufficient to attribute scienter to corporate defendants."), *opinion corrected on denial of reconsideration,* 612 F. Supp. 2d 397 (S.D.N.Y. 2009).  But because Plaintiffs have failed to properly plead scienter for any of the Director and Officer Defendants, they fail to impute scienter on Garrett.

"A defendant is liable only for those statements made during the class period." *Lattanzio*, 476 F.3d at 154 (quoting *In re Int'l Bus. Machs. Corp. Sec. Litig.*, 163 F.3d 102, 107 (2d Cir. 1998)) (alterations omitted); *accord In re Inv. Tech. Grp., Inc. Sec. Litig.*, 251 F. Supp. 3d 596, 610 (S.D.N.Y. 2017) ("[T]he pre-Class Period statements here are not actionable.").  In applying this principle, courts in this District have "barr[ed] securities fraud claims where, as here, they are premised on knowingly false statements made prior to the Class Period" because "statements that pre-date the Class Period are not actionable." *Wilder v. News Corp.*, No. 11 Civ. 4947 (PGG), 2014 WL 1315960, at *7-8 (S.D.N.Y. Mar. 31, 2014); *accord Fogel v. Wal-Mart de México SAB de CV*, No. 13 Civ. 2282 (KPF), 2017 WL 751155, at *17 (S.D.N.Y. Feb. 27, 2017) (finding that "[t]he challenged statements made prior to the December 8, 2011 start of the class period are inactionable to the extent that they were known to be false when they were made, as Plaintiff has alleged they were in his scienter arguments"), *aff'd*, 759 F. App'x 18 (2d Cir. 2018); *In re Openwave Sys. Sec. Litig.*, 528 F. Supp. 2d 236, 254 (S.D.N.Y. 2007) (rejecting Rule 10b-5 claim when the "Plaintiff claims that [the defendants] knew the financial statements to be untrue at the time they signed them"); *see also In re Nokia Corp. Sec. Litig.*, No. 19 Civ. 3509 (ALC), 2021 WL 1199030, at *14 n.9 (S.D.N.Y. Mar. 29, 2021) (explaining that the "Plaintiff's Complaint includes statements that precede the Class Period," but that those statements "cannot serve as the basis for liability for a § 10(b) or Rule 10-b(5) claim"); *In re Refco, Inc. Sec. Litig.*, 503 F. Supp. 2d 611, 643 (S.D.N.Y. 2007) (explaining that "[a]lthough pre-class-period statements can be relevant for showing whether defendants had knowledge that their later statements were false, those statements cannot themselves give rise to liability" (quotations and citation omitted)).

Plaintiffs first try to distinguish these cases by claiming that none of them involve the exact facts here: "a stock that commences trading for the first time on the first day of the alleged class

period." Opposition to Lu Motion at 12 n.7. Yet Plaintiffs cite no authority suggesting that the Court should find *Lattanzio*'s general rule inapplicable when a stock first trades on the first day of the Class Period. Instead, Plaintiffs only cite a case, *City of Omaha Police & Fire Retirement System v. Evoqua Water Techologies Corp.*, 450 F. Supp. 3d 379 (S.D.N.Y. 2020), that involved an initial public offering ("IPO"). Plaintiffs claim that the court in *City of Omaha* found the statements in the registration statement "filed in October 2017 actionable where the class period started when the subject shares started trading on November 1, 2017." Opposition to Lu Motion at 12. But that is not what happened in *City of Omaha*. Instead, the court only considered misstatements in the IPO's prospectus, which was filed within the class period. *See City of Omaha*, 450 F. Supp. 3d at 397 (considering misstatements in the IPO's prospectus), *id.* at 390-91 (class period ran "between November 1, 2017 and October 30, 2018" and IPO prospectus was "dated November 1, 2017").

Nor would it make sense to limit *Lattanzio* in this way. For one, as courts have explained when discussing the duty to correct a statement made before the class period,[12] cutting off claims before the class period starts makes sense because otherwise courts would "impose a never-ending duty . . . [that] would circumvent the general rule that pre-Class Period statements are not actionable." *In re Lions Gate Ent. Corp. Sec. Litig.*, 165 F. Supp. 3d 1, 17 (S.D.N.Y. 2016). Another reason to not extend section 10(b) and Rule 10b-5 in this way is that misstatements before an IPO can create liability through another avenue: section 11 of the Securities Act. That section

---

[12] Plaintiffs concede that they do not bring a duty to correct claim. *See* Opposition to Lu Motion at 13. Nor could they bring this claim because they allege that Lu had the required scienter when she made the statements. *See In re Inv. Tech. Grp., Inc. Sec. Litig.*, 251 F. Supp. 3d at 610 ("The Second Circuit has held that the duty to correct previous misstatements does not apply where the defendants made the original statements before the Class Period and became aware of the errors in those statements before the Class Period." (quotations omitted)); *see Lattanzio*, 476 F.3d at 154.

"prohibits materially misleading statements or omissions in registration statements filed with the SEC." *In re Morgan Stanley Info. Fund Sec. Litig.*, 592 F.3d 347, 358 (2d Cir. 2010).  And it provides redress for violations by creating a private cause of action for the "purchaser of the registered security against the security's issuer, its underwriter, and certain other statutorily enumerated parties." *Id.*  Besides section 11 often providing redress, in a typical IPO the final prospectus will be filed on the first day that the stock publicly trades, which additionally makes misstatements within it actionable under section 10(b) and Rule 10b-5.

Plaintiffs next claim that Lu's statements are actionable because different directors "incorporated by reference" the statements "into Garrett's first Form 10-Q during the Class Period, filed on November 6, 2018."  Opposition to Lu Motion at 12; *see also id.* n.7.  But again, Plaintiffs cite no authority suggesting that a person is liable for pre-class period statements that *another* person incorporates into a statement made during the class period.  Instead, the general rule is that "a defendant must actually make a false or misleading statement in order to be held liable under Section 10(b)." *Wright v. Ernst & Young LLP*, 152 F.3d 169, 175 (2d Cir. 1998) (quotations omitted).  Thus, courts have rejected section 10(b) and Rule 10b-5 claims against a defendant for statements that another person made, especially when, as here, the defendant left the company before the statement was made. *See In re Refco, Inc. Sec. Litig.*, 503 F. Supp. 2d at 643 (rejecting liability for a defendant for "misstatements in . . . [a] Registration Statement, which was filed after his departure from [the company]" because of "the general rule . . . that a defendant must actually make a false or misleading statement in order to be held liable under Section 10(b)" (quotations omitted)).[13]

---

[13] Plaintiffs do not allege that Lu is liable for the later statements under the group pleading doctrine.  That doctrine can allow a plaintiff to "circumvent the general pleading rule that

In sum, Lu's statements are not actionable under section 10(b) and Rule 10b-5 because she made all the statements before the class period.

## B.     Rule 10b-5(a) and (c)

Along with proscribing material misstatements and omissions, subsections (a) and (c) of Rule 10b-5 "prohibit schemes to defraud investors." *Menaldi v. Och-Ziff Cap. Mgmt. Grp. LLC*, 164 F. Supp. 3d 568, 576-77 (S.D.N.Y. 2016). *Lattanzio* does not preclude Plaintiffs' scheme liability claim against Lu because scheme liability does not require a misleading statement or omission: "[s]cheme liability under subsections (a) and (c) of Rule 10b-5 hinges on the performance of an inherently deceptive act that is distinct from an alleged misstatement." *Sec. & Exch. Comm'n v. Kelly*, 817 F. Supp. 2d 340, 344 (S.D.N.Y. 2011). "To state a claim for scheme liability, a plaintiff must present facts showing (1) that the defendant committed a deceptive or manipulative act, (2) in furtherance of the alleged scheme to defraud, (3) with scienter, and (4) reliance." *Menaldi*, 164 F. Supp. 3d at 577 (quotations omitted). In making this showing, Plaintiffs must meet the heightened pleading standard of Rule 9(b) by pleading the facts "with specificity and particularity." *Fogel v. Vega*, 759 F. App'x 18, 25 (2d Cir. 2018).[14]

---

fraudulent statements must be linked directly to the party accused of the fraudulent intent by relying on a presumption that statements in prospectuses, registration statements, annual reports, press releases, or group-published information, are the collective work of those individuals with direct involvement in the everyday business of the company." *In re Parmalat Sec. Litig.*, 479 F. Supp. 2d 332, 340 (S.D.N.Y. 2007) (quotations and alteration omitted). Nor would that doctrine work here because Lu had left Garrett—and thus had no "involvement in the everyday business of" Garrett—when the other Defendants allegedly incorporated her statements into the Form 10-Q.

[14]   The PSLRA applies differently for scheme liability than in the material misrepresentations context. "Because scheme liability does not require an allegation that the defendant made a statement, claims brought under Rule 10b-5(a) and (c) need not comport with Subsection (b)(1) of the PSLRA, which requires that a plaintiff set forth each statement alleged to have been misleading, and facts giving rise to this belief." *Menaldi*, 164 F. Supp. 3d at 577 (quotations omitted). But scheme liability claims are "subject to the PSLRA pleading standard with respect to scienter." *Id.*

To recap, Plaintiffs allege that Lu committed manipulative and deceptive acts by "(a) drafting and executing unconscionable Agreements on Garrett's behalf, often with Defendant Lu signing for both sides of the transaction, (b) procuring, and then approving, a sham, fundamentally flawed 'Solvency Opinion' created by a 'hopelessly conflicted' financial advisor that failed to take into account the impact of the Agreements on Garrett's balance sheet and future prospects, (c) using Section 12(g), and filing on Form 10, to avoid regulatory scrutiny of the sham transaction, and (d) misrepresenting the true nature Garrett's future business prospects in various pre-Spin-Off public statements."  SAC ¶ 309.  Plaintiffs fail to adequately allege, however, that any of these acts count as manipulative or deceptive acts in furtherance of an alleged scheme to defraud.

First, Plaintiffs do not adequately allege that Lu committed manipulative and deceptive acts because "the market is not misled when a transaction's terms are fully disclosed."  *Set Cap. LLC v. Credit Suisse Grp. AG*, 996 F.3d 64, 77 (2d Cir. 2021) (quotations omitted).  Here, the spin-off's terms were fully disclosed.  The Form 10-12B fully disclosed the Honeywell Obligations: it detailed the $1.7 billion in asbestos-related liability and disclosed that the spin-off would bind Garrett to the Indemnification Agreement, Credit Agreement, and Tax Matters Agreement.  Form 10-12B at 21, 32, 36.  The full terms of these agreements were also publicly filed.  *See* Carlinsky Decl., Exh. C at 4.[15]

---

[15] The claim involving misrepresenting Garrett's future business prospects also fails because Plaintiffs have not identified any "inherently deceptive act that is distinct from an alleged misstatement."  *Kelly*, 817 F. Supp. 2d at 344; *see also Menaldi*, 164 F. Supp. 3d at 586 ("To the extent that Plaintiffs allege a scheme to misrepresent [the company] in SEC filings, Plaintiffs' claim fails because they have not identified any deceptive act apart from the alleged misrepresentation." (quotations omitted)).

Second, the Solvency Opinion does not support scheme liability for another reason.  The Solvency Opinion was created by an independent third party, the retained financial advisor, not Lu, *see* SAC ¶ 66, so it was not an inherently deceptive act by Lu.  Plaintiffs do not, for example, allege that retaining the financial advisor prior to the spin-off was a deceptive act.  In any event, Plaintiffs also have not adequately alleged that they relied on the Solvency Opinion.  Plaintiffs "fail[] to allege that investors knew of, or relied upon," the Solvency Opinion because the Second Amended Complaint fails to even mention when the Solvency Opinion became public.  *Menaldi v. Och-Ziff Cap. Mgmt. Grp. LLC*, 277 F. Supp. 3d 500, 519 (S.D.N.Y. 2017); *see Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, Inc.*, 552 U.S. 148, 159 (2008) ("[The defendants'] deceptive acts were not communicated to the public.  No member of the investing public had knowledge, either actual or presumed, of [the defendants]' deceptive acts during the relevant times.  [The plaintiff], as a result, cannot show reliance upon any of [the defendants]' actions except in an indirect chain that we find too remote for liability.").[16]

## C.    Section 20(a) of the Exchange Act

Plaintiffs also bring claims for control-person liability against the Director and Officer Defendants and Lu under section 20(a) of the Exchange Act.  To plead a section 20(a) claim, a plaintiff must allege "(1) a primary violation by the controlled person, (2) control of the primary violator by the defendant, and (3) that the defendant was, in some meaningful sense, a culpable participant in the controlled person's fraud."  *Carpenters Pension Tr. Fund of St. Louis v. Barclays*

---

[16] As to the allegation that Garrett used section 12(g) of the Exchange Act to register its securities, Plaintiffs are incorrect.  *See* SAC ¶ 69.  The Form 10-12B instead used section 12(b) of the Exchange Act to register the stock—the correct Exchange Act section to register publicly traded securities.  *See* Form 10-12B at 1; *see* 15 U.S.C. § 78l (detailing how "[a] security may be registered on a national securities exchange").  And again, the spin-off, including registering the securities, was fully disclosed.

*PLC*, 750 F.3d 227, 236 (2d Cir. 2014) (quotations omitted).  Because the Court finds that Plaintiffs

fail to plead an underlying section 10(b) and Rule 10b-5 violation, their section 20(a) claim also

fails.  *See ATSI Commc'ns, Inc.*, 493 F.3d at 108 (explaining that if a plaintiff "fails to allege any

primary violation[,] . . . it cannot establish control person liability"); *Schwab v. E\*TRADE Fin.*

*Corp.*, 752 F. App'x 56, 59-60 (2d Cir. 2018) ("Because [the plaintiff]'s Section 10(b) claim was

properly dismissed, . . . [the plaintiff]'s Section 20(a) claim also necessarily fails and was properly

dismissed.").

## D.    Leave to Amend

Because the Court grants Defendants' motions to dismiss, the Court must next consider

whether to grant leave to amend.  Under Rule 15(a) of the Federal Rules of Civil Procedure, a

court "should freely give leave when justice so requires."  Fed. R. Civ. P. 15(a)(2).  Plaintiffs here

have not asked the Court for leave to amend the Complaint.  But even when a party does not ask

for leave to amend, "the Court may grant leave to amend *sua sponte*."  *Found. Ventures, LLC v.*

*F2G, LTD.*, No. 08 Civ. 10066 (PKL), 2010 WL 3187294, at \*11 (S.D.N.Y. Aug. 11, 2010)

(granting leave to amend *sua sponte* despite the plaintiffs' "brief in opposition to [the defendant]'s

motion to dismiss . . . not request[ing] that the Court grant them leave to amend"); *accord Morales*

*v. Kimberly-Clark Corp.*, No. 18 Civ. 7401 (NSR), 2020 WL 2766050, at \*9 (S.D.N.Y. May 27,

2020) ("It is within the Court's discretion to *sua sponte* grant leave to amend."); *Steger v. Delta*

*Airlines, Inc.,* 382 F. Supp. 2d 382, 387 (E.D.N.Y. 2005) ("[E]ven if not requested by the Plaintiff,

the Court may *sua sponte* grant leave to amend.").

Plaintiffs who must satisfy the heightened pleading requirements of Rule 9(b) are generally

allowed "at least one opportunity to plead fraud with greater specificity."  *ATSI Commc'ns, Inc.*,

493 F.3d at 108.  Leave to amend should generally be denied, however, "in instances of futility,

undue delay, bad faith or dilatory motive, repeated failure to cure deficiencies by amendments previously allowed, or undue prejudice to the non-moving party." *Burch v. Pioneer Credit Recovery, Inc.*, 551 F.3d 122, 126 (2d Cir. 2008).

Here, the Court grants Plaintiffs leave to amend their claims against the Garrett Defendants. As discussed earlier, during oral argument, Plaintiffs appeared to shift their theory for the case. In the Second Amended Complaint, Plaintiffs claimed that the Garrett Defendants "knew since the time of the Spin-Off that the Company's capital structure and Indemnification Agreement would make it impossible for the Company to succeed." SAC ¶ 8 . But during oral argument, Plaintiffs described an "evolving situation" at Garrett, with the Garrett Defendants' only coming to appreciate the full effect of the Honeywell Obligations on the company at a later date. Oral Argument Tr. at 21, 25. This would seem to present a different theory of the Garrett Defendants' scienter. Plaintiffs also suggested during oral argument this new theory could affect whether certain factual and opinion statements are false or misleading. *See, e.g.*, *id.* at 26 (claiming that later statements about the Honeywell Obligation were misrepresentations because the Garrett Defendants could not "say there *may* be a risk [from the Honeywell Obligations] . . . when [the Garrett Defendants] know that the risk is actually manifest" (emphasis added)). Although Plaintiffs are on their Second Amended Complaint, this is the first time that the Court has ruled on whether Plaintiffs had deficiencies in their pleadings. The Court therefore will allow Plaintiffs thirty days to amend their claims against the Garrett Defendants.[17]

---

[17] Without deciding the merits, the Court notes that many alleged misstatements in the Second Amended Complaint appear to be puffery, to fall under the PSLRA's safe harbor and the bespeaks caution doctrine, or to be historical facts without allegations suggesting that they are false. Should they choose to amend, Plaintiffs are urged to include only statements in the Third Amended Complaint that meet the heightened pleading standards of the PSLRA and Rule 9(b).

But the Court finds that any amendment to Plaintiffs' claims against Lu would be futile. Lu made the alleged misstatements before the Class Period, so the claims are not actionable under Second Circuit precedent.  And because Garrett fully disclosed the terms of the Honeywell Obligations, Plaintiffs cannot show scheme liability.

## IV.  Conclusion

For all the reasons given, the Court grants Defendants' motions to dismiss.  The Court dismisses with prejudice all claims against Lu.  The Court dismisses without prejudice the claims against the Garrett Defendants.  If Plaintiffs choose to do so, they have thirty days to file a Third Amended Complaint.  Failure to file a Third Amended Complaint within thirty days, and without good cause to excuse such failure, will result in the dismissal of Plaintiffs' claims against the Garrett Defendants with prejudice.

The Clerk of the Court is respectfully directed to close the motions pending at Docket Numbers 54 and 57 and to terminate Defendant Su Ping Lu from the case.

SO ORDERED.

Dated: March 31, 2022
      New York, New York

                                     JOHN P. CRONAN
                           United States District Judge

**APPENDIX**
**Chart of Alleged Misstatements**[1]

| Stmt. # | SAC ¶ | Date | Speaker(s) | Source | Actual Statement |
|---|---|---|---|---|---|
| 1 | 153 | 10/1/18 | Garrett; Rabiller | Press Release | "Defendant Rabiller stated that Garrett was 'an automotive ***technology pioneer, inventor and innovator*'** and had '***established a strong position for providing differentiated technologies*** that are in demand.'" |
| 2 | 155 | 11/6/18 | Garrett[2] | Press Release | "In the press release, the Company described itself as 'a ***cutting-edge technology provider***.'" |
| 3 | 155 | 11/6/18 | Garrett; Rabiller | Press Release | Also in the press release, Defendant Rabiller is quoted, stating he is 'pleased that Garrett successfully ***raised the financing at favorable rates, to become a strong independent company*** and we look forward to continued advance in our growth vectors in software and electrification.'" |
| 4 | 155 | 11/6/18 | Garrett; Rabiller | Press Release | "The press release also states that the Company's 'Research and Development expenses were $29 million in the third quarter of 2018, a decrease of $1 million from the third quarter of 2017 . . . ***For the first nine months of 2018, R&D expenses increased 8%*** to $96 million as compared with $89 million in the same period last year.'" |

---

[1] Paragraph references are to the Second Amended Complaint.  All material quoted in the Statement column is from the Second Amended Complaint, and emphases are Plaintiffs' from that complaint.  Plaintiffs' brief in opposition to the Garrett Defendants' motion to dismiss includes an "Appendix 1."  *See* Dkt. 69 at 50-62 ("Opposition Appendix 1").  The Speakers are those that Plaintiffs have identified in the Second Amended Complaint and its Opposition Appendix 1.

[2] Opposition Appendix 1 identifies Rabiller also as a speaker for this alleged misstatement, but there are no allegations in the Second Amended Complaint that Rabiller made this statement. *Compare* SAC ¶ 155, *with* Opposition Appendix 1 at 4.

| Stmt. # | SAC ¶ | Date | Speaker(s) | Source | Actual Statement |
|---|---|---|---|---|---|
| 5 | 157 | 11/6/18 | Garrett; Rabiller; Gili | Earnings Call | "Defendants Rabiller and Gili repeatedly discussed Garrett's purported technology focused growth strategy. For example, Defendant Rabiller started the call by discussing Garrett's first few months as an independent company, touting Garrett's 'strong organic growth driven by new product launches.' Likewise, Defendant Rabiller's opening remarks discussed Garrett's '***three stage technology growth strategy***' and Garrett's presentation accompanying the call listed 'sustainable margin profile ***driven by technology*** as one of its Key Q3 and 9M 2018 Takeaways.'" |
| 6 | 158, 111 | 11/6/18 | Rabiller; Garrett | Earnings Call | "During the question-and-answer session, Defendant Rabiller was asked about Garrett's R&D cost being down year-over year. Defendant Rabiller stated: ***This is not us managing our EBITDA to make the quarter*** so that we are very clear, that would be that would not be something very smart to do. ***So we're obviously investing in our R&D all year long according to the target we have for the full year*** that can vary a bit one quarter to the other quite frankly. When we look at the R&D expense the comparison to the previous quarter over quarter is nothing like either way we look at it. But we think about this as being pretty well on track is what we said in spend for the year and the guidance we did give in terms of percentage of R&D spend for the next 5 years. ***R&D is a mix and extremely important part of our strategy. We are a technology company.*** We are investing differentiated technologies. We have a number of launches, but more than launches we are funding very well our growth vectors that will drive the company not only for the next 5 years but the next 10 to 15 years." |

| Stmt. # | SAC ¶ | Date | Speaker(s) | Source | Actual Statement |
|---|---|---|---|---|---|
| 7 | 160 | 11/6/18 | Garrett; Rabiller; Gili | 10-Q | "[T]he Form 10-Q stated: Our ability to fund our operating needs will depend on our future ability to continue to generate positive cash flow from operations and raise cash in the capital markets.  Based upon our history of generating strong cash flows, we believe we will be able to meet our short-term liquidity needs for at least the next twelve months.  **We believe we will meet known or reasonably likely future cash requirements, through the combination of cash flows from operating activities, available cash balances and available borrowings through our debt agreements.**  We expect that our primary cash requirements in 2018 will primarily be to fund capital expenditures and to meet our obligation under the debt instruments and the Indemnification and Reimbursement Agreement described below, as well as the Tax Matters Agreement.  If these sources of liquidity need to be augmented, **additional cash requirements would likely be financed through the issuance of debt or equity securities**; however, there can be no assurances that we will be able to obtain additional debt or equity financing on acceptable terms in the future." |
| 8 | 161 | 11/6/18 | Garrett; Rabiller; Gili | 10-Q | "The Form 10-Q also included statements regarding capital expenditures and R&D, including that '*We expect to continue investing to expand and modernize our existing facilities and invest in our facilities to create capacity for new product development.*'" |

| Stmt. # | SAC ¶ | Date | Speaker(s) | Source | Actual Statement |
|---|---|---|---|---|---|
| 9 | 163 | 12/6/18 | Garrett | Garrett Website | "The post stated that '***Garrett remains committed to providing state-of-the-art automotive technology***' and discussed the Company's 1,400 patents.   The post continued by discussing '***The Garrett Technology Road Map***,' which noted that the automotive 'industry today is evolving at a rapid pace.' Garrett stated that it '***is already pioneering the solutions that will capitalize on these macro trends***, with highly-engineered products deeply integrated with our customers.'" |
| 10 | 165 | 1/15/19 | Garrett; Rabiller[3] | Deutsche Bank Global Auto Industry Conference. Presentation | "Garrett's presentation at the conference included a slide on '***R&D Supporting Growth***.' On the slide, the Company represented its ***investment capacity in growth will increase from 50% to 100% of R&D budget in 4 years***, and that Garrett has '***investment capacity available to support growth and innovation***.'" |
| 11 | 167 | 2/20/19 | Garrett; Rabiller | Press Release | "The press release described Garrett as a '***cutting-edge technology provider***.'"<br><br>"Defendant Rabiller was quoted as stating '[w]e remain well positioned for future growth as ***we continue to benefit from our global scale and develop the next generation of technology focused on electrification and software***. By working closely with our customers, we can accelerate ***our differentiated technology solutions*** to the market and help solve their challenges by redefining and advancing motion.'" |
| 12 | 169 | 2/20/19 | Garrett; Rabiller | Press Release | "Our solid cash generation has already enabled us to reduce debt and begin to deleverage our financial profile, providing a strong start upon completion of our initial quarter as an independent company." |

[3] Plaintiffs seemingly attribute Rabiller to this statement because he was the one gave the presentation.  *See* SAC ¶ 165.

| Stmt. # | SAC ¶ | Date | Speaker(s) | Source | Actual Statement |
|---|---|---|---|---|---|
| 13 | 169 | 2/20/19 | Garrett; Gili | Earnings Call | "Defendant Gili was asked the Company's 2020 year-end leverage target.  Gili responded that '[t]here's a higher cash generation in our structure today by the end of the year, which means that also ***the deleverage is going to most likely take place by the end of the year***.  And when I talk the leverage I mean gross debt going down.'" |

| Stmt. # | SAC ¶ | Date | Speaker(s) | Source | Actual Statement |
|---|---|---|---|---|---|
| 14 | 171-172 | 2/20/19 | Garrett; Rabiller; Gili | Earnings Call and Investor Presentation | "Defendant Rabiller stated Garrett's '*cost structure [] enables us to improve our operational performance.*'"<br><br>"Defendants Rabiller and Gili also discussed the Company's R&D, stating '[w]e are **uniquely positioned as a company when it comes to resourcing the development of our new growth vectors and innovation pipeline.** Considering that our R&D spend as a percentage of sales is flat, *our 4% to 6% revenue growth per year converts into a direct increase of the resources available to our engineers.*'"<br><br>"Defendants Rabiller and Gili again discussed R&D on the call, stating 'the R&D intensity required to support our technology differentiation in our core business is not increasing. Although the turbo penetration is increasing at a healthy rate, the number of engine programs that DOEs are working on is quite stable. It is in fact production volumes associated with each of this program that is increasing. And therefore looking at the difference between the two, we are generating a disproportionate amount of money that we can allocate to resource our growth vectors.'"<br><br>"During the earnings call, Defendants Rabiller and Gili referred to an investor presentation. The presentation included a slide titled '*Increasing R&D Supports Emerging Growth Vectors*.' On the slide, the Company noted *investment capacity in new growth will increase from 50% to 100% of R&D budget in 4 years* and that Garrett has 'investment capacity available to support growth and innovation.' The presentation also illustrated a *steadily increasing R&D budget*." |

6

| Stmt. # | SAC ¶ | Date | Speaker(s) | Source | Actual Statement |
|---|---|---|---|---|---|
| 15 | 174 | 3/1/19 | Garrett; Rabiller; Gili; James; Cardoso; Clark; Enghauser; Main; Reinhardt; Tozier | 10-K | "The Form 10-K described Garrett as a '***global technology leader***.'"<br><br>"The Form 10-K further stated '***[l]eading technology, continuous innovation, product performance and OEM engineering collaboration are central to our customer value proposition and a core part of our culture and heritage***.'" |
| 16 | 174 | 3/1/19 | Garrett; Rabiller; Gili; James; Cardoso; Clark; Enghauser; Main; Reinhardt; Tozier | 10-K | "The Form 10-K further stated that Garrett had '***led the revolution in turbocharging technology over the last 60 years and maintains a leading technology portfolio of more than 1,400 patents and patents pending***.'" |
| 17 | 174 | 3/1/19 | Garrett; Rabiller; Gili; James; Cardoso; Clark; Enghauser; Main; Reinhardt; Tozier | 10-K | "The 2018 Form 10-K included numerous risk factors, such as that Garrett's 'future growth is ***largely dependent on [its] ability to develop new technologies and introduce new products*** with acceptable margins that achieve market acceptance or correctly anticipate regulatory changes.'" |
| 18 | 175 | 3/1/19 | Garrett; Rabiller; Gili; James; Cardoso; Clark; Enghauser; Main; Reinhardt; Tozier | 10-K | "The Form 10-K contained additional statements regarding technology, such as '***We expect to continue to invest in product innovations and new technologies and believe that we are well positioned to continue to be a technology-leader in the propulsion of electrified vehicles***.'" |

| Stmt. # | SAC ¶ | Date | Speaker(s) | Source | Actual Statement |
|---------|-------|------|------------|--------|------------------|
| 19 | 175 | 3/1/19 | Garrett; Rabiller; Gili; James; Cardoso; Clark; Enghauser; Main; Reinhardt; Tozier | 10-K | "The Form 10-K also included a statement that Garrett's '***regional research, development and manufacturing capabilities are a key advantage*** in helping us to supply OEMs as they expand geographically and shift towards standardized engines and vehicle platforms globally.'" |
| 20 | 175 | 3/1/19 | Garrett; Rabiller; Gili; James; Cardoso; Clark; Enghauser; Main; Reinhardt; Tozier | 10-K | "Garrett stated in the Form 10-K that '***[w]e continue to conduct research to determine key areas of the market where we are best positioned to leverage our existing technology platforms and capabilities*** to serve our customers.'" |

| Stmt. # | SAC ¶ | Date | Speaker(s) | Source | Actual Statement |
|---|---|---|---|---|---|
| 21 | 177 | 3/1/19 | Garrett; Rabiller; Gili; James; Cardoso; Clark; Enghauser; Main; Reinhardt; Tozier | 10-K | "Garrett's 2018 Form 10-K also included statements regarding its capital and liquidity. Specifically, the Form 10-K included a risk factor that '***we may not be able to obtain additional capital that we need in the future on favorable terms or at all.***' The risk factor elaborated: We ***may*** require additional capital in the future to finance our growth and development, upgrade and improve our manufacturing capabilities, implement further marketing and sales activities, fund ongoing R&D activities, satisfy regulatory and environmental compliance obligations, satisfy indemnity obligations to Honeywell, and meet general working capital needs. Our capital requirements will depend on many factors, including acceptance of and demand for our products, the extent to which we invest in new technology and R&D projects and the status and timing of these developments. ***If our access to capital were to become constrained significantly***, or if costs of capital increased significantly, due to lowered credit ratings, prevailing industry conditions, the solvency of our customers, a material decline in demand for or our products, the volatility of the capital markets or other factors, our financial condition, results of operations and cash flows could be adversely affected. ***These conditions may adversely affect our ability to obtain targeted credit ratings***." |

| Stmt. # | SAC ¶ | Date | Speaker(s) | Source | Actual Statement |
|---|---|---|---|---|---|
| 22 | 178 | 3/1/19 | Garrett; Rabiller; Gili; James; Cardoso; Clark; Enghauser; Main; Reinhardt; Tozier | 10-K | "The Form 10-K also further stated the following regarding Garrett's capital structure and liquidity: *We believe we will meet our known or reasonably likely future cash requirements through the combination of cash flows from operating activities, available cash balances and available borrowings through our debt agreements*. If these sources of liquidity need to be augmented, *additional cash requirements would likely be financed through the issuance of debt or equity securities*; however, there can be no assurances that we will be able to obtain additional debt or equity financing on acceptable terms in the future. Based upon our history of generating strong cash flows, *we believe we will be able to meet our short-term liquidity needs for at least the next twelve months*." |

| Stmt. # | SAC ¶ | Date | Speaker(s) | Source | Actual Statement |
|---|---|---|---|---|---|
| 23 | 180 | 3/1/19 | Garrett; Rabiller; Gili; James; Cardoso; Clark; Enghauser; Main; Reinhardt; Tozier | 10-K | "The Form 10-K also contained a risk factor that 'we are subject to risks associated with the Indemnification and Reimbursement Agreement, pursuant to which we are required to make substantial cash payments to Honeywell, measured in substantial part by reference to estimates by Honeywell of certain of its liabilities.' The risk factor stated that: '[t]his agreement may have material adverse effects on our liquidity and cash flows and on our results of operations, regardless of whether we experience a decline in net sales. The agreement may also require us to accrue significant long-term liabilities on our consolidated and combined balance sheet, the amounts of which will be dependent on factors outside of our control, including Honeywell's responsibility to manage and determine the outcomes of claims underlying the liabilities.'" <br><br> "The risk factor further stated the agreements 'may impose significant operating and financial restrictions on us and our subsidiaries and limit our ability to engage in actions that may be in our long-term best interests.'" |

| Stmt. # | SAC ¶ | Date | Speaker(s) | Source | Actual Statement |
|---|---|---|---|---|---|
| 24 | 182-183 | 5/7/19 | Garrett; Rabiller | Press Release | "The press release . . . described Garrett as a '*cutting-edge technology provider*.'" |
| | | | | Investor Presentation | "Garrett also released an investor presentation, which discussed Garrett's '*Technology Growth Strategy*.'" |
| | | | | Earnings Call | "On the related earnings call, Defendant Rabiller continued to discuss Garrett's technology as a strength. In his opening remarks, Defendant Rabiller attributed the positive first quarter results to the 'high technology content of our products.' Defendant Rabiller likewise discussed the Company's "technology project pipeline" and stated that "*Garrett is a technology company*, operating into the automotive industry and our technology growth strategy depicted here remains a key priority for the long-term success of our company.'" |
| 25 | 183 | 5/7/19 | Garrett; Rabiller; Gili | Earnings Call | "Defendant Rabiller also stated on the earnings call that Garrett's '*first priority for the business is to de-leverage* and *then we'll look at bolt-on acquisition opportunities*, if the opportunity occurs.'" |
| | | | | | "During the same May 7, 2019 earnings call, analyst John Sykes asked what Garrett plans to do with its approximately $100 million of free cash flow for the year. Defendant Gili confirmed Garrett's plan was to pay down debt, elaborating that 'I think we've been public since the beginning that *our key target is to deleverage*.'" |
| 26 | 185 | 5/8/19 | Garrett; Rabiller; Gili | 10-Q | The Form 10-Q "incorporat[es] by reference the false and misleading risk factors from Garrett's 2018 Form 10-K." |
| | | | | | "The Form 10-Q also stated that it was 'subject to a number of important factors that *could* cause actual results to differ materially from those forward-looking statements.'" |

| Stmt. # | SAC ¶ | Date | Speaker(s) | Source | Actual Statement |
|---------|-------|------|-----------|--------|------------------|
| 27 | 187 | 5/8/19 | Garrett; Rabiller; Gili | 10-Q | "[T]he Form 10-Q stated, in relevant part: We expect that our primary cash requirements in the remainder of 2019 will primarily be to fund operating activities, working capital, and capital expenditures, and to meet our obligations under the debt instruments and the Indemnification and Reimbursement Agreement described below, as well as the Tax Matters Agreement.  In addition, we engage in repurchases of our debt and equity securities from time to time. ***We believe we will meet our known or reasonably likely future cash requirements through the combination of cash flows from operating activities, available cash balances and available borrowings through our debt agreements. If these sources of liquidity need to be augmented, additional cash requirements would likely be financed through the issuance of debt or equity securities; however, there can be no assurances that we will be able to obtain additional debt or equity financing on acceptable terms in the future.  Based upon our history of generating strong cash flows, we believe we will be able to meet our short-term liquidity needs for at least the next twelve months***." |

| Stmt. # | SAC ¶ | Date | Speaker(s) | Source | Actual Statement |
|---|---|---|---|---|---|
| 28 | 189 | 7/30/19 | Garrett; Rabiller | Press Release | "These documents again described Garrett as a '*cutting-edge technology provider*' and touted the Company's '*Technology Growth Strategy*.'" |
| | | | | Earnings Call | "During Garrett's earnings call on the same day, Rabiller stated that 'Garrett is a *leading technology company* operating in the automotive industry' and emphasized its '*technology led growth strategy [] remains a key priority for long-term success*.'" |
| | | | | Investor Presentation | "Garrett's investor presentation regarding the results contained a slide titled 'Key Q2 2019 Takeaways.' The slide represented that Garrett's 'positive long-term business fundamentals remain intact' and that the Company that it made 'continued progress in core and new growth factors.' The presentation also stated that Garrett 'remains well positioned to drive future results.'" |
| 29 | 191 | 7/30/19 | Garrett; Rabiller; Gili | 10-Q | The Form 10-Q "incorporat[es] by reference the false and misleading risk factors from Garrett's 2018 Form 10-K." |
| | | | | | "The Form 10-Q also stated that Garrett was 'subject to a number of important factors that *could* cause actual results to differ materially from those forwardlooking statements.'" |
| 30 | 193 | 7/30/19 | Garrett; Gili | Earnings Call | "During Garrett's earnings call, Defendant Gili stated that '*We remain focused on utilizing our cash generation to deleverage our balance sheet.*'" |

| Stmt. # | SAC ¶ | Date | Speaker(s) | Source | Actual Statement |
|---------|-------|------|------------|--------|-----------------|
| 31 | 193 | 7/30/19 | Garrett; Rabiller; Gili | 10-Q | "[T]he Form 10-Q stated, in relevant part: We expect that our primary cash requirements in the remainder of 2019 will primarily be to fund operating activities, working capital, and capital expenditures, and to meet our obligations under the debt instruments and the Indemnification and Reimbursement Agreement described below, as well as the Tax Matters Agreement.  In addition, we engage in repurchases of our debt and equity securities from time to time. *We believe we will meet our known or reasonably likely future cash requirements through the combination of cash flows from operating activities, available cash balances and available borrowings through our debt agreements. If these sources of liquidity need to be augmented, additional cash requirements would likely be financed through the issuance of debt or equity securities; however, there can be no assurances that we will be able to obtain additional debt or equity financing on acceptable terms in the future.  Based upon our history of generating strong cash flows, we believe we will be able to meet our short-term liquidity needs for at least the next twelve months.*" |
| 32 | 195 | 9/9/19 | Garrett; Rabiller | Press Release | "The press release described Garrett as a '*leading differentiated technology provider*' and stated the Company will 'showcase its latest products and technology applications' at an upcoming Motor Show in Frankfurt."<br><br>"The press release quoted Defendant Rabiller discussing Garrett's electrified engine technology, stating it 'will be key in meeting industry challenges for increased energy efficiency and new global regulatory emission targets while still meeting consumer demands for better vehicle performance and affordability.'" |

15

| Stmt. # | SAC ¶ | Date | Speaker(s) | Source | Actual Statement |
|---|---|---|---|---|---|
| 33 | 197 | 9/10/19 | Garrett | Deutsche Bank IAA Cars Conference Presentation | The presentation "included a slide concerning '*Financial Flexibility* and Efficiency' where it represented it had a '*highly variable cost structure* to support the business' and 'low working capital needs.' Garrett further stated it had a 'well-invested capacity base to *support continued growth*.' On a slide titled 'Key Investor Takeaways,' the Company represented its "[s]trong financial foundation *supports new growth vectors and innovation pipeline*." The presentation concluded that Garrett was 'well positioned to create enduring value for shareholders.'" |
| 34 | 199 | 10/17/19 | Garrett | Press Release | "Garrett issued a press releasing 'confirming its development of the world's first 'E-Turbo' for mass market passenger vehicles expected to launch in 2021.' The press release, which continued to describe Garrett as a '*differentiated technology leader*' discussed Garrett's 'ETurbo" technology and '*next generation software*.'" |
| 35 | 201 | 11/8/19 | Garrett; Rabiller[4] | Press Release | "The press release continued to describe Garrett as 'a *cutting-edge technology provider*.'" |
|  |  |  |  | Earnings Call | "On the earnings call, Rabiller stated 'Garrett remains well positioned to benefit from the positive long-term macros as we *continue to provide advanced technology* to the global auto industry to help it meet more stringent regulations and set new benchmarks in vehicle performance' and that 'we believe our broad and balanced portfolio positions Garrett well to drive long-term value for shareholders.'" |

---

[4] Opposition Appendix 1 also lists Bracke as a speaker, although no statement above is attributed to Bracke in the Second Amended Complaint. *Compare* SAC ¶ 201, *with* Opposition Appendix 1 at 7. The Second Amended Complaint does, however, allege that Bracke was on the earnings call mentioned above. *See* SAC ¶ 201.

| Stmt. # | SAC ¶ | Date | Speaker(s) | Source | Actual Statement |
|---------|-------|------|------------|--------|------------------|
| 36 | 201 | 11/8/19 | Bracke; Garrett; Rabiller | Earnings Call | "Defendant Bracke also stated that '*we remain focused on utilizing our strong cash generation to deleverage our balance sheet.*' Similarly, Defendant Rabiller stated that 'Garrett produced solid cash flow generation in the [] quarter and *we maintain our focus on deleveraging our balance sheet, making notable progress in reducing net debt.*'" |
| 37 | 203 | 11/8/19 | Bracke; Garrett | Earnings Call | "Defendant Bracke stated 'We remain focused on utilizing our strong cash generation to deleverage our balance sheet.'" |

| Stmt. # | SAC ¶ | Date | Speaker(s) | Source | Actual Statement |
|---------|-------|------|------------|--------|------------------|
| 38 | 204-205 | 11/8/19 | Garrett; Rabiller; Bracke | 10-Q | "The Form 10-Q incorporated by reference the risk factors from Garrett's 2018 Form 10-K." <br><br> "The Form 10-Q also stated that Garrett was 'subject to a number of important factors that could cause actual results to differ materially from those forward-looking statements.' One of these factors included Garrett's 'ability to develop new technologies and products, and the development of either effective alternative turbocharger or new replacement technologies.'" <br> "The 2019 Form 10-Q also stated that: *We believe we will meet our known or reasonably likely future cash requirements* through the combination of cash flows from operating activities, available cash balances and available borrowings through our debt agreements.  If these sources of liquidity need to be augmented, *additional cash requirements would likely be financed through the issuance of debt or equity securities*; however, there can be no assurances that we will be able to obtain additional debt or equity financing on acceptable terms in the future. *Based upon our history of generating strong cash flows, we believe we will be able to meet our short-term liquidity needs for at least the next twelve months*." |
| 39 | 207 | 11/20/19 | Garrett; Rabiller | Barclays Global Automotive Conference Presentation | "In the presentation, Garrett was described as a '*cutting edge technology provider*.' On a slide concerning '*Financial Flexibility and Efficiency*,' Garrett represented it had a '[h]ighly variable cost structure to support the business' and 'low working capital needs.' Garrett also represented it had a 'well-invested capacity base to *support continued growth*.'" |

| Stmt. # | SAC ¶ | Date | Speaker(s) | Source | Actual Statement |
|---------|-------|------|-----------|--------|------------------|
| 40 | 209 | 2/27/20 | Garrett | Press Release | "The press release stated that '*[w]ith significant financial flexibility combined with the industry's broadest portfolio for LV, commercial vehicle, hybrid, and fuel cell products, we are well positioned to build upon the progress we achieved during our first full year as an independent company.*'" |
| 41 | 211 | 2/27/20 | Garrett; Rabiller; Bracke | Earnings Call | "Defendants Rabiller and Bracke again discussed the '*Technology Growth Strategy*' repeatedly highlighted in the Company's investor presentations. Defendant Rabiller also discussed in his opening remarks how Garrett 'maintained [its] *strong financial position*' and 'stayed true to [its] approach in utilizing [its] solid cash flow to *deleverage* [its] balance sheet.'" "Rabiller later stated that Garrett had a '*flexible and resilient business model*' that provided '*significant flexibility* to help mitigate the impact from any short-term fluctuations in the underlying macro environment[.]' Rabiller also stated that '[g]oing forward, we plan to continue to *utilize our strong free cash flow generation to reduce net debt and deleverage our balance sheet*.'" |
| 42 | 213 | 2/27/20 | Garrett; Rabiller; Bracke; James; Cardoso; Clark; Enghauser; Main; Reinhardt; Tozier[5] | 10-K | "Garrett's Form 10-K described the Company as '*a global technology leader*' and noted its '*technology leadership*.'" |

[5] Opposition Appendix 1 lists "all Garrett Defendants" as speakers. *See* Opposition Appendix 1 at 8. But when this statement was made, Gili was no longer at Garrett, and Deason did not yet have a position at the company. *See* SAC ¶¶ 31, 33.

| Stmt. # | SAC ¶ | Date | Speaker(s) | Source | Actual Statement |
|---|---|---|---|---|---|
| 43 | 215 | 2/27/20 | Garrett; Rabiller; Bracke; James; Cardoso; Clark; Enghauser; Main; Reinhardt; Tozier | 10-K | "The Form 10-K included the following language regarding liquidity and capital expenditures: We expect that our primary cash requirements in 2020 will primarily be to fund operating activities, working capital, and capital expenditures, and to meet our obligations under the debt instruments and the Indemnification and Reimbursement Agreement described below, as well as the Tax Matters Agreement.  In addition, we may engage in repurchases of our debt and equity securities from time to time.  *We believe we will meet our known or reasonably likely future cash requirements through the combination of cash flows from operating activities, available cash balances and available borrowings through our debt agreements.  If these sources of liquidity need to be augmented, additional cash requirements would likely be financed through the issuance of debt or equity securities; however, there can be no assurances that we will be able to obtain additional debt or equity financing on acceptable terms in the future.  Based upon our history of generating strong cash flows, we believe we will be able to meet our short-term liquidity needs for at least the next twelve months*." |
| 44 | 123, 217 | 4/7/20 | Garrett; Rabiller | Press Release | "Defendant Rabiller is quoted, stating '[w]hile our focus has been on safeguarding the health and safety of our employees and supporting our customers and local communities, we are also taking decisive and prudent steps with various stakeholders to *enhance our liquidity and preserve the long-term health of the business*.  Our senior leadership team has navigated downturns in the past and we expect to rely upon our extensive experience and resilient business model to emerge from this crisis as a stronger company.'" |

| Stmt. # | SAC ¶ | Date | Speaker(s) | Source | Actual Statement |
|---|---|---|---|---|---|
| 45 | 219 | 5/11/20 | Garrett; Rabiller | Press Release | "In the press release, Garrett was again described as a 'cutting-edge technology provider.'"<br><br>"Despite disclosing in its Form 10-Q that there was a substantial doubt concerning Garrett's ability to continue as a going concern, Defendant Rabiller is quoted in the press release stating: 'Our financial results for the first quarter *demonstrate Garrett's flexible operating platform* and global capabilities amid the novel coronavirus outbreak,' said Olivier Rabiller, Garrett President and CEO. 'Both of our production facilities in China have restarted operations and returned rapidly to full capacity after closing for a portion of the quarter due to the COVID19 pandemic.  We remain focused on taking aggressive measures in response to this unprecedented crisis with a priority on protecting the health and well-being of our employees and meeting our customer commitments.  Last month, we fully drew down on our revolving credit facility to increase our financial flexibility and started the current quarter with $658 million in total liquidity.  We are also temporarily reducing pay for Garrett's senior leadership team by 20% and postponing future capital expenditures without impacting near-term programs.  *By actively managing our cost structure and preserving capital, we expect to generate significant cash savings for the year, and we are evaluating further steps to ensure the continuity of our operations. Garrett's positive business fundamentals remain intact* and we will continue to calibrate production schedules in the near term and *flex our cost structure to maintain our agility and strengthen our position for long-term success*.'" |

| Stmt. # | SAC ¶ | Date | Speaker(s) | Source | Actual Statement |
|---------|-------|------|------------|--------|------------------|
| 46 | 220 | 5/11/20 | Garrett; Rabiller | 10-Q | "The Form 10-Q filed on the same day included the following statement regarding Garrett's cash flows and liquidity: We have historically funded our cash requirements through the combination of cash flows from operating activities, available cash balances and available borrowings through our debt agreements.  If these sources of liquidity need to be augmented, ***additional cash requirements would likely be financed through the issuance of debt or equity securities***; however, there can be no assurances, particularly in light of the volatility in global financial markets as a result of the COVID-19 pandemic, that we will be able to obtain additional debt or equity financing on acceptable terms in the future or at all.  Based upon our history of generating strong cash flows, and subject to any acceleration of the obligations under our Credit Agreement by and among us, certain of our subsidiaries, the lenders and issuing banks party thereto and JPMorgan Chase Bank, N.A., as administrative agent (the "Credit Agreement"), or our other agreements, as discussed below, ***we believe we will be able to meet our short-term liquidity needs for at least the next twelve months***." |

| Stmt. # | SAC ¶ | Date | Speaker(s) | Source | Actual Statement |
|---------|-------|------|------------|--------|------------------|
| 47 | 221 | 5/11/20 | Garrett; Rabiller; Bracke | Earnings Call Presentation | "During an earnings call . . . Defendants Rabiller and Bracke discussed [] Garrett's investor presentation.  The first substantive slide of the investor presentation highlighted that Garrett 'maintained business continuity' in light of the pandemic, and that the Company took actions to obtain '*increased financial flexibility*.' The presentation listed as a 'GTX Priority' that the Company would '*leverage [its] flexible and resilient business model*' and noted that it had 'increased cash on hand to withstand current market conditions.' Garrett's presentation also touted that its '*long-term technology growth strategy remains intact*' and noted it had a 'pipeline of proof-of-concept opportunities with additional customers.'" |
| 48 | 223 | 5/11/20 | Garrett; Rabiller; Bracke | 10-Q<br><br>Earnings Call | The Form 10-Q "incorporated by reference the risk factors from Garrett's 2019 Form 10-K."<br><br>"The Form 10-Q further warned that a number of important factors 'could' impact its results, including 'our ability to develop new technologies and products, and the development of either effective alternative turbochargers or new replacement technologies.'"<br><br>"On the related earnings call, Defendant Rabiller stated that Garrett (i) would 'maintain our focus on developing our new technologies,' (ii) the Company remained '*well positioned to accelerate our cutting-edge technologies to the market and drive long-term success*,' and (iii) that Garrett was a '*technology leader poised for above market growth in the short, mid and long term*[.]'" |

| Stmt. # | SAC ¶ | Date | Speaker(s) | Source | Actual Statement |
|---|---|---|---|---|---|
| 49 | 225-226 | 5/11/20 | Garrett; Rabiller; Bracke | Earnings Call | "Defendant Rabiller stated with respect to cash flows and financial flexibility: We have implemented numerous actions to adjust our operations, reduce our costs, optimize our cash position and strengthen Garrett's financial flexibility. During the first quarter and into early April, we fully drew down on our 470 million revolving credit facility. Our total liquidity was approximately 665 million at the start of the second quarter positioning us to better withstand the substantial disruption across the global automotive industry and economies worldwide. We continue to preserve capital by implementing strict cost controls and cash management actions, including significantly reducing discretionary expenses of temporarily reducing pay for Garrett's senior leadership team. On the CapEx side as most of our capital expenditure is related to volume growth, we are also reducing or postponing commitments for 2020 by up to 40%, while preserving our new product launches of both the near and long term." <br><br> "[A]fter summarizing actions taken to mitigate the impacts of the pandemic, Rabiller stated that 'we expect to generate significant cash savings for the year and we are evaluating further steps to bolster our liquidity.'" <br><br> "Later in the call, Defendant Bracke stated that '[w]e truly believe that even today, middle of May, *we still have the very substantial liquidity position starting from the 658 [million] that we started the quarter with*.'" |

| Stmt. # | SAC ¶ | Date | Speaker(s) | Source | Actual Statement |
|---|---|---|---|---|---|
| 50 | 228 | 5/11/20 | Garrett; Rabiller | Earnings Call | "[D]uring the question-and-answer portion of the call, an analyst asked about covenant relief and lending relationships.  Defendant Rabiller responded, reminding investors that Garrett was spun-out from Honeywell only six quarters ago, and stating: '*Our former parent imposed on us a rigid capital structure that was unable unless Garrett executed perfectly in a highly favorable macroeconomic and industry environment, meaning that was really unsustainable that way unless everything was perfect.  With insight, it is clear that our capital structure was ill suited to cope with any meaningful operating challenges*.'" |
| 51 | 230 | 6/12/20 | Garrett; Rabiller | Press Release | "Defendant Rabiller stated in the press release announcing the amendments that '[t]he modifications to our Credit Agreement *significantly enhance Garrett's financial flexibility* to weather the current pandemic-induced economic slowdown.'  Rabiller further stated that 'Despite the near-term disruption across the automotive industry and global economy, it is important to remember that the *positive long-term fundamentals of our business remain intact*.  Garrett has excelled as an industry leader for over 65 years, delivering critical cutting-edge technologies to major automakers worldwide.  Going forward, automakers will likely encounter even tougher regulations and technical challenges after the crisis, and Garrett will bring them a wide range of differentiated products and solutions.'" |

| Stmt. # | SAC ¶ | Date | Speaker(s) | Source | Actual Statement |
|---|---|---|---|---|---|
| 52 | 232 | 7/30/20 | Garrett; Rabiller[6] | Press Release | "In the press release, Garrett described itself as '*a leading differentiated technology provider*' and in its investor presentation touted its '*Long-Term Technology Growth Strategy*.' In the press release, Defendant Rabiller is quoted, stating 'Garrett's proven track record in operational excellence has helped us navigate the current pandemic-induced downturn.  Although the market environment remains highly uncertain, we continue to benefit from our robust infrastructure and agile working capabilities as we execute on our **long-term strategy and lead the evolution of advanced turbocharging, electric-boosting, and software solutions for the global automotive industry**.'" |
| 53 | 130, 233 | 7/30/20 | Garrett; Rabiller; Deason; Bracke | Earnings Call | "On the earnings call to discuss Garrett's second quarter earnings, Defendants Rabiller, Deason and Bracke answered analyst questions.  Despite COVID-19 weighing on the business, Defendant Rabiller was 'pleased to report in Q2, Garrett general $63 million adjusted EBITDA for a margin of 13.2% . . . .' Rabiller continued that the crisis 'highlights the strong fundamentals of Garrett . . . [b]ut at the same time exposes the ill-suited capital structure that the company inherited from its former parent Spinoff.'" <br><br> "Defendant Rabiller also touted 'the resiliency of [Garrett's] operating structure.' Defendant Rabiller also discussed that Garrett 'obtained near-term covenant relief' by further postponing payments to Honeywell, but that it 'creates a significant cash burden for 2023 and beyond.' Nothing was said about the now admittedly known issues that would force the Company into bankruptcy just a few months later." |

---

[6] Opposition Appendix 1 also lists Deason as a speaker, but there are no allegations that he made these alleged misstatements.  *Compare* SAC ¶ 232, *with* Opposition Appendix 1 at 8.

| Stmt. # | SAC ¶ | Date | Speaker(s) | Source | Actual Statement |
|---------|-------|------|------------|--------|------------------|
| 54 | 234 | 7/30/20 | Garrett; Rabiller; Deason[7] | 10-Q | "As part of its second quarter earnings filings with the SEC, Garrett removed the 'substantial doubt' language raised in its previous Form 10-Q regarding the Company's ability to continue as a going concern, portraying optimism that the Company could survive despite the COVID-19 pandemic and the debt/indemnity obligations that had been undermining the Company since the Spin-Off." |
| 55 | 117 | Unknown | Garrett Defendants[8] | Unknown | "The Garrett Defendants also made statements that Garrett had 'no large restructuring initiatives planned.'" |

---

[7] Opposition Appendix 1 lists Bracke as a speaker, but there are no allegations in the Second Amended Complaint regarding Bracke's involvement.  *Compare* SAC ¶ 235, *with* Opposition Appendix 1 at 3.

[8] Opposition Appendix 1 does not include this alleged misstatement, but it appears in the Second Amended Complaint.  The Second Amended Complaint does not, however, identify the source or date of this alleged misstatement.

| Stmt. # | SAC ¶ | Date | Speaker(s) | Source | Actual Statement |
|---|---|---|---|---|---|
| 56 | 105, 146 | 8/23/18 | Garrett; Lu | Form 10 | "This agreement *may* have material adverse effects on our liquidity and cash flows and on our results of operations, regardless of whether we experience a decline in net sales. The agreement *may* also require us to accrue significant long-term liabilities on our combined balance sheet, the amounts of which will be dependent on factors outside of our control, including Honeywell's responsibility to manage and determine the outcomes of claims underlying the liabilities. As of December 31, 2017, we have accrued $1,703 million of liability in connection with Bendix related asbestos, representing the estimated liability for pending claims as well as future claims expected to be asserted. The liabilities related to the Indemnification and Reimbursement Agreement *may have* a significant negative impact on the calculation of key financial ratios and other metrics that are important to investors, rating agencies and securities analysts in evaluating our creditworthiness and the value of our securities. Accordingly, our access to capital to fund our operations *may be* materially adversely affected and the value of your investment in our company *may* decline." |
| 57 | 147 | 8/23/18 | Garrett; Lu | Form 10 | "[T]he Form 10 stated: '*There is a material weakness in internal control over financial reporting related to the estimation of our liability for unasserted Bendix-related asbestos claims which has resulted in a restatement of our previously issued financial statements.*'" |

28

| Stmt. # | SAC ¶ | Date | Speaker(s) | Source | Actual Statement |
|---|---|---|---|---|---|
| 58 | 105, 146 | 8/23/18 | Garrett; Lu | Form 10 | The registration contained numerous false and misleading statements, such as a risk factor that warned: *"**We are subject to risks associated with the Indemnification and Reimbursement Agreement, pursuant to which we will be required to make substantial cash payments to Honeywell, measured in substantial part by reference to estimates by Honeywell of certain of its liabilities.*** *** *This agreement may have material adverse effects on our liquidity and cash flows and on our results of operations, regardless of whether we experience a decline in net sales. The agreement may also require us to accrue significant long-term liabilities on our combined balance sheet*, the amounts of which will be dependent on factors outside of our control, including Honeywell's responsibility to manage and determine the outcomes of claims underlying the liabilities. ***As of December 31, 2017, we have accrued $1,703 million of liability in connection with Bendix related asbestos, representing the estimated liability for pending claims as well as future claims expected to be asserted.*** The liabilities related to the Indemnification and Reimbursement Agreement ***may have*** a significant negative impact on the calculation of key financial ratios and other metrics that are important to investors, rating agencies and securities analysts in evaluating our creditworthiness and the value of our securities. Accordingly, our access to capital to fund our operations may be materially adversely affected and the value of your investment in our company may decline. Moreover, the payments that we will be required to make to Honeywell pursuant to that agreement will not be deductible for U.S. federal income tax purposes."* |

| Stmt. # | SAC ¶ | Date | Speaker(s) | Source | Actual Statement |
|---|---|---|---|---|---|
| 59 | 149 | 8/23/18 | Garrett; Lu | Form 10 | "Specifically, the Form 10 stated 'we may have potential business conflicts of interest with Honeywell with respect to our past and ongoing relationships" and that '[f]ollowing the Spin-Off, certain of our directors and employees ***may have*** actual or potential conflicts of interest because of their financial interests in Honeywell.' The Form 10 elaborated that '[b]ecause of their current or former positions with Honeywell, certain of our expected executive officers and directors own equity interests in Honeywell. Continuing ownership of Honeywell shares and equity awards could create, or appear to create, potential conflicts of interest in SpinCo and Honeywell face decisions that ***could have*** implications for both SpinCo and Honeywell.'" |
| 60 | 151 | 9/5/18 | Garrett; Lu | Amend. 1 to Form 10 | "Defendant Lu caused Garrett to file Amendment 1 to Form 10, which was again signed by Defendant Lu. The amendment stated, among other things, that 'Following the Spin-Off, Honeywell and SpinCo will each have a more focused business that will be ***better positioned to invest more in growth opportunities*** and execute strategic plans best suited to address the distinct market trends and opportunities for its business. Given that SpinCo is the only Honeywell business primarily focused on the automotive industry, ***SpinCo will be better positioned as an independent company to properly channel and fund investments to capitalize on long-term industry needs.***'" |