**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE GARRETT MOTION INC. SECURITIES LITIGATION | Case No. 1:20-cv-07992-JPC |
| | **CLASS ACTION** |
| | <u>**JURY TRIAL DEMANDED**</u> |

**THIRD CONSOLIDATED AMENDED COMPLAINT FOR**
<u>**VIOLATIONS OF THE FEDERAL SECURITIES LAWS**</u>

## TABLE OF CONTENTS

I.    INTRODUCTION ............................................................................................... 2

II.   JURISDICTION AND VENUE .................................................................... 11

III.  PARTIES ......................................................................................................... 12

      A.    Plaintiffs ............................................................................................. 12

      B.    Defendant Garrett ............................................................................. 13

      C.    The Director and Officer Defendants ................................................ 13

IV.   SUBSTANTIVE ALLEGATIONS .................................................................. 15

      A.    Honeywell Burdens Garrett with an Unsustainable Capital Structure on the
            Date of the Spin-Off........................................................................... 15

      B.    Defendants Issue Positive Statements to Distinguish Newly Independent
            Garrett from its Peers ........................................................................ 17

      C.    Defendants' Growing Knowledge of the Undisclosed and Deepening
            Impacts of the Inherited Capital Structure on Garrett's Core Business
            Operations in the Year Following the Spin-Off................................... 20

      E.    Garrett Includes a "Going Concern" Warning in the Second Quarter of
            2020.................................................................................................... 25

      F.    Garrett Enters into Amendments to Certain Credit Agreements ......... 25

      G.    Garrett Allows its Accountants to Remove its Going Concern Warning ............. 26

V.    DEFENDANTS' CLASS PERIOD MATERIALLY FALSE AND MISLEADING
      STATEMENTS AND OMISSIONS OF MATERIAL FACTS ..................................... 26

      A.    February 27, 2020 False and Misleading Statements and Omissions of
            Material Facts..................................................................................... 27

      B.    March and April 2020 False and Misleading Statements and Omissions of
            Material Facts..................................................................................... 30

      C.    May 11, 2020 False and Misleading Statements and Omissions of Material
            Facts ................................................................................................... 32

      D.    June 12, 2020 False and Misleading Statements and Omissions of Material
            Facts ................................................................................................... 34

E. July 30, 2020 False and Misleading Statements and Omissions of Material Facts .................................................................................................. 36

F. July 30, 2020 Omission of Going Concern Language ........................................... 37

G. August 26, 2020 False and Misleading Statements and Omissions of Material Facts ........................................................................................... 39

H. Garrett's Class Period "Risk Factors" Omitted the Existing Manifestation of the Risks ........................................................................... 41

VI. DEFENDANTS ACTED WITH SCIENTER .................................................... 44

A. Defendants Had Actual Knowledge Their Statements Were False and Misleading When Made or Acted Highly Recklessly ............................................ 44

B. Deepening Problems in Garrett's Core Operations Support an Inference of Scienter ...................................................................................... 47

C. Defendant Rabiller Was Financially Motivated to Inflate Garrett's Stock Price ............................................................................................. 48

VII. LOSS CAUSATION ................................................................................... 49

VIII. PRESUMPTION OF RELIANCE ................................................................. 52

IX. INAPPLICABILITY OF THE STATUTORY SAFE HARBOR AND BESPEAKS CAUTION DOCTRINE ............................................................................... 53

X. CLASS ACTION ALLEGATIONS ................................................................ 57

XI. CLAIMS FOR RELIEF .............................................................................. 59

COUNT I  For Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Against Defendant Garrett ............................................................................... 59

COUNT II For Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Against the Director and Officer Defendants ............................................................ 61

COUNT III For Violations of Section 20(a) of the Exchange Act Against the Director and Officer Defendants ............................................................................... 63

XII. JURY DEMAND ...................................................................................... 64

XIII. PRAYER FOR RELIEF .............................................................................. 64

1.      Lead Plaintiffs The Gabelli Asset Fund, The Gabelli Dividend & Income Trust, The Gabelli Value 25 Fund Inc. and GAMCO Asset Management Inc. (together, "Lead Plaintiffs") bring this class action (the "Class Action") pursuant to Rule 23 of the Federal Rules of Civil Procedure against Garrett Motion Inc. ("Garrett" or the "Company") and certain directors and officers of Garrett (the "Director and Officer Defendants") (collectively, with Garrett, the "Defendants"), on behalf of themselves and all other individuals or entities (excluding Defendants), who purchased or otherwise acquired Garrett securities during the period February 27, 2020 through September 18, 2020, inclusive (the "Class Period") and were damaged thereby (the "Class").

2.      Lead Plaintiffs' allegations are based upon personal knowledge as to themselves and their own acts and upon information and belief as to all other matters.  Lead Plaintiffs' information and belief is based on an investigation conducted by Lead Plaintiffs' counsel, which included, among other things, consultation with financial experts and a review of public filings with the U.S. Securities and Exchange Commission ("SEC"), press releases, investor presentations, earnings calls, analyst research and media reports, public filings in the Garrett bankruptcy proceedings (*In re Garrett Motion Inc.*, No. 20-12212-MEW (Bankr. S.D.N.Y.) (the "Bankruptcy Proceedings" or "Chapter 11 Case"), and public filings in the adversary proceeding between Garrett and Honeywell (*Garrett Motion Inc. et al. v. Honeywell International Inc. et al.*, Adv. Proc. No. 20-01223 (Bankr. S.D.N.Y.) (MEW)) (the "Adversary Proceeding") that was resolved as part of *Debtors' Amended Joint Plan of Reorganization Under Chapter 11 of the Bankruptcy Code* ("Garrett's Reorganization Plan" or the "Plan"), which was confirmed by the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court") on April 23, 2021.

1

3.     Lead Plaintiffs reserve the right to later move the Court for leave to amend this Complaint if discovery reveals that Defendants knowingly or recklessly made misleading statements or omissions prior to the start of the Class Period on February 27, 2020.

## I.     INTRODUCTION

4.     On February 27, 2020, the first day of the Class Period, Garrett reported its annual results for 2019, the Company's first full year as a stand-alone company.  On that day, after managing and observing Garrett's operations during the sixteen months since industrial giant Honeywell International Inc. ("Honeywell") spun-off Garrett on October 1, 2018 (the "Spin-Off"), Defendant Olivier Rabiller, Garrett's President and Chief Executive Officer ("CEO"), told investors that "*we are well positioned **to build upon the progress** we achieved during our first full year as an independent company*." Defendants also made aggressive statements touting, among other things, Garrett's:

- "*Significant financial flexibility;*"

- "*Strong financial position;*"

- "*Significant flexibility to help mitigate the impact from any short-term fluctuations in the underlying macro environment;*"

- "*Abl[ity] to meet our short-term liquidity needs for at least the next twelve months;*" and

- "*Flexible and resilient business model.*"

5.     We now know that ***none*** of those statements were true.  At the time the above statements were made the deepening – and undisclosed – financial and operational crisis at Garrett caused by the capital structure inherited from the Spin-Off and the related Honeywell Obligations (defined below) had, among other things, caused Defendants to hire financial advisors who conducted a strategic and business review only to have them confirm what Defendants already

knew — that the capital structure inherited from the Spin-Off from Honeywell was untenable.  By the beginning of the Class Period, Defendants had also directed the bankers to conduct a solicitation of interest for a sale or merger with 15 likely bidders (only to learn the Company could not be sold unless it was restructured or sold in a bankruptcy due to the inherited capital structure), and directed the hiring of additional restructuring advisors to solicit a stalking horse bidder to lead a sale of the Company in a court-supervised restructuring.  Those and other undisclosed facts that we now know occurred during the 16 months after the Spin-Off simply cannot be reconciled with the above misstatements, including, in particular, Defendant Rabiller's statement that Garrett was "*well positioned **to build upon the progress** we achieved during our first full year as an independent company*."  By February 27, 2020, the only thing Garrett was "well positioned for" was bankruptcy — and Defendants knew it.

6.       In this regard, Garrett's Bankruptcy filings provided a unique, behind-the-scenes view into what was really happening inside of Garrett during its short life as an independent company.  That view stands in sharp contrast to the rosy picture painted by Defendants from the date of the Spin-Off and continuing throughout most of the Class Period.  Indeed, even as they began to partially reveal the truth late in the Class Period, Defendants continued to make positive countervailing statements that were extraordinarily misleading given Garrett's imminent bankruptcy.

7.       Defendants expressly blamed Garrett's bankruptcy on the inherited and unsustainable capital structure that, according to Defendants themselves, caused problems ***from the day of the Spin-Off***; admitting, among other things, that "***[s]ince the Spin-Off, the Company has struggled with the capital structure*** Honeywell foisted upon it, which is not sustainable and

puts the Company at a substantial disadvantage to its competitors."[1]  While the full impact of the inherited capital structure and related Honeywell Obligations may not have been fully understood by Defendants at the time of the Spin-Off, it is now clear from the series of actions by Defendants in the sixteen months of operations following the Spin-Off that they became increasingly aware that Honeywell "imposed on [Garret] a rigid capital structure . . . that was really unsustainable . . . [and] ill-suited to cope with any meaningful operating challenges."[2]

8.      We see the early evidence that Defendants were aware of the deepening impact of the inherited capital structure on Garrett's core business operations no later than ***six months*** after the Spin-Off when, in the first quarter of 2019, the Board of Directors (the "Board") retained financial advisors at Morgan Stanley & Co. LLC. ("MS&Co.")[3] to begin a strategic review of the Company.  The bankruptcy filings also revealed for the first time that Garrett was actively negotiating, albeit unsuccessfully, with Honeywell "***throughout 2019"*** to escape the escalating harm to its core operations caused by the inherited capital structure.[4]

9.      By the fourth quarter of 2019, Garrett's problems caused by the unsustainable capital structure became so dire that the Board directed the pursuit of two strategies.  *First*, the Board directed Garrett to file a Hail-Mary litigation against Honeywell in New York State Court

---

[1] *See* Bankruptcy Proceedings, ECF No. 137 (*Application of Debtors and Debtors in Possession for Entry of an Order Authorizing Retention and Employment of Quinn Emanuel Urquhart & Sullivan LLP as Special Counsel Pursuant to Bankruptcy Code Sections 327(e), 328(a), and 1107(b), Nunc Pro Tunc to the Petition Date and Notice of Opportunity for Hearing*) ("Quinn Application") at ¶7.

[2] *See* Paragraph 134, *infra*.

[3] *See* Bankruptcy Proceedings, ECF No. 19 (*Declaration of Regina Savage in Support of Debtors' Motion for One or More Orders (A) Authoring and Approving Bid Procedures, (B) Authorizing and Approving The Stalking Horse Bid Protections, (C) Scheduling A Sale Hearing, (D) Authorizing and Approving Assumption and Assignment procedures, (E) Approving Notice Procedures and (F) Granting Other Relief* (the "Savage Decl.")) at ¶7 ("MS&Co has been providing services to the Debtors since the first quarter of 2019").

[4] *See* Bankruptcy Proceedings, ECF No. 15 (*Declaration of Sean Deason in Support of the Debtors' Chapter 11 Petitions and First Day Pleadings* (the "Deason Decl.")) *at* ¶56.

seeking relief from the Honeywell Obligations.[5]  However, the litigation floundered and was later abandoned as part of the resolution of issues in the Bankruptcy Proceedings.

10.     *Second*, the Board directed  MS&Co. to contact the 15 most likely merger partners to determine whether there was interest in a potential merger with, or acquisition of, Garrett.[6]  This survey resulted in MS&Co. confirming to the Board in early 2020 (**before** Garrett touted its "significant financial flexibility" and "strong financial position" to investors on February 27, 2020), that **none** of the potential merger partners would consider a strategic transaction without a bankruptcy or restructuring that would remedy the unsustainable capital structure.

11.     Consequently, the Board retained Perella Weinberg Partners ("PWP") on February 1, 2020, to evaluate strategic alternatives, including potential restructuring and an auction process for a stalking horse bidder to take the company into bankruptcy.[7]  Notably, PWP's retention **predated** Defendant Rabiller's February 27, 2020, statement that Garrett was "*well positioned **to build upon the progress** we achieved during our first full year as an independent company*.".

12.     The auction process seeking a stalking horse bidder commenced shortly thereafter and would include new solicitations of interest and months of due diligence supervised by PWP, MS&Co., Sullivan & Cromwell ("S&C"), and AlixPartners LLP ("AlixPartners") — all of whom were hired to "assist in reviewing and preparing for various court-supervised restructuring processes that could be available to the Company given its global footprint and capital structure."[8]

---

[5] *Garrett Motion Inc. et al. v. Honeywell International Inc. et al.*, Adv. Proc. No. 20-01223 (Bankr. S.D.N.Y.) (MEW) (the "Adversary Proceeding").

[6] Deason Decl. at ¶74.

[7] Bankruptcy Proceedings, ECF No. 128 (*Application of Debtors for Authority to Retain and Employ Perella Weinberg Partners LP as Restructuring Investment Banker to the Debtors Nunc Pro Tunc to the Petition Date*) at ¶10.

[8] Deason Decl. at ¶74; *see also* Bankruptcy Proceedings, ECF No. 16 (*Declaration of Scott M. Tandberg, Director at AlixPartners, LLP, In Support of Debtors' Chapter 11 Petitions and First Day Motions*) at ¶6.

13.     The fact that Defendants were actively pursuing a court-supervised restructuring as early as the February 1, 2020 hiring of PWP simply cannot be reconciled with the positive Class Period public statements made by Defendants including statements: on February 27, 2020 noted above; in April and May, 2020 touting the *resiliency* of Garrett's financial structure; on May 11, 2020 stating "*positive business fundamentals remain intact and we will continue to calibrate production schedules in the near term and flex our cost structure to maintain our agility and strengthen our position for long-term success*;" on June 12, 2020 – while in the final stages of due diligence with potential stalking horse bidders for the Company – reassuring investors that "[d]espite the near-term disruption across the automotive industry and global economy, *it is important to remember that the positive long-term fundamentals of our business remain intact*;" and on July 30, 2020, touting the fact Garrett was *"execut[ing] on our long-term strategy*."

14.     The contrast between Defendants' public statements and Garrett's restructuring preparations is even more stark when one compares Defendants' public statement on August 26, 2020 – that Garrett had "***not yet determined whether to pursue any balance sheet restructuring altern**atives*" – with the fact that Garrett had already (after more than six months of restructuring work by PWP, S&C and AlixPartners) signed the Exclusivity Agreement with stalking horse KPS Capital Partners, LP ("KPS") to initiate a court-supervised reorganization and sale.[9]

15.     Notably, Defendants' Class Period misstatements about Garrett's financial flexibility, strong financial position, and positioning for future success were not general reflections of corporate optimism, but rather were specific statements designed to reassure investors that – even in the face of the COVID disruptions – Garrett's current results and operations indicated investors could expect long-term success at the newly public company.  Nor were they protected

---

[9] Deason Decl. at ¶81.

forward-looking statements accompanied by meaningful cautionary language.  To the contrary, Garrett's "risk factors" in its Class Period annual and quarterly filings were themselves misleading because they warned of what "*may*" or "*could*" happen when Garrett's filings in the Bankruptcy Proceedings demonstrate Defendants *knew* or were highly reckless in disregarding that the harm had already manifested.  Defendants were not permitted to warn investors of what *might* be ahead when the harm was *already underfoot*.

16.    In sum, and as set forth in more detail herein, Garrett's bankruptcy filings reveal, among other things, that:

(i)    "Since the Spin-Off, the Company . . . struggled with the capital structure Honeywell foisted upon it" (Bankruptcy Proceedings, ECF No. 19 at ¶7);

(ii)    Members of Garrett's senior management and Board of Directors frequently reviewed Garrett's financials and were aware of Garrett's capital structure shortly after the Spin-Off in October 2018, including the fact that Garrett's leverage ratio grossly exceeded the industry-standard;

(iii)    Garrett started working with MS&Co. in the first quarter 2019 to explore strategic alternatives (Savage Decl. at ¶7);

(iv)    Garrett negotiated, albeit unsuccessfully, with Honeywell throughout 2019 to attempt to alleviate the Honeywell Obligations, culminating with a failed mediation in September 2019 (Deason Decl. at ¶56);

(v)    In the fourth quarter 2019, Garrett instructed MS&Co. to explore strategic options, including a survey of the 15 most likely merger partners (Deason Decl. at ¶74);

(vi)    In December 2019, Garrett commenced a Hail-Mary litigation against Honeywell (*see* the Adversary Proceeding);

(vii)    Prior to the COVID pandemic, Garrett's senior officers and customer relationship teams reported to the Board that customers were nervous about Garrett's financial health;

(viii)    Garrett's senior management knew that the capital structure and Honeywell obligations precluded the Company from accessing the capital markets for liquidity; [10]

---

[10] Deason Decl. at ¶3 ("The inherited capital structure is not sustainable.  It . . . eliminates access to new

(ix)    Prior to the Board's retention of PWP on February 1, 2020, MS&Co. confirmed to the Board that a sale would not be possible without disposing of the Honeywell Obligations through litigation or bankruptcy;[11]

(x)    On February 27, 2020 – after MS&Co. confirmed to the Board that a sale would not be possible without disposing of the Honeywell Obligations through litigation or bankruptcy (and a month after the Board directed the hiring of PWP) – Defendant Rabiller misleadingly touted the Company's "*significant financial flexibility*," "*significant flexibility to help mitigate the impact from any short-term fluctuations in the underlying macro environment;*" and that it was "well *positioned to build upon the progress*" *in its first y*ear;

(xi)    On March 20, 2020, the Board retained AlixPartners to assist in reviewing and preparing for various court-supervised restructuring processes that could be available to the Company given its global footprint and capital structure;

(xii)    On May 11, 2020 – months after the Board directed the active solicitation of a stalking horse bidder and pursuit of court-supervised restructuring – the Defendants misleadingly stated its "*positive business fundamentals remain intact and we will continue to calibrate production schedules in the near term and flex our cost structure to maintain our agility and strengthen our position for long-term success*;"

(xiii)    On June 12, 2020 – while in the final stages of due diligence with potential stalking horse bidders for the Company (Deason Decl. at ¶¶79-81) – the Defendants misleadingly reassured investors that "[*d]espite the near-term disruption across the automotive industry and global economy, it is important to remember that the positive long-term fundamentals of our business remain intact*;"

(xiv)    On July 30, 2020 – after receiving five nonbinding indications of interest, all of which were contingent on receiving Garrett free and clear of the Honeywell Obligations[12] and after conducting months of due diligence all

---

debt and equity capital." *See also Id.* at ¶71 ("It is extremely unlikely that any investor would contribute new equity capital behind both the Company's funded debt and its ASASCO Indemnity Obligations").

[11] Deason Decl. at ¶74 ("All financial sponsor insisted on potential transaction structures in which the balance sheet of the Company – including its excess funded debt leverage, the ASASCO Indemnity Agreement and other legal liabilities – could be left behind or discharged and the business of the Company acquired free and clear of those burdens.").

[12] Deason Decl. at ¶80 ("All second round bidders made clear to the Company that they would not purchase the Company except in a chapter 11 proceeding or other process that could deliver the business free and clear of its current balance sheet").

in pursuit of court-supervised restructuring – the Defendants misleadingly assured investors "*we continue to benefit from our robust infrastructure and agile working capabilities as we execute on our long-term strategy*" and filed a Form 10-Q that removed cautionary "going concern" language;

(xv)　On August 13, 2020 – while Garrett's stock was still trading over $4 per share – Garrett signed the undisclosed Exclusivity Agreement with stalking horse bidder KPS (Deason Decl. at ¶81), which enabled the Company to make final preparations for its court-supervised restructuring, which would be filed just five weeks later and caused the stock price to drop to $1.76 per share; and

(xvi)　On August 26, 2020 – thirteen days after entering the Exclusivity Agreement with stalking horse bidder KPS and only twenty-five days before Garrett initiated its Bankruptcy Proceedings – Defendant Rabiller falsely claimed Garrett "*has **not** yet determined whether to pursue any balance sheet restructuring alternatives.*"

17.　Defendants' foregoing activities and admissions demonstrate their knowledge of the deepening impact of the inherited capital structure and Honeywell Obligations on the Company's core operations and the inevitability of a court-supervised restructuring (with or without an accompanying strategic sale of the Company).　Their statements and actions simply cannot be reconciled with Defendants' positive Class Period statements touting Garrett's flexibility, financial condition, resiliency, long-term strategy, ability to meet its liquidity needs, and positioning to build toward the future.　Defendants' statements were, at the very least, highly unreasonable and represented an extreme departure from the standards of ordinary care by public-company directors and officers when they chose to speak on a subject.

18.　Defendants' misstatements and omissions were highly material to investors. Garrett's common stock lost approximately $350 million in value during the Class Period on trading days following Defendants' partial corrections on subjects addressed in their previous misstatements and omissions.

19.     For example, Garrett started to reveal the truth on May 11, 2020, when Defendant Rabiller stated for the first time that *"[o]ur former parent imposed on us a rigid capital structure that was unable [sic] unless Garrett executed perfectly in a highly favorable macroeconomic and industry environment, meaning that was really unsustainable that way unless everything was perfect. With insight, it is clear that our capital structure was ill suited to cope with any meaningful operating challenges*."   Despite accompanying positive countervailing statements by Defendants, Garrett's stock price fell 16%.

20.      On August 26, 2020, Garrett issued a press release revealing, for the first time, that its "*leveraged capital structure poses significant challenges to its overall strategic and financial flexibility and may impair its ability to gain or hold market share in the highly competitive automotive supply market, thereby putting Garrett at a meaningful disadvantage relative to its peers*."   Despite countervailing positive statements by Defendants, including, incredibly, that Garrett "*has **not** yet determined whether to pursue any balance sheet restructuring alternatives*," Garrett's stock price fell 44%.

21.     On September 18, 2020, *The Wall Street Journal* reported that "Auto Supplier Garrett Motion Nears Bankruptcy Sale to KPS."   *The Wall Street Journal* detailed, among other things, that Garrett's bankruptcy filing was imminent due to its unsustainable capital structure. Garrett's stock price fell 16%.

22.     Garrett finally revealed the full truth on September 20, 2020 when it filed its Chapter 11 Case in the Bankruptcy Court.   In connection with the announcement, Defendant Rabiller stated, among other things, that *"[a]lthough the fundamentals of our business are strong and we have continued to try to develop our business strategy, **the financial strains of the heavy debt load and liabilities we inherited in the spinoff from Honeywell – all exacerbated by COVID-***

10

*19 – have created a significant long-term burden on our business*."  Shares closed at $1.76 per share on the next trading day, September 22, 2020, a drop of an additional 12.4%.

## II.    JURISDICTION AND VENUE

23.    This Court has jurisdiction over this Action under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. § 78) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).  In addition, because this is a civil action arising under the laws of the United States, this Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1337.

24.    Venue is proper in this District pursuant to 28 U.S.C. § 1391(b).  Substantial acts in furtherance of the alleged fraud or the effects of the fraud have occurred in this District.  Many of the acts charged herein, including the dissemination of materially false and/or misleading information, occurred in substantial part in this District.  Moreover, Garrett voluntarily elected to file for bankruptcy protection in this District and in those filings has asserted jurisdiction based on certain bank accounts of its subsidiaries.

25.    Personal jurisdiction exists over each Defendant because either the Defendant: (i) conducts business in or maintains operations in this District; or (ii) is an individual who is either present in this District for jurisdictional purposes or has sufficient minimum contacts with this District to render the exercise of jurisdiction over the Defendant by this Court permissible under traditional notions of fair play and substantial justice.

26.    In connection with the acts alleged herein, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to the mail, interstate telephone communications and the facilities of a national securities exchange.

27.     Garrett's Reorganization Plan expressly exempts from the Plan releases of any securities claims against Garrett (the "Section 510(b) Claims")[13] brought as part of this class or another class action:

> [N]o Releasing Party shall be deemed to have released (a) any Section 510(b) Claim against the Debtors, or (b) any claim arising from rescission of a purchase or sale of Existing Common Stock or for damages arising from the purchase or sale of Existing Common Stock against one or more of the Debtors' current or former officers or directors, or Honeywell or Honeywell's current or former officers or directors; provided that each Releasing Party shall only be entitled to assert the claims identified in subclause (b) above as a member of a class in a class action in which such Releasing Party is not a lead plaintiff and to respond to or oppose any objections or challenges to such Releasing Party's inclusion in such class action.

(Chapter 11 Case, ECF 1129, Section 11.10).  However, the Plan limits recovery on such Section 510(b) Claims to the "aggregate Cash payments received or recoverable from any Insurance Policies on account of any Allowed Section 510(b) Claim."[14]

28.     This Court authorized Lead Plaintiffs to assert the Section 510(b) Claims by July 12, 2021 Order, and the Section 510(b) Claims against Garrett are alleged in Count I for violations of Section 10(b) of the Exchange Act.

## III.    PARTIES

### A.    Plaintiffs

29.     Lead Plaintiffs The Gabelli Asset Fund, The Gabelli Dividend & Income Trust Fund, and The Gabelli Value 25 Fund Inc. are mutual funds managed by Gabelli Funds, LLC, and have their principal places of business in Rye, New York.  The funds transactions in Garrett common stock are listed at ECF No.17-1.

---

[13] So defined in the Plan based on 11 U.S.C. § 510(b), the provision of the United States Bankruptcy Code that subordinates securities claims against debtors by equity holders to all claims by other creditors.

[14] Chapter 11 Case, ECF No. 1129 p. 37.

30.     Lead Plaintiff GAMCO Asset Management Inc. is an investment manager, and has its principal place of business in Rye, New York.  GAMCO Asset Management Inc.'s transactions in Garrett common stock are listed at ECF No. 17-2.

### B.     Defendant Garrett

31.     Garrett is a Delaware Corporation with its principal executive offices located in Rolle, Switzerland.  Garrett designs, manufactures, and sells automotive turbochargers, electric-boosting and connected vehicle technologies for original equipment manufacturers.  Garrett became a stand-alone company following the October 1, 2018 Spin-Off from Honeywell and commenced its Chapter 11 Bankruptcy Proceedings less than two years later on September 20, 2020 in the Bankruptcy Court, asserting jurisdiction based on, among other things, bank accounts of its subsidiaries in New York.

### C.     The Director and Officer Defendants

32.     Defendant Olivier Rabiller has been Garrett's President and CEO since the Spin-Off.  On May 4, 2018, Honeywell announced Defendant Rabiller would become Garrett's CEO following the Spin-Off.  Defendant Rabiller officially assumed the position of CEO and became a member of the Board effective on the date of the Spin-Off.  Before joining Garrett, Rabiller served as President and CEO of the Transportation Systems division at Honeywell, and before that as Vice President and General Manager of Transportation Systems for Honeywell's High Growth Regions, Business Development and Aftermarket.  Defendant Rabiller signed Garrett's Form 10-K filed on February 27, 2020 (the "February 2020 Form 10-K"), Garrett's Form 10-Q dated May 11, 2020 (the "May 2020 10-Q"), and Garrett's Form 10-Q filed July 30, 2020 (the "July 2020 10-Q"), and is quoted in documents dated March 19, 2020, April 7, 2020, May 11, 2020, June 12, 2020 and August 26, 2020, and participated in Garrett investor calls/presentations on February 27, 2020, May 11, 2020 and July 30, 2020, all of which are alleged to be false and misleading.

33.     Defendant Peter Bracke was Garrett's Interim Chief Financial Officer ("CFO") from September 5, 2019 to June 2020.  From June 2020 to June 2021, Bracke served as Garrett's Vice President and Chief Transformation Officer.  Prior to September 5, 2019, Defendant Bracke was the Company's Vice President, FP&A and Business Finance.  Prior to the Spin-Off, Bracke held various senior-level roles within multiple divisions at Honeywell during his more than 20-year tenure at the company.  Defendant Bracke signed Garrett's February 2020 Form 10-K and May 2020 Form 10-Q and participated in Garrett investor calls/presentations on those same dates, as well as the earnings call on July 30, 2020.  On May 31, 2021, Garrett terminated Defendant Bracke's employment, effective November 30, 2021.

34.     Defendant Sean Deason has been Garrett's CFO since June 8, 2020.  Defendant Deason signed Garrett's July 2020 Form 10-Q and participated in Garrett's earnings call on the same day.

35.     Defendant Russell James has served as Garrett's Principal Accounting Officer and Controller since the Spin-Off.  Defendant James signed Garrett's February 2020 Form 10-K.

36.     Defendant Carlos M. Cardoso served as Garrett's non-executive chairperson of the Board from the Spin-Off until Garrett emerged from bankruptcy on April 20, 2021.  Defendant Cardoso signed Garrett's February 2020 Form 10-K.

37.     Defendant Maura J. Clark served as a member of the Board from the Spin-Off until Garrett emerged from bankruptcy on April 20, 2021.  Defendant Clark signed Garrett's Form 10-K alleged to be false and misleading dated February 27, 2020.

38.     Defendant Courtney M. Enghauser served as a member of the Board from the Spin-Off until Garrett emerged from bankruptcy on April 20, 2021.  Defendant Enghauser signed Garrett's February 2020 Form 10-K.

39.     Defendant Susan L. Main served as a member of the Board from the Spin-Off until Garrett emerged from bankruptcy on April 20, 2021.  Defendant Main signed Garrett's February 2020 Form 10-K.

40.     Defendant Carsten J. Reinhardt served as a member of the Board from the Spin-Off until Garrett emerged from bankruptcy on April 20, 2021.  Defendant Reinhardt signed Garrett's Form 10-K, alleged to be false and misleading, dated February 27, 2020.

41.     Defendant Scott A. Tozier served as a member of the Garrett Board from the Spin-Off until Garrett emerged from bankruptcy on April 20, 2021.  Defendant Tozier signed Garrett's Form 10-K, alleged to be false and misleading, dated February 27, 2020.

42.     Defendants Rabiller, Bracke, Deason, James, Cardoso, Clark, Enghauser, Main, Reinhardt, and Tozier are collectively referred to herein as the "Director and Officer Defendants."

## IV.    SUBSTANTIVE ALLEGATIONS

### A.     Honeywell Burdens Garrett with an Unsustainable Capital Structure on the Date of the Spin-Off

43.      In anticipation of the Spin-Off, Honeywell renamed its Transportation Systems business Garrett Motion Inc.  Garrett designs and manufactures highly engineered turbocharger, electric-boosting and connected vehicle technologies for the big automotive manufacturers, known in the industry as original equipment manufacturers ("OEMs"), and for the automotive aftermarket for gasoline and diesel engines that enhance performance, fuel economy and drivability.  Garrett's OEM business represents 85% of its total sales.  The OEM business is a long tail business in the sense that Garrett works with the OEMs for several years on the design and integration of Garrett turbochargers and other components before those products are ever actually manufactured and sold to the OEM by Garrett.  As one might expect, the stability and financial condition of suppliers like Garrett are critical to the OEMs who need to assure they can meet production goals when the new

model vehicles come to market years after the original contract is signed and design begins.  In addition to its OEM business, Garrett sells components and technologies in the global aftermarket through a distribution network of more than 190 distributors covering 160 countries.

44.     As part of the Spin-Off Garrett, Honeywell forced Garrett to assume a capital structure with massive liabilities and restrictions on its business through three core governing agreements — the Indemnification Agreement, the Credit Agreement and the Tax Matters Agreement (collectively referred to herein as the "Spin-Off Agreements" or the "Honeywell Obligations").

45.     The Indemnification Agreement required Garrett to indemnify Honeywell for certain asbestos liabilities, including judgments, settlements, and the legal costs of defense, for a term of 30 years and payments up to $5.25 billion.  The Indemnification Agreement also limited Garrett's ability to engage in strategic transactions through various "loan-like covenants and restrictions," and effectively provided Honeywell with an absolute veto over any Garrett transaction outside of the ordinary course of business.  The Indemnification Agreement could not be terminated or cashed out in connection with a merger or strategic transaction; it had to be assumed by any purchaser or surviving company and could not be prepaid or restructured absent Honeywell's consent.

46.     Honeywell also required Garrett to enter the Credit Agreement with certain secured lenders to fund a $1.6 billion "dividend" to Honeywell.  Specifically, Garrett's debt consisted of: (i) a seven-year senior secured first-lien term loan B loan facility, maturing on September 27, 2025; (ii) a five-year senior secured first-lien term loan A facility in an aggregate principal amount of approximately €251.6 million, maturing on September 26, 2023; and (iii) a five-year senior secured first-lien revolving credit facility in an aggregate commitment amount of €430 million.  In

addition to the credit facility and term loan facilities during the Spin-Off, Honeywell forced Garrett affiliates to issue €350 million in 5.125% senior notes maturing on October 15, 2026.

47.     The Tax Matters Agreement required Garrett to reimburse Honeywell for certain tax obligations, included certain income taxes, sales taxes, VAT and payroll taxes and additional obligations under the Tax Cuts and Jobs Act of 2017.   As of September 2020, Honeywell determined that Garrett's payment obligations totaled $240 million, to be paid in eight annual installments from November 2018 through April 2025.

**B.    Defendants Issue Positive Statements to Distinguish Newly Independent Garrett from its Peers**

48.     Leading up to and following the Spin-Off, Defendants made more than sixteen months of statements stressing the importance of Garrett's core business operations, including the Company's technology and research and development ("R&D"), and touting its financial health, financial flexibility, stability, and resiliency.   The statements were deliberately designed to distinguish the newly independent Garrett from its competitors in the turbocharger industry and they underscored to investors the materiality both of Garrett's ability to reinvest in R&D and its financial flexibility, stability, and resiliency to Garrett's core business operations.

**i.     Pre-Class Period Statements Regarding Technology and R&D**

49.     During the period Post-Spin-Off but before the Class Period, Garrett issued statements touting its superior technology and R&D funding and growth plan, including:

- On October 1, 2018, Garrett issued a press release where Defendant Rabiller stated that Garrett was "an automotive *technology pioneer, inventor and innovator*" and had "*established a strong position for providing differentiated technologies* that are in demand;"

- On November 6, 2018, during an earnings call Defendant Rabiller emphasized Garrett's "*three stage technology growth strategy*" and Garrett's presentation accompanying the call listed "[s]ustainable margin profile *driven by technology*" as one of its "Key Q3 and 9M 2018 Takeaways;"

- At the January 2019 Deutsche Bank Global Auto Industry conference (at or about the same time the Board had quietly hired MS&C to conduct a strategic review), Defendant Rabiller presented and used a presentation with a slide titled "*R&D Supporting Growth*" that represented Garrett's investment capacity in growth "*will increase from 50% to 100% of R&D budget in 4 years"*, and that Garrett has "*investment capacity available to support growth and innovation;*"

- In a press release dated February 20, 2019, Defendant Rabiller was quoted as stating "[w]e remain well positioned for future growth as we continue to benefit from our global scale and develop the next generation of technology focused on electrification and software.  By working closely with our customers, *we can accelerate our differentiated technology solutions to the market and help solve their challenges by redefining and advancing motion*;"

- During an earnings call on February 20, 2019, Defendant Rabiller discussed the Company's R&D, stating *"[w]e are uniquely positioned as a company when it comes to resourcing the development of our new growth vectors and innovation pipeline.  Considering that our R&D spend as a percentage of sales is flat, our 4% to 6% revenue growth per year converts into a direct increase of the resources available to our engineers*;"

- Garrett's Form 10-K dated March 1, 2019 described Garrett as a "g*lobal technology leader*" and stated that the Company is a *"[l]eading technology, continuous innovation, product performance and OEM engineering collaboration are central to our customer value proposition and a core part of our culture and heritage.*" It also stated *"[w]e expect to continue to invest in product innovations and new technologies*", despite the fact that by this point Garrett was already in negotiations with Honeywell to get relief from the inherited capital structure which was impeding its core operations including its ability to fund R&D;

- During a May 7, 2019, earnings call, Defendant Rabiller discussed the Company's "*technology project pipeline*" and stated that "*Garrett is a technology company, operating into the automotive industry and our technology growth strategy depicted here remains a key priority for the long-term success of our company*;" and

- Similarly, on a July 30, 2019, related earnings call Defendant Rabiller stated that "Garrett is a *leading technology company* operating in the automotive industry" and emphasized its "*technology led growth strategy [] remains a key priority for long-term success.*"

18

### ii. Pre-Class Period Statements Regarding Garrett's Financial Health and Flexibility

50.  Garrett also issued a series of statements stressing to investors its purported financial health, flexibility and resiliency.  These statements were material to investors because the health of Company's balance sheet was critical to it surviving, and Garrett's critical OEM customers were nervous Garrett would be unable to perform on its long-term projects.  These statements included:

- On November 6, 2018, in a press release Defendant Rabiller is quoted stating he is "pleased that Garrett successfully *raised the financing at favorable rates, to become a strong independent company* and we look forward to continued advances in our growth vectors in software and electrification;"

- Garrett's Form 10-K dated March 1, 2019, stated "We believe *we will meet our known or reasonably likely future cash requirements through the combination of cash flows from operating activities, available cash balances and available borrowings through our debt agreements,*" despite the fact that by this point Garrett was already in negotiations with Honeywell to get relief from the inherited capital structure that was impeding its core operations including its ability to fund the Company including raising capital through new debt or equity offerings;

- Also on September 10, 2019, Garrett stated in the presentation it had a "[*w*]*ell-invested capacity base to support continued growth.*"  On a slide titled "Key Investor Takeaways," the Company represented its *"[s]trong financial foundation supports new growth vectors and innovation pipeline,*" even though by this time Garrett knew its negotiations with Honeywell to obtain relief from its inherited capital structure had failed; and

- On November 20, 2019 at the Barclay's Global Automotive Conference, Garrett represented that it had a "[*w*]*ell-invested capacity base to support continued growth,*" despite the fact that by this point Garrett had hired bankers to solicit interest in a possible merger or acquisition and had directed the filing of a Hail Mary litigation against Honeywell.

### C. Defendants' Growing Knowledge of the Undisclosed and Deepening Impacts of the Inherited Capital Structure on Garrett's Core Business Operations in the Year Following the Spin-Off

51.     Revelations from the Bankruptcy Proceedings provide a unique window into how Defendants' understanding of the undisclosed impacts the inherited capital structure and related Honeywell Obligations deepened from the date of the October 1, 2018 Spin-Off through the start of the class period on February 27, 2020.

52.     Immediately after the Spin-Off in October 2018, Garrett's senior management and Board reviewed Garrett's financials.  Bankruptcy testimony demonstrates the Board was aware that Garrett's leverage ratio grossly exceeded industry standards.  Further, the Board was aware early on that Garrett was subject to numerous constraints in the Indemnification Agreement that severely impacted its ability to operate independently and competitively.

53.     Garrett revealed for the first time during the Bankruptcy Proceedings that the Company struggled with the capital structure from day one: "*[s]ince the Spin-Off, the Company has struggled with the capital structure Honeywell foisted upon it, which is not sustainable and puts the Company at a substantial disadvantage to its competitors.*"[15]

54.     Because of the capital structure's impact on its business, the Board began working with MS&Co. to conduct a strategic review in the first quarter of 2019 – *i.e.*, just a few months after the Spin-Off.[16]  This review focused on Garrett's transition to operating as an independent company and evaluating the various issues the Company was confronting because of the restrictive capital structure and related Honeywell Obligations.

---

[15] *See* Quinn Application at ¶7.

[16] *See* Savage Decl. at ¶7.

55.     During the first half of 2019, Garrett also retained the law firm Quinn Emanuel "to, among other things, review the . . . Indemnity Agreement" (Deason Decl. at ¶56)."  Garrett's motion in the Bankruptcy Court seeking permission to continue employing Quinn Emanuel *nunc pro tunc* confirmed that the retention evolved out of issues caused by the Honeywell Obligation's impact on Garrett's business.[17]

56.     The Bankruptcy Proceedings also revealed for the first time that "[t]hroughout 2019, [Garrett] attempted to negotiate with Honeywell regarding the terms of the . . . Indemnity Agreement." (Deason Decl. at ¶56).  Defendants understood the enormous impact the Honeywell Obligations and resulting capital structure were having on Garrett's business and were desperately negotiating with Honeywell to find a way out of the restrictive underlying agreements.

57.     The revelations in the Bankruptcy Proceedings that Garrett almost immediately retained financial and legal counsel to review the Honeywell Obligations and engaged in a months' long campaign to try to negotiate a way out of the Honeywell Obligations is not surprising based on facts disclosed during the Bankruptcy Proceeding regarding how Garrett's capital structure undermined its core operations.  For example, the Deason Declaration revealed the Company's capital structure and Indemnification Agreement would make it impossible for the Company to succeed for at least four reasons.

58.     *First*, Defendants knew that Garrett's precarious balance sheet created by the Spin-Off made it difficult for Garrett to maintain its business and financial relationships with OEMs and suppliers.  Garrett typically bids for business 3-5 years prior to the production of the vehicles. Because Garrett was substantially overleveraged compared to its primary competitors (even before considering the effects of the Indemnification Agreement and before the COVID pandemic – *i.e.*,

---

[17] *See* Quinn Application at ¶7.

no later than fourth quarter 2019), Garrett's sales and customer relationship teams reported to Defendants that OEMs and suppliers had growing concerns about the Company's financial condition. (Deason Decl. at ¶¶67-68).

59.     *Second*, Defendants knew Garrett's leverage and indemnity obligations made it nearly impossible for the Company to navigate the highly uncertain and rapidly shifting automotive industry.   In recent years, the automotive industry has faced uncertainty due to technological changes and unprecedented disruptions that led to increased competition from new participants and necessary consolidation among existing industry participants.   Defendants knew the Company's inherited capital structure would effectively preclude it from engaging in strategic acquisitions or other consolidation.   (Deason Decl. at ¶¶69-70).

60.     *Third*, Defendants knew Garrett's ability to invest in R&D to sustain its business was severely constrained because Garrett was heavily leveraged and as a result Garrett had no access to incremental debt to fund R&D or capital expenditures.   These constraints were crucial because Garrett's business model and industry position required constant investment in new technology, both to improve the Company's existing products and to develop new products to meet customer demands.   (Deason Decl. at ¶¶65-66).

61.     *Fourth*, Defendants knew Garrett did not have access to the equity capital necessary to grow as an independent company and that no lender or investor would contribute new equity capital subordinated to both the Company's funded debt and its indemnity obligations.   (Deason Decl. at ¶71).

62.     Recognizing the internally known but publicly undisclosed impacts of the inherited capital structure and Honeywell Obligations, Garrett engaged in months of unsuccessful

negotiations with Honeywell, culminating in an unsuccessful mediation with Honeywell in September 2019.  (Deason Decl. at ¶56).

63.     As a result, the Board directed two desperate strategies during the fourth quarter of 2019.  First, the Board directed the investigation and filing of a Hail-Mary lawsuit against Honeywell in New York Supreme Court seeking to void certain aspects of the Honeywell Obligations, arguing that during the Spin-Off negotiations its counsel "blindly acceded to Honeywell's wishes, regardless of the best interest of their other client, Garrett"[18] and that its purportedly independent financial advisor that opined on the Company's solvency was "hopelessly conflicted."[19]   The lawsuit was futile and floundered until it was resolved as part of the reorganization approved in the Bankruptcy Proceeding.

64.     Second, at approximately the same time, the Board secretly directed MS&Co. to conduct a marketing and sales process for the Company, which included a market test on a "no-names basis" with approximately 15 parties regarding a potential merger with, or acquisition of, Garrett.  (Deason Decl. at ¶74).  According to Garrett's bankruptcy filings, in the first quarter of 2020, MS&Co. reported to Garrett that no potential strategic buyers expressed interest in exploring a potential transaction, but multiple financial sponsors expressed interest *if and only if* the potential transaction structures included leaving behind the excessive debt and indemnity liabilities on Garrett's balance sheet (*i.e.*, a sale through the bankruptcy court or successfully voiding the indemnification obligations through litigation).  (*Id.*).  As a result of MS&Co.'s report, on February 1, 2020, the Board retained PWP to focus on a restructuring.[20]  By March 20, 2020, the Board had

---

[18] Deason Decl. at ¶56.  *See also* Adversary Proceeding, ECF No. 1 pp. 20-21 (Complaint) at ¶5.

[19] *Id*. p. 3 (Notice of Removal) at ¶6.

[20] Bankruptcy Proceedings, ECF No. 128 (*Application of Debtors for Authority to Retain and Employ Perella Weinberg Partners LP as Restructuring Investment Banker to the Debtors Nunc Pro Tunc to the Petition Date*) at ¶10.

also retained S&C and AlixPartners to assist in reviewing and preparing for various court-supervised restructuring processes given its global footprint and capital structure.

65.     Garrett's Bankruptcy filings acknowledge that its advisors' conclusions confirmed the Honeywell Obligations made Garrett unsustainable as a stand-alone entity.  Significantly, the analysis was conducted prior to the COVID pandemic.  (Deason Decl. at ¶73).

66.     Garrett's own filings demonstrate that COVID was not the cause of the Garrett's capital structure problems or its eventual bankruptcy.  Defendants knew no later than February 27, 2020 that the inherited capital structure was not resilient, that it was ill suited to any market issues, and, of course, that Garrett was already in the process of pursuing restructuring.  The Bankruptcy Proceedings also made clear that Garrett's OEM customers had concerns about Garrett's financial health prior to the pandemic (*i.e.*, no later than fourth quarter 2019).

### D.  Garrett Solicits a Stalking Horse Bidder

67.      Following the hiring of PWP on February 1, 2020, the Board directed the solicitation of a Stalking Horse Bidder.  Garrett resolicited the potential acquirers previously solicited in the fourth Quarter of 2019 by MS&Co. and conducted the first phase of due diligence with the six sponsors who had expressed interest in earlier conversations, as well as one additional sponsor that later proactively reached out to the Company.  (Deason Decl. at ¶79).

68.     By June 15, 2020, Garrett had received 5 non-binding indications of interests, ***all*** of which were contingent on delivering Garrett and acquiring the business "in a chapter 11 proceeding or other process that could deliver the business ***free and clear of its current balance sheet"***.  (Deason Decl. at ¶80).[21]

---

[21] *See also* Savage Decl. at ¶12.

69.     Garrett selected the top three bidders to proceed with a "second phase" of diligence. (Deason Decl. at ¶81).   After three weeks of the second phase of diligence, one of the parties removed itself from consideration for the transactions.   (*Id.*).   The remaining two parties then "conducted an additional three weeks of diligence, expert sessions with management and outside advisors, reviewed a virtual data room with more than 50,000 pages of the Debtors' documents, and submitted over 400 specific due diligence questions."   (*Id.*).   It is beyond dispute that the Defendants were at least aware of (if not directly involved in) the diligence process.

70.     On August 3, 2020 the two remaining parties submitted non-binding proposals. Ten days after that, on August 13, 2020, Garrett signed an Exclusivity Agreement with the Stalking Horse Purchasers KPS.

### E.     Garrett Includes a "Going Concern" Warning in the Second Quarter of 2020

71.     In its May 2020 Form 10-Q reporting on first quarter results, Garrett disclosed that, in the absence of modifications to certain Credit Agreements, there was a substantial doubt concerning Garrett's ability to continue as a going concern.   Specifically, Garrett stated that "[o]ur management has concluded that the foregoing conditions and events raise substantial doubt as to our ability to continue as a going concern. The accompanying financial statements do not include any adjustments or classifications that may result from the possible inability of the Company to continue as a going concern within one year after the issuance of the financial statements."

### F.     Garrett Enters into Amendments to Certain Credit Agreements

72.     On June 12, 2020, Garrett entered into amendments to certain of its credit agreements – a strategy that Defendants knew at best would simply buy the Company some additional time.   Defendant Rabiller stated in the press release announcing the amendments that "[t]he modifications to our Credit Agreement significantly enhance Garrett's financial flexibility to weather the current pandemic-induced economic slowdown."   Rabiller said nothing about the

25

planned restructuring or the stalking horse bid process which was entering the final phase at that time.

### G.    Garrett Allows its Accountants to Remove its Going Concern Warning

73.    Despite the ongoing restructuring preparations and the advanced state of the stalking horse bid process (Deason Decl. at ¶¶80, 81),[22] Garrett's July 30, 2020 Form, 10-Q omitted the going concern language.  While going concern language is overseen by accountants and auditors, its removal created the misimpression that all was well with the Company when indeed bankruptcy was both a certainty and near at hand.  (Deason Decl. at ¶80).[23]

74.    It is beyond dispute that all Defendants were at least aware of (if not directly involved in) the bidding and diligence process, which was completed before the removal of the Going Concern Language in the July 30, 2020, 10-Q (just days before the two remaining parties submitted non-binding proposals on August 3, 2020).  Whether the accountants were aware or not about the bankruptcy process, the Defendants were in final preparations for a bankruptcy filing that was less than six weeks away and knew or recklessly disregarded the fact that the removal of the Going Concern Language would be viewed by investors as a sign of financial good health when bankruptcy was in fact imminent.

## V.    DEFENDANTS' CLASS PERIOD MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS OF MATERIAL FACTS

75.    By the beginning of the Class Period on February 27, 2020, Garrett had been a stand-alone Company for more than 16 months and the Director and Officer Defendants had extensively observed the impact the unsustainable capital structure was having on Garrett's core operations.  Nevertheless, Defendants made a series of materially false and misleading statements

---

[22] *See also* Savage Decl. at ¶12.

[23] *Id.*

and omissions that were irreconcilable with Defendants' knowledge of Garrett's deepening financial and operational crisis and, at very least, were highly reckless and represented an extreme departure from the standards of ordinary care by public-company directors and officers.

76.     Defendants' false and misleading statements were not general statements of corporate optimism, but rather were specific statements designed to reassure investors that – even in the face of the COVID disruptions – that Garrett's current results and operations indicated investors could expect long-term success at the new company.

77.     Nor were the statements forward-looking or protected by the safe harbor.  As set forth herein, the risk factors that accompanied Defendants' statements were themselves misleading because the "harm" in the risk factors had already manifested.

**A.     February 27, 2020 False and Misleading Statements and Omissions of Material Facts**

78.     On February 27, 2020, Garrett issued a press release announcing its fourth quarter and full year 2019 financial results, the Company's first full-year financial results as a stand-alone company.   In the press release, Defendant Rabiller touted Garrett's "***significant financial flexibility***" that made it "***well positioned to build upon the progress we achieved during our first full year as an independent company***."

79.     During an earnings call that same day, Defendant Rabiller assured investors that Garrett "maintained [its] ***strong financial position***" and touted the Company's "***flexible and resilient business model***" that provided "***significant flexibility*** to help mitigate the impact from any short-term fluctuations in the underlying macro environment[.]"   Rabiller also stated that "[g]oing forward, we plan to continue to ***utilize our strong free cash flow generation to reduce net debt and deleverage our balance sheet***."

80.     Garrett's February 27, 2020, Form 10-K for 2019 (the "February 2020 Form 10-K"), which was signed by each of the Director and Officer Defendants except for Defendant Deason, misleadingly represented that Garrett would be able to meet its anticipated cash requirements and liquidity needs over the ensuing 12 months through cash flow, available borrowing, and issuance of debt or equity:

> ***We believe we will meet our known or reasonably likely future cash requirements through the combination of cash flows from operating activities, available cash balances and available borrowings through our debt agreements. If these sources of liquidity need to be augmented, additional cash requirements would likely be financed through the issuance of debt or equity securities; however,*** there ***can be no assurances*** that we will be able to obtain additional debt or equity financing on acceptable terms in the future. ***Based upon our history of generating strong cash flows, we believe we will be able to meet our short-term liquidity needs for at least the next twelve months.***

81.     The above-referenced statements in Garrett's February 27, 2020 press release, earnings call and February 2020 Form 10-K were materially false and misleading when made and stand in stark contrast to Defendants' knowledge of the deepening impact of the inherited capital structure on core business operations.

82.     By February 27, 2020, Defendants already knew both that the Company could not survive in light of its capital structure (unless – as Rabiller put it – Garrett executed perfectly and the macroeconomic trends were highly favorable), and that no strategic transactions were available without restructuring the Honeywell Obligations.  As discussed above, the Defendants' knowledge had evolved to fully understand these facts by this point in February 2020 as evidenced by Bankruptcy admissions that Garrett: (i) "struggled" with the onerous capital structure *since the Spin-Off*; (ii) worked with financial advisors during a years-long strategic review process that started in the *first quarter of 2019*; (iii) attempted to negotiate, albeit unsuccessfully, with

Honeywell to get relief from the Honeywell Obligations *throughout 2019*; (iii) engaged in a failed mediation with Honeywell *in September 2019*; (iv) understood OEM customers were concerned with Garrett's capital structure by at least the *Fall of 2019*; (v) directed the filing of a Hail Mary lawsuit against Honeywell; (vi) directed its financial advisors to initiate a marketing and sales process in connection with the merger or acquisition of the Company in the *fourth quarter of 2019;* and (vii) learned *in the first quarter of 2020* (before hiring PWP *on February 1, 2020* to evaluate restructuring scenarios) that no strategic transactions were available without restructuring the Honeywell obligations.

83.     The statements by Rabiller that Garrett: had "*significant financial flexibility*;" was "*well positioned to build" upon its first full year "progress*;" maintained a "*strong financial position*;" was "*flexible and resilient*;" and had "*significant flexibility" to mitigate fluctuations in macro environment*, simply cannot be reconciled with Defendant Rabiller's later admission that Garrett had inherited "a rigid capital structure . . . that was really unsustainable . . . [and] ill-suited to cope with any meaningful operating challenges."

84.     It was similarly false and misleading for Garrett to state that it was "*likely*" to and "*believed*" it would *meet its upcoming liquidity needs and that it had the cash flow to "deleverage*." When, as Deason later admitted, all of Garrett's cash flows were "trapped" by the Honeywell Obligations and the resulting liquidity crisis at Garrett led to the company's bankruptcy.  (Deason Decl. at ¶71).

85.     Garrett's statements that it would "*likely*" be able to access the capital markets if necessary to issue debt or equity likewise stand in stark contrast to Deason's admission that Garrett had "*no access to equity capital*" because "*it is extremely unlikely that any investor would contribute new equity capital behind both the Company's funded debt and its ASASCO Indemnity*

29

*Obligations*." (Deason Decl. at ¶71).  The same is true for Deason's related admission that Garrett "*has no access to incremental debt [] given its high leverage*" and that it "*cannot realistically sell equity to raise funds*" because of its inherited capital structure and the related Honeywell Obligations.  (Deason Decl. at ¶66).

86.     The statements in paragraphs 78, 79 and 80 simply cannot be reconciled with Defendants' knowledge of Garrett's deepening financial and operational crisis and, at the very least, were highly reckless and represented an extreme departure from the standards of ordinary care by public-company directors and officers.

**B.     March and April 2020 False and Misleading Statements and Omissions of Material Facts**

87.     On March 19, 2020, more than six weeks after Garrett retained PWP to explore restructuring transactions and after MS&Co. reported that potential merger partners were unwilling to consider a transaction with the Honeywell Obligations in place, Garrett issued a press release announcing its Wuhan, China facility was restarting operations following the COVID pause.  Among other things, Defendant Rabiller stated that the Company's "***focus remains on leveraging our flexible and resilient business model***."

88.     Likewise, on April 7, 2020, Garrett issued a press release containing certain preliminary first quarter 2020 results, withdrawing the Company's financial guidance for the year ending December 31, 2020 and announcing a business update related to the COVID pandemic. Defendant Rabiller again touted the Company's actions "*to enhance our liquidity and preserve the long-term health of the business*" and the expectation to rely, among other things, on Garrett's "***resilient business model*** to emerge from this crisis as a stronger company."

89.     The above-referenced statements on March 19, 2020 and April 7, 2020, were materially false and misleading when made and cannot be reconciled with Defendants' deepening

knowledge of the impact of the inherited capital structure on core business operations or the fact that the Board had already directed its restructuring advisors, lawyers and bankers to pursue a stalking horse bidder and to prepare for a court-supervised restructuring.  As discussed above, by this point in March and April 2020 Garrett: (i) "struggled" with the onerous capital structure *since the Spin-Off*; (ii) worked with financial advisors during a years-long strategic review process that started in the *first quarter of 2019*; (iii) attempted to negotiate with Honeywell to get relief from the Honeywell Obligations *throughout 2019*; (iv) engaged in a failed mediation with Honeywell *in September 2019*; (v) understood OEM customers were concerned with Garrett's capital structure by the *Fall of 2019*; (vi) directed the filing of a Hail Mary lawsuit against Honeywell in *December 2019*; (vii) directed its financial advisors to initiate a marketing and sales process in the *fourth quarter of 2019;* (viii) learned *in the first quarter of 2020* from its financial advisors that no strategic transactions were available without restructuring the Honeywell obligations; (ix) retained PWP *on February 1, 2020* to evaluate restructuring scenarios; and (x) retained AlixPartners *by March 2020* "to assist in reviewing and preparing for various court-supervised restructuring processes that could be available to the Company given its global footprint and capital structure."

90.     Indeed, Garrett's statements touting its "***resilient business model***" and the related implication that it could weather the storm of the pandemic cannot be reconciled with the statement Defendant Rabiller would make shortly thereafter that the Company was plagued by a "***rigid capital structure***" that could only survive a "***highly favorable macroeconomic and industry environment***."

91.     Significantly, COVID was not the cause of Garrett's eventual bankruptcy.  As noted above, Defendants were already in the process of marketing the Company and preparing for a Court-supervised restructuring before making any COVID-related pronouncements.

C.     **May 11, 2020 False and Misleading Statements and Omissions of Material Facts**

92.     On May 11, 2020, Garrett issued a press release announcing its first quarter 2020 financial results, its first quarterly financial results since it retained PWP and AlixPartners to prepare for a potential financial restructuring.  In the press release, Defendant Rabiller boasted that Garrett's "*positive business fundamentals remain intact*" and flexibility allowed it "*to maintain our agility and strengthen our position for long-term success*."

93.     The same day, during an earnings call, Defendants Rabiller and Bracke likewise touted the purported facts that Garrett would "*leverage [its] flexible and resilient business model;*" its "*long-term technology growth strategy remains intact;*" and remained "*well positioned to accelerate our cutting-edge technologies to the market and drive long-term success*."

94.     On May 11, 2020, Garrett also issued its Form 10-Q for the first quarter of 2020 (the "May 2020 Form 10-Q"), which was signed by Defendants Rabiller and Bracke.  The May 2020 Form 10-Q represented, as had the February 2020 Form 10-K, that Garrett would be able to meet its anticipated cash requirements and liquidity needs over the ensuing 12-months through cash flow, available borrowing, and issuance of debt or equity:

> If these sources of liquidity need to be augmented, ***additional cash requirements would likely be financed through the issuance of debt or equity securities***; however, there can be no assurances, particularly in light of the volatility in global financial markets as a result of the COVID-19 pandemic, that we will be able to obtain additional debt or equity financing on acceptable terms in the future or at all… ***we believe we will be able to meet our short-term liquidity needs for at least the next twelve months***.

95.     The statements in Garrett's May 11, 2020 earnings call and Form 10-Q were materially false and misleading when made and cannot be reconciled with the Defendants' knowledge of the impact of the inherited capital structure on core business operations or the fact that by this point in time the Board had directed its restructuring advisors, bankers and lawyers to

actively pursue a court-supervised restructuring and that, toward that end, the process of selecting a stalking horse bidder was already well under way.  In this regard, the Bankruptcy admissions make clear that Garrett: (i) "struggled" with the onerous capital structure *since the Spin-Off*; (ii) worked with financial advisors during a years-long strategic review process that started in the *first quarter of 2019*; (iii) attempted to negotiate, albeit unsuccessfully, with Honeywell to get relief from the Honeywell Obligations *throughout 2019*; (iv) engaged in a failed mediation with Honeywell *in September 2019*; (v) understood OEM customers were concerned with Garrett's capital structure by the *Fall of 2019*; (vi) directed the filing of a Hail Mary lawsuit against Honeywell in *December 2019*; (vii) directed its financial advisors to initiate a marketing and sales process in the *fourth quarter of 2019;* (viii) learned *in the first quarter of 2020* from its financial advisors that no strategic transactions were available without restructuring the Honeywell obligations; (ix) retained PWP *on February 1, 2020* to evaluate restructuring scenarios; (x) retained AlixPartners *by March 2020* "to assist in reviewing and preparing for various court-supervised restructuring processes that could be available to the Company given its global footprint and capital structure"; and (xi) was actively pursuing a stalking horse bid and providing potential acquirors with due diligence.

96.    The statements that Garrett had a "*flexible and resilient business mo*del" also cannot be reconciled with the fact that Garrett blamed its bankruptcy filing – which at this time was already in the process of being prepared – on **"the financial strains of the heavy debt load and liabilities we inherited in the spinoff from Honeywell** – all exacerbated by COVID-19 – [that] *created a significant long-term burden on our business*." The same is true for Garrett's related statements regarding its "*technology growth strategy*" and that it is "*well positioned to accelerate our cutting-edge technologies*", which cannot be reconciled with Deason's admissions Garrett's

balance sheet "constrains its ability to make the investments in technology necessary to preserve its business for the future."  (Deason Decl. at ¶66).

97.     Garrett's statements that it "*believed*" it will meet its *liquidity needs* and that *additional cash "would likely" be financed through issuance of debt or equity securities* are also false and misleading for many of the same reasons and simply cannot be reconciled with Deason's bankruptcy-related statements that Garrett had "*no access to equity capital*" because "*it is extremely unlikely that any investor would contribute new equity capital behind both the Company's funded debt and its ASASCO Indemnity Obligations,*"  (Deason Decl. at ¶71), or the related concessions that Garrett "*has no access to incremental debt [] given its high leverage*" and that it "*cannot realistically sell equity to raise funds*" because of the inherited capital structure and related Honeywell Obligations.  (Deason Decl. at ¶66).  In other words, Defendants did not have a reasonable basis to use the words "*believe*" and "*likely*" in these putative risk factors because Defendants already understood the exact opposite was true.

**D.     June 12, 2020 False and Misleading Statements and Omissions of Material Facts**

98.     On June 12, 2020, Garrett issued a press release announcing the Company had reached an agreement with its senior lenders for certain covenant relief concerning its credit agreement.  In the press release, Defendant Rabiller specifically raised Garrett's "*long-term fundamentals*" even in the face of COVID disruptions:  "[d]espite the near-term disruption across the automotive industry and global economy, ***it is important to remember that the positive long-term fundamentals of our business remain intact.***"  Remarkably, Rabiller made this statement while Garrett was actively pursuing court-supervised restructuring and soliciting and conducting due diligence with various stalking horse bidders.

99.     Garrett and Defendant Rabiller's statement on June 12, 2020 was materially false and misleading when made and simply cannot be reconciled with what was, by that point in time, Garrett's well advanced restructuring process and the Defendants' deep understanding of the impact of the inherited capital structure on core business operations evidenced by Bankruptcy admissions that Garrett: (i) "struggled" with the onerous capital structure *since the Spin-Off*; (ii) worked with financial advisors during a years-long strategic review process that started in the *first quarter of 2019*; (iii) attempted to negotiate with Honeywell to get relief from the Honeywell Obligations *throughout 2019*; (iv) engaged in a failed mediation with Honeywell *in September 2019*; (v) understood OEM customers were concerned with Garrett's capital structure by the *Fall of 2019*; (vi) directed the filing of a Hail Mary lawsuit against Honeywell in *December 2019*; (vii) directed its financial advisors to initiate a marketing and sales process in the *fourth quarter of 2019;* (viii) learned *in the first quarter of 2020* from its financial advisors that no strategic transactions were available without restructuring the Honeywell obligations; (ixi) retained PWP *on February 1, 2020* to evaluate restructuring scenarios; (x) retained AlixPartners *by March 2020* "to assist in reviewing and preparing for various court-supervised restructuring processes that could be available to the Company given its global footprint and capital structure"; and (xi) were days away from *on June 15, 2020* receiving five nonbinding indications of interests from stalking horse bidders, all of which were proposing to acquire Garrett through a restructuring that disposes of the Honeywell Obligations.

100.    It was likewise misleading to state the "*positive long-term fundamentals of our business remain intact*" when Garrett knew it was unable to survive as an independent company considering its admittedly "*rigid*" and "*unsustainable*" inherited capital structure and the fact that a bankruptcy filing was imminent.

E.   **July 30, 2020 False and Misleading Statements and Omissions of Material Facts**

101.   On July 30, 2020, Garrett issued a press release announcing its second quarter 2020 financial results in which Defendant Rabiller assured investors that Garrett was managing COVID disruptions through its agility and executing its long-term strategy:

> "Garrett's proven track record in operational excellence has helped us navigate the current pandemic-induced downturn.  Although the market environment remains highly uncertain, we continue to benefit from our robust infrastructure and ***agile working capabilities as we execute on our long-term strategy*** and lead the evolution of advanced turbocharging, electric-boosting, and software solutions for the global automotive industry."

102.   The same day, Defendants Rabiller, Deason and Bracke held an earnings call during which Defendant Rabiller touted "***the strong fundamentals of Garrett . . . combined with a variable cost model that helps preserve cash and an attractive margin profile,***" and "the ***resiliency of [Garrett's] operating structure***."

103.   Defendants' statements in the press release issued and related earnings call on July 30, 2020 were materially false and misleading when made and simply cannot be reconciled with what was, by that point in time, Garrett's well advanced restructuring process and the Defendants' deep understanding of the impact of the inherited capital structure on core business operations evidenced by Bankruptcy admissions that Garrett: (i) "struggled" with the onerous capital structure *since the Spin-Off*; (ii) worked with financial advisors during a years-long strategic review process that started in the *first quarter of 2019*; (iii) attempted to negotiate with Honeywell to get relief from the Honeywell Obligations *throughout 2019*; (iv) engaged in a failed mediation with Honeywell *in September 2019*; (v) understood OEM customers were concerned with Garrett's capital structure by the *Fall of 2019*; (vi) directed the filing of a Hail Mary lawsuit against Honeywell *in December 2019*; (vii) directed its financial advisors to initiate a marketing and sales

process in the *fourth quarter of 2019;* (viii) learned *in the first quarter of 2020* from its financial advisors that no strategic transactions were available without restructuring the Honeywell obligations; (ix) retained PWP *on February 1, 2020* to evaluate restructuring scenarios; (x) retained AlixPartners *by March 2020* "to assist in reviewing and preparing for various court-supervised restructuring processes that could be available to the Company given its global footprint and capital structure"; (xi) received five nonbinding indications of interests from stalking horse bidders *on June 15, 2020,* all of which were proposing to acquire Garrett through a restructuring that disposes of the Honeywell Obligations; and (xii) continued with additional weeks of due diligence and were days away from selecting and entering an exclusivity agreement with a stalking horse purchaser.

104.    It is also impossible to reconcile Defendants' positive statements about the Company's "*long-term strategy*" and "*strong fundamentals*" when Garrett was already deep into the process of selecting a stalking horse bidder (indeed, after months of due diligence, Garrett received two final non-binding proposals on August 3, 2020 and entered into an Exclusivity Agreement with the stalking horse purchaser on August 13, 2020).

105.    It was equally misleading for Defendants to tout the "resiliency" of the Company's operating structure for the reasons stated above as well as Garrett's Bankruptcy-related admission that ***"the financial strains of the heavy debt load and liabilities we inherited in the spinoff from Honeywell – all exacerbated by COVID-19 –*** [that] ***created a significant long-term burden on our business***" and that the capital structure was "*unsustainable*" because it "*trapped"* its cash flows.

### F.   July 30, 2020 Omission of Going Concern Language

106.    Garrett disclosed in its May 11, 2020, First Quarter 2020 Form 10-Q that there was a substantial doubt concerning Garrett's ability to continue as a going concern unless certain

modifications were made to its Credit Agreements, stating that "Our management has concluded that the foregoing conditions and events raise substantial doubt as to our ability to continue as a going concern. The accompanying financial statements do not include any adjustments or classifications that may result from the possible inability of the Company to continue as a going concern within one year after the issuance of the financial statements."

107.    In Garrett's July 30, 2020 Form 10-Q, Garrett permitted its accountants to remove the above-referenced language reflecting that there was a substantial doubt about Garrett's ability to continue as a going concern.

108.    Garrett's failure to include the Going Concern Language on July 30, 2020 without some explanation of its ongoing restructuring process was an omission of material fact and highly misleading.  By July 30, 2020, Garrett was already in the final stages of obtaining a stalking horse bid, was preparing for a court-supervised restructuring, and it knew a bankruptcy filing was imminent – arguably a the ultimate cause for going concern warning language.  Thus, regardless of whether Garrett bought a little time when it amended certain credit agreements, Defendants knew that it was no longer viable as a going concern due to its inherited capital structure and the related Honeywell Obligations.

109.    While going concern language is overseen by accountants and auditors, it was misleading for Garrett to approve the removal of the language because it implied the warning was tied solely to Garrett's credit agreement negotiation, not the fact the Company was actively pursuing restructuring and days away from entering into a stalking horse exclusivity agreement. Whether or not the accountants were aware of the bankruptcy process (and it is reasonable to assume they were given that a bankruptcy filing was just weeks away and the stalking horse bid was days away from being finalized), the Defendants certainly had no reasonable basis to believe

that Garrett was viable as a going concern.   The fact the Defendants used the accountants' removal of the going concern opinion to hide the truth about the Company's restructuring plans and to obscure the true state of the Company's core operations and capital structure inherited in the Spin-Off only serves to underscore the Defendants' wrongdoing here.

### G.   August 26, 2020 False and Misleading Statements and Omissions of Material Facts

110.   On August 26, 2020, Garrett issued a press release (the "August 26, 2020 Press Release") stating the Company "*today announced that, with the assistance of its financial and legal advisors, it is exploring alternatives for addressing its previously disclosed balance sheet concerns*."   The August 26, 2020 Press Release noted the Company had entered into a June 2020 amendment to its credit agreement to obtain relief from certain financial covenants, but revealed for the first time that "*Garrett's leveraged capital structure poses significant challenges to its overall strategic and financial flexibility . . .  thereby putting Garrett at a meaningful disadvantage relative to its peers.*"   The August 26, 2020 Press Release further stated that "*Garrett is seeking to address its balance sheet concerns while **its core business remains strong** in order to preserve the resources necessary to provide exceptional service to its customers, be a reliable partner to its suppliers and other stakeholders, and act as a stable and desirable employer.*"   Garrett also stated that "*any actions taken by Garrett in relation to liability management **may** materially reduce the value or trading price of our common stock, dilute existing holders of our common stock by the issuance of equity (whether through conversion of existing liabilities into equity or otherwise), or result in the cancellation of existing common stock.*"

111.   Incredibly, the August 26, 2020 Press Release also falsely claimed that "***Garrett has not yet determined whether to pursue any balance sheet restructuring alternatives.***"   That statement simply cannot be reconciled with the fact that Garrett had already signed the Exclusivity

Agreement with the stalking horse bidder KPS and the fact that a filing for a court-supervised restructuring was less than two weeks away.

112.    Defendants' other statements in the August 26, 2020 press release were also materially false and misleading when made because Defendants' statements in the press release simply cannot be reconciled with what was, by that point in time, Garrett's well advanced restructuring process and the Defendants' deep understanding of the impact of the inherited capital structure on core business operations evidenced by Bankruptcy admissions that Garrett: (i) "struggled" with the onerous capital structure *since the Spin-Off*; (ii) worked with financial advisors during a years-long strategic review process that started in the *first quarter of 2019*; (iii) attempted to negotiate with Honeywell to get relief from the Honeywell Obligations *throughout 2019*; (iv) engaged in a failed mediation with Honeywell *in September 2019*; (v) understood OEM customers were concerned with Garrett's capital structure by the *Fall of 2019*; (vi) directed the filing of a Hail Mary lawsuit against Honeywell in *December 2019*; (vii) directed its financial advisors to initiate a marketing and sales process in the *fourth quarter of 2019;* (viii) learned *in the first quarter of 2020* from its financial advisors that no strategic transactions were available without restructuring the Honeywell obligations; (ix) retained PWP *on February 1, 2020* to evaluate restructuring scenarios; (x) retained AlixPartners *by March 2020* "to assist in reviewing and preparing for various court-supervised restructuring processes that could be available to the Company given its global footprint and capital structure"; (xi) received five non-binding indications of interests from stalking horse bidders *on June 15, 2020*, all of which were proposing to acquire Garrett through a restructuring that disposes of the Honeywell Obligations; (xii) conducted multiple phases of due diligence over the course of a number of months, entered into

the Exclusivity Agreement with stalking horse bidder KPS on August 13, 2020; and (xiii) were just weeks away from seeking court-supervised restructuring.

113.     The statements in Garrett's August 26, 2020 Press Release indicating that Garrett's "***core business remains strong,***" and that "*any actions taken by Garrett in relation to liability management **may** materially reduce the value or trading price of our common stock, dilute existing holders of our common stock by the issuance of equity (whether through conversion of existing liabilities into equity or otherwise), or result in the cancellation of existing common stock*" likewise cannot be reconciled with the fact that Garrett had entered into an Exclusivity Agreement with KPS as a stalking horse bidder weeks before the statement and that a Bankruptcy filing was just weeks away.  Simply put, there was no "***may***" about what would happen to Garrett's common stockholders — that harm was a certainty and Defendants knew it.

### H.     Garrett's Class Period "Risk Factors" Omitted the Existing Manifestation of the Risks

114.     Garrett's February 2020 Form 10-K contained putative "risk factors" that were themselves false and misleading because they purported to "warn" investors of risks that Defendants knew had already manifested.  Garrett stated that the Indemnification Agreement "***may have material adverse effects on our liquidity and cash flows and on our results of operations, regardless of whether we experience a decline in net sales,*" "***may** also require us to accrue significant long-term liabilities on our consolidated and combined balance sheet,*" and that "our access to capital to fund our operations **may** be materially adversely affected*".  The February 27, 2020 Form 10-K also contained a separate risk factor stating that "[o]ur indebtedness ***could*** adversely affect our business, financial condition and results of operations."

115.     However, by February 27, 2020, Defendants already knew both that the Company could not survive in light of its capital structure (unless – as Rabiller put it – Garrett executed

perfectly and the macroeconomic trends were highly favorable), and that no strategic transactions were available without restructuring the Honeywell Obligations.  As discussed above, Defendants' deep understanding of those facts is evidenced by Bankruptcy admissions that Garrett: (i) "struggled" with the onerous capital structure *since the Spin-Off*; (ii) worked with financial advisors during a years-long strategic review process that started in the *first quarter of 2019*; (iii) attempted to negotiate, albeit unsuccessfully, with Honeywell to get relief from the Honeywell Obligations *throughout 2019*; (iv) engaged in a failed mediation with Honeywell *in September 2019*; (v) understood OEM customers were concerned with Garrett's capital structure by at least the *Fall of 2019*; (vi) directed the filing of a Hail Mary lawsuit against Honeywell; (vii) directed its financial advisors to initiate a marketing and sales process in connection with the merger or acquisition of the Company in the *fourth quarter of 2019;* and (viii) learned *in the first quarter of 2020 (before hiring PWP on February 1, 2020 to evaluate restructuring scenarios),* that no strategic transactions were available without restructuring the Honeywell obligations.

116.    Garrett's May 11, 2020 Form 10-Q incorporated by reference the risk factors in its 2019 Form 10-K set forth above in Paragraph 114  and those statements are false and misleading for the same reasons and the additional facts that by May 11, 2020, Garrett had retained AlixPartners "to assist in reviewing and preparing for various court-supervised restructuring processes that could be available to the Company given its global footprint and capital structure"; and was actively pursuing a stalking horse bid and providing potential acquirors with due diligence.

117.    The May 11, 2020 Form 10-Q also included a section titled "Indemnification and Reimbursement Agreement", which stated the "Indemnification and Reimbursement Agreement **may have** material adverse effects on our liquidity and cash flows and on our results of operations,

regardless of whether we experience a decline in net sales."  However, the putative risk of "*adverse effects on our liquidity and cash flows and on results of operations*" cannot be reconciled with the fact that Garrett blamed its bankruptcy filing – which at this time was in the process of being prepared – on **"the financial strains of the heavy debt load and liabilities we inherited in the spinoff from Honeywell** – all exacerbated by COVID-19 – [that] **created a significant long-term burden on our business**," just as it cannot be reconciled with Deason's bankruptcy-related statements that Garrett had "*no access to equity capital*" because "*it is extremely unlikely that any investor would contribute new equity capital behind both the Company's funded debt and its ASASCO Indemnity Obligations,*" (Deason Decl. at ¶71), and the related concessions that Garrett "*has no access to incremental debt [] given its high leverage*" and that it "*cannot realistically sell equity to raise funds*" because of the inherited capital structure and related Honeywell Obligations. (Deason Decl. at ¶66).  Defendants did not have a reasonable basis to use words like "may" in these putative risk factors because Defendants knew the risk was already manifest.

118.    Garrett's July 30, 2020 Form 10-Q also incorporated by reference the putative risk factors in its February 2020 Form 10-K set forth above in Paragraph 114 above as well as the additional "Indemnification and Reimbursement Agreement" risk factor found in the May 11, 2020 Form 10-Q.  Those putative risk factors are false and misleading for the reasons stated above and the additional facts that by July 30, 2020 Garrett was just days away from finalizing the selection of the stalking horse bidder and just over a month away from filing its Bankruptcy Petition.  It was patently misleading for Garrett to continue stating that the inherited capital structure and related Honeywell Obligations "*may*" have material adverse effects when Defendants knew the actual and undisclosed impacts on Garrett's core business operations had long since manifested.

VI.    **DEFENDANTS ACTED WITH SCIENTER**

A.    **Defendants Had Actual Knowledge Their Statements Were False and Misleading When Made or Acted Highly Recklessly**

119.    Each of the Defendants had authority over the materially false and misleading statements alleged above, and the substantial direct and circumstantial facts and evidence detailed from Garrett's own filings in the Bankruptcy Proceedings collectively support a strong inference of scienter.

120.    Each of the Defendants had actual knowledge by no later than February 27, 2020, and increasingly through the Class Period culminating with Defendant Rabiller's August 26, 2020 massively misleading statement that "***Garrett has not yet determined whether to pursue any balance sheet restructuring alternatives***" (after it signed an exclusivity agreement with stalking horse bidder KPS and was days away from filing its Bankruptcy Petition), that Garrett was highly unlikely to survive as a stand-alone Company and any strategic merger or sale of the business would be conditioned on a court-supervised restructuring to fix the unsustainable capital structure and Honeywell Obligations.

121.    The following facts taken from Garrett's own bankruptcy pleadings are uncontroverted:

- "Since the Spin-Off, the Company . . . struggled with the capital structure Honeywell foisted upon it" (Bankruptcy Proceedings, ECF No. 137 at ¶7);

- Members of Garrett's senior management and Board of Directors frequently reviewed Garrett's financials and were aware of Garrett's capital structure shortly after the Spin-Off in October 2018, including the fact that Garrett's leverage ratio grossly exceeded industry-standard criteria;

- Garrett started working with MS&Co. in the first quarter 2019 to explore strategic alternatives (Savage Decl. at ¶7);

44

- Garrett negotiated, albeit unsuccessfully, with Honeywell throughout 2019 to attempt to alleviate the Honeywell Obligations, culminating with a failed mediation in September 2019 (Deason Decl. at ¶56);

- In the fourth quarter 2019, Garrett instructed MS&Co. to explore strategic options, including a survey of the 15 most likely merger partners (Deason Decl. at ¶74);

- In December 2019, Garrett commenced a Hail-Mary litigation against Honeywell (*see* the Adversary Proceeding);

- Prior to the COVID pandemic, Garrett's senior officers and customer relationship teams reported to the Board that customers were nervous about Garrett's financial health;

- Garrett's senior management knew that the capital structure and Honeywell obligations precluded the Company from accessing the capital markets for liquidity; [24]

- Prior to the Board's retention of PWP on February 1, 2020, MS&Co. confirmed to the Board that a sale would not be possible without disposing of the Honeywell Obligations through litigation or bankruptcy;[25]

- On February 27, 2020 – after MS&Co. confirmed to the Board that a sale would not be possible without disposing of the Honeywell Obligations through litigation or bankruptcy and a month after the Board directed the hiring of PWP) – Defendant Rabiller touted the Company's "significant financial flexibility," "significant flexibility to help mitigate the impact from any short-term fluctuations in the underlying macro environment;" and "position[ing] to build upon the progress" in its first year;

- On March 20, 2020, the Board retained AlixPartners to assist in reviewing and preparing for various court-supervised restructuring processes that could be available to the Company given its global footprint and capital structure;

- On May 11, 2020 – months after the Board directed the active solicitation of a stalking horse bidder and pursuit of court-supervised restructuring– the

---

[24] Deason Decl. at ¶3 ("The inherited capital structure is not sustainable. It . . . eliminates access to new debt and equity capital." *See also id.* at ¶71 ("It is extremely unlikely that any investor would contribute new capital behind both the Company's funded debt and its ASASCO Indemnity Obligations").

[25] Deason Decl. at ¶74 ("All financial sponsors insisted on potential transaction structures in which the balance sheet of the Company – including its excess funded debt leverage, the ASASCO Indemnity Agreement and other legal liabilities – could be left behind or discharged and the business of the Company acquired free and clear of those burdens.").

Company stated its "positive business fundamentals remain intact and we will continue to calibrate production schedules in the near term and flex our cost structure to maintain our agility and strengthen our position for long-term success;"

- On June 12, 2020 – while in the final stages of due diligence with potential stalking horse bidders for the Company (Deason Decl. at ¶¶79-81) – the Company reassured investors that "[d]espite the near-term disruption across the automotive industry and global economy, it is important to remember that the positive long-term fundamentals of our business remain intact;"

- On July 30, 2020 – after receiving five nonbinding indications of interest, all of which were contingent on receiving Garrett free and clear of the Honeywell Obligations (Deason Decl. at ¶80) and conducting months of due diligence all in pursuit of court-supervised restructuring– the Company assured investors "we continue to benefit from our robust infrastructure and agile working capabilities as we execute on our long-term strategy" and filed a Form 10-Q that removed cautionary "going concern" language;

- On August 13, 2020, while Garrett's stock was still trading over $4 per share, Garrett signed an Exclusivity Agreement with stalking horse bidder KPS (Deason Decl. at ¶81), following which Garrett finalized its plans for a court-supervised restructuring which would be filed just twenty-five days later; and

- On August 26, 2020 – thirteen days after entering an exclusivity agreement with stalking horse bidder KPS and only twenty-five days before Garrett initiated its Bankruptcy Proceedings – Garrett claimed it "has not yet determined whether to pursue any balance sheet restructuring alternatives."

122.    Defendants' reassuring Class Period statements were knowingly false and misleading when made or, at very least, highly reckless and represented an extreme departure from the standards of ordinary care by public-company directors and officers when they choose to speak on a subject.   Garrett's "risk factors" were likewise false and misleading (and particularly insidious) because they warned investors of what "*may*" or "*could*" happen as a result of the inherited capital structure and Honeywell Obligations when it is abundantly clear that those risks had already manifested by the time those Class Period statements were made.

### B.   Deepening Problems in Garrett's Core Operations Support an Inference of Scienter

123.    The undisclosed impacts of the Honeywell Obligations and resulting capital structure – which the Bankruptcy Proceedings admit were material and the cause of Garrett's bankruptcy – go to the core operations of Garrett, and particularly the role of the Company's senior directors and officers.   As a result, knowledge of the issues plaguing Garrett can be inputted to Garrett's directors and officers.

124.    **Technology**.  As detailed above, Garrett regularly described itself as a "technology company."  Indeed, the Deason Declaration explains that the Company's "business model requires constant investment in new technology, both to improve the Company's existing products and to develop new products to meet customer demands" and that "[a] failure to invest in technology for any sustained period of time will result in a loss of customers, market share and margin."  (Deason Decl. at ¶65).  Garrett admitted in the Bankruptcy Proceedings that the Company knew it was unable to "make the investments in technology necessary to preserve its business for the future," had "no access to incremental debt to fund R&D or capital expenditures given its high leverage" and that its "current balance sheet constrains its ability to make the investments in technology necessary to preserve its business for the future."  (Deason Decl. at ¶66).

125.    **Relationship with Business Partners**.  Garrett's long-term relationships with its customers (OEMs) and suppliers are undeniably critical to its business.  OEMs – who are responsible for 85% of Garrett's revenues – design their vehicles around Garrett's turbochargers 3-5 years in advance of production and thus pay close attention to suppliers' financial condition. The Deason Declaration concedes that maintaining Garrett's relationship with OEMs has been "more difficult" because of its balance sheet problems and the issue "will grow as the Company's technology advantages decline with underinvestment."  (Deason Decl. at ¶68).  Moreover, Deason

indicated during the Bankruptcy Proceedings Garrett's OEM customers were "very nervous" and that he received calls that certain customers were not allowing Garrett to bid on new business because of Garrett's balance sheet.

126.    **Strategic Transactions**.  It is well known that there are ongoing rapid shifts in the automotive industry, including a shift toward electric vehicles and "industry consolidation." (Deason Decl. at ¶¶69-70).  Garrett admitted its capital structure prevented it from engaging in strategic transactions because no rational buyer would voluntarily purchase assets that were encumbered with billions of dollars in asbestos liabilities.  (*Id.*)  Indeed, in Garrett's bankruptcy filings, Garrett characterized the related provision in the Indemnification Agreement as a "poison pill" that effectively precluded any merger transaction.

127.    **Ability to Raise Equity Capital**.  Raising capital when necessary is a critical part of the job of senior executives and directors of public companies, and of course can be necessary for some businesses to continue operating.  Defendants knew no investor would contribute equity capital in the face of Garrett's capital structure because any additional equity or debt would be subordinate to the Honeywell Obligations.  (Deason Decl. at ¶71).  Debt financing would also be particularly costly because of the rating agencies' concerns with Garrett's leverage ratio.

**C.    Defendant Rabiller Was Financially Motivated to Inflate Garrett's Stock Price**

128.    Prior to the Spin-Off, Honeywell entered into an extraordinary employment agreement with Defendant Rabiller that provided $4.3 million of dollars' worth of "Founder's Grants" contingent upon the successful completion of the Spin-Off that would not fully vest until Garrett's fourth year as a publicly traded Company.

| Name and Principal Position | Sign-On Long-Term Incentive Award | |
| --- | --- | --- |
| | Founder's Grant | Vesting Schedule |
| Olivier Rabiller, President and CEO | $4,300,000 | 50% year 3; 50% year 4 |

129.    Honeywell also increased Defendant Rabiller's annual base compensation to CHF 870,000 (approximately $900,000) and his annual incentive compensation pay to equal 100% of his annual cash base salary.  Honeywell also made Defendant Rabiller eligible for annual equity awards with an initial target of 325% of Defendant Rabiller's base salary.  In February 2019, the Garrett Board increased Defendant Rabiller's base salary to $920,000.  Honeywell also guaranteed Defendant Rabiller 24 months of base salary and incentive compensation severance in the event of his involuntary termination of employment.

130.    In addition to generous Founder's Grants, Garrett converted outstanding incentive compensation of Defendant Rabiller from his time at Honeywell to incentive compensation tied to Garrett's performance.  This resulted in Defendant Rabiller receiving 291,042 restricted stock units worth approximately $1,953,633 as of the date of the Spin-Off.

131.    The special compensation arrangement in place for Defendant Rabiller incentivized him to perpetuate the myth that Garrett was a strong, stable, flexible, and resilient company when he and the other Defendants had determined the only relief from the rigid and unsustainable capital structure inherited from Honeywell was a court-supervised restructuring.

## VII.   LOSS CAUSATION

132.    Defendants' wrongful conduct as alleged herein directly and proximately caused Lead Plaintiffs and the Class to suffer substantial losses.

133.    As a result of purchasing Garrett's common stock and related securities during the Class Period, Lead Plaintiffs and the Class were damaged when the price of Garrett's common stock declined when the truth was revealed through a series of partial corrective disclosures and/or the undisclosed risks regarding Garrett's viability materialized in a manner visible to the public. The price of Garrett's common stock and related securities significantly declined each time there was a partial disclosure of Defendants' misrepresentations and/or omissions and/or the materialization of undisclosed risks.

134.    On May 11, 2020, just before market open, Garrett held an earnings call to discuss its first quarter 2020 results.  During the question-and-answer portion of the call, an analyst asked about covenant relief and lending relationships.   Defendant Rabiller responded, reminding investors that Garrett was spun out from Honeywell only six quarters ago, and stating:  "*Our former parent imposed on us a rigid capital structure that was unable unless Garrett executed perfectly in a highly favorable macroeconomic and industry environment, meaning that was really unsustainable that way unless everything was perfect.  With insight, it is clear that our capital structure was ill suited to cope with any meaningful operating challenges*."   As a result of Rabiller's statement, Garrett's stock price fell $1.05 per share during the trading day, from $6.66 per share at open to $5.61 per share at close, a decline of approximately 16%.  On the same day, the price of the S&P 500 index was flat, rising just 0.01%.  Garrett's stock price continued to decline, closing at $5.07 per share on May 12th and at $4.58 per share on May 13th (a total decline of an additional $1.03 per share) as the market further considered the significance of Defendant Rabiller's statements.

135.    On the same day Defendants made countervailing statements to further obscure the whole truth about Garrett's dire condition.  For example, Garrett's May 11, 2020 Form 10-Q

falsely stated that Garrett believes "*we will be able to meet our short-term liquidity for at least the next twelve months*" and that "*additional cash requirements would be financed through the issuance of debt or equity*."   Garrett's Form 10-Q likewise failed to update its putative "risk factors" including that the Indemnification and Reimbursement Agreement "*may have material adverse effects on our liquidity and cash flows and on our results of operations*" (Garrett also repeated this statement on July 30, 2020).   As detailed above, each of these misleading countervailing statements are at complete odds with the reality the Defendants knew but continued to obscure.

136.   On August 26, 2020, before market open, Garrett announced it would explore alternatives to address balance sheet concerns.   Garrett also stated for the first time that its "*leveraged capital structure poses significant challenges to its overall strategic and financial flexibility and may impair its ability to gain or hold market share in the highly competitive automotive supply market, thereby putting Garrett at a meaningful disadvantage relative to its peers*."   The press release also stated that "*Garrett's high leverage is exacerbated by significant claims asserted by Honeywell against certain Garrett subsidiaries under the disputed subordinated asbestos indemnity and tax matters agreement*."   Following the August 26, 2020 press release, Garrett's stock price fell by approximately 44%, from $6.88 per share to $3.84 per share at close on August 26, 2020.   On the same day, the price of the S&P 500 index rose 0.1%. Garrett's stock price fell an additional $0.56 per share the following trading day to close at $3.28 per share as the market further digested the news.   While Garrett's August 26, 2020 revelation was material, Garrett still failed to fully disclose the truth by concealing that it had already gone through two bid processes, permitted extensive due diligence, selected a stalking horse bidder, signed the Exclusivity Agreement, and that it was making final preparations to file for court-supervised

restructuring. Incredibly, as noted above, Defendant Rabiller went so far as to falsely state that in the August 26, 2020 Press Release that "***Garrett has not yet determined whether to pursue any balance sheet restructuring alternatives.***"   That blatantly false countervailing statement simply cannot be reconciled with the facts that Garrett had signed already signed an Exclusivity Agreement with the stalking horse bidder KPS and that a filing for a court-supervised restructuring was less than two weeks away,

137.    The truth was further partially revealed on September 17, 2020, when *The Wall Street Journal* reported that Garrett was nearing a sale through bankruptcy.  The article revealed for the first time what Defendants had long actively concealed –that Garrett's bankruptcy filing was imminent.  On this news, the price of Garrett's common stock fell from $2.41 per share on September 17, 2020 to $2.01 per on September 18, 2020.  On the same day, the price of the S&P 500 index fell only 0.1%.

138.    The full truth was revealed three days later on September 20, 2020 when Garrett filed for Chapter 11 bankruptcy protection.  According to its filings, after a robust bidding process, the Company selected a winning bid of $2.1 billion from a new company formed by KPS Capital Partners, LP as a stalking horse bid.   Garrett's bankruptcy filings admitted the Company's bankruptcy resulted from the fact that Garrett's "*former parent imposed on us a rigid capital structure . . . that was really unsustainable . . . [and] ill suited to cope with any meaningful operating challenges*."   Following this news, Garrett's stock price started trading under the symbol "GTXMQ" and fell from $2.01 per share on September 18, 2020 to $1.76 per share at close on September 20, 2020.  During the same two-day period, the S&P 500 was flat, falling just 0.01%.

## VIII.   PRESUMPTION OF RELIANCE

139.    At all relevant times, the market for Garrett's common stock was efficient for the following reasons, among others:

(a)     Garrett common stock met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient and automated market;

(b)     As a regulated issuer, Garrett filed periodic reports with the SEC;

(c)     Garrett regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d)     Garrett was followed by numerous securities analysts employed by major brokerage firms, who wrote reports which were distributed to those brokerage firms' sales force and certain customers.  Each of these reports was publicly available and entered the public marketplace.

140.    As a result of the foregoing, the market for Garrett common stock and related securities promptly digested current information regarding Garrett from all publicly available sources and reflected such information in the price of Garrett's common stock.  All purchasers of Garrett securities during the Class Period suffered similar injury through their purchase of Garrett securities at artificially inflated prices, and a presumption of reliance applies.

141.    A Class-wide presumption of reliance is also appropriate in this action under the United States Supreme Court holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the claims asserted herein against Defendants are, in part, predicated upon omissions of material fact for which there is a duty to disclose.

## IX.    INAPPLICABILITY OF THE STATUTORY SAFE HARBOR AND BESPEAKS CAUTION DOCTRINE

142.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the false statements pled in this complaint.  The specific statements alleged to be false and misleading herein were not identified as "forward looking

statements" when made.  To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important facts that could cause actual results to differ materially from those in the purportedly forward-looking statements.

143.     Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the speaker knew that the particular forward-looking statement was false or had no reasonable basis, and/or the forward-looking statement was authorized and/or approved by the Defendant who knew that those statements were false when made.  In other words, Defendants had no basis for their positive statements because they already understood the impact Garrett's inherited capital structure and related Honeywell Obligations were having on the Company's core operations.

144.     As detailed above, Defendants had an evolving knowledge of the deepening crisis at Garrett caused by the unsustainable capital structure.  Not only did Defendants admit in the Bankruptcy Proceedings that the capital structure was "*inherited*" from the Spin-Off and that Garrett "*struggled*" with it "*since*" the Spin-Off, but Defendants' actions post-Spin-Off demonstrate their increasing knowledge and concern with the undisclosed impacts of the capital structure.

145.     Garrett's statements on February 27, 2020 are not protected by safe harbor because Defendants already knew affirmatively at the time that, among other things, the Company did not have "*significant financial flexibility*" and that it was extremely unlikely that it would be able to meet its liquidity needs or raise additional capital.  Garrett's Bankruptcy filings revealed that by this point Garrett had already worked with Morgan Stanley on a strategic review and a solicitation for a merger or acquisition, negotiated with Honeywell for a year and determined that its only hope

was a Hail Mary litigation or a restructuring.  Indeed, on February 1, 2020 Garrett engaged PWP to evaluate restructuring scenarios.  Accordingly, safe harbor does not protect Defendants' February 27, 2020 statements because Defendants knew those statements were false, or at a minimum had no reasonable basis to believe that their statements were true in light of the known impacts of Garrett's unsustainable capital structure on core operations.

146.    Garrett's statements on March 19, 2020 and April 7, 2020 about its "*flexible and resilient business model*" are likewise not protected by safe harbor.  In addition to the facts evidencing Defendants had actual knowledge the February 27, 2020 statements were false when made, by March and April 2020 Garrett had also retained AlixPartners "to assist in reviewing and preparing for various court-supervised restructuring processes that could be available to the Company given its global footprint and capital structure," and it was actively engaged in the process of selecting a stalking horse bidder to lead the court-supervised restructuring.  Given those facts and Defendants' knowledge of the truth about Garrett's rigid capital structure it is clear Defendants had no reasonable basis to state that Garrett had a "*resilient business model.*"

147.    Garrett's statements on May 11, 2020 that it had a "*flexible and resilient business model*", had a "*long-term technology growth strategy*," was "*well positioned to accelerate our cutting-edge technologies*," "*would likely" finance additional liquidity needs through the issuance of securities*" and believes it "*will be able to meet our short-term liquidity needs*" are likewise not protected by safe harbor for the same reasons set forth above.  In addition, by this point in May 2020, Garrett was actively pursuing a stalking horse bid and providing potential acquirors with due diligence.  As a result of Defendants' clear knowledge that Garrett had no realistic chance of survival without a restructuring, Defendants did not have a reasonable basis to state Garrett would, for example, meet its liquidity needs.  Garrett also subsequently admitted that it could not issue

55

additional debt or equity and did not have the cash flows necessary to continue investing in R&D/technology – all because it had a "rigid" and "unsustainable" capital structure.  The May 11, 2020 statements – even those starting with "*we believe*" – are not protected by safe harbor because it was already clear to the Defendants at the time that there was no reasonable basis that Garrett could survive as an independent company.

148.    Defendant Rabiller's June 12, 2020 statement about Garrett's "*positive long-term fundamentals*" remaining intact and related statements are likewise not protected by safe harbor. In addition to the reasons set forth above, by June 12, 2020 Garrett had already been working with restructuring advisors for several months, was in the final stages of due diligence and just days away from receiving five indications of interest from stalking horse bidders.  The safe harbor does not protect Defendant Rabiller's June 12, 2020 statement because he already knew affirmatively that the long-term fundamentals of the company were not intact – indeed he knew the opposite was true and the Company was in the process of preparing for bankruptcy.

149.    Garrett's July 30, 2020 statements are similarly not protected by safe harbor because of Defendants' affirmative knowledge the statements were not true at the time of issuance. By July 30, 2020, Garrett had received non-binding indications of interest from stalking horse bidders, all of which were contingent on obtaining Garrett through a restructuring free and clear of the Honeywell Obligations, had conducted several phases of due diligence, had winnowed the potential stalking horse bidders to just two candidates, and was days away from selecting and signing an Exclusivity Agreement with KPS.  Accordingly, it is beyond dispute that Garrett already knew affirmatively that its long-term strategy could not be executed, its liquidity crisis prevented it from preserving cash, and that a bankruptcy filing was imminent.  Neither the statutory safe

harbor nor bespeaks caution doctrine immunize misstatements where, as here, Defendants had no reasonable basis to believe the statements were accurate.

150.    Garrett's August 26, 2020 statement that "*Garrett has not yet determined whether to pursue any balance sheet restructuring alternatives*" is also not protected by safe harbor. Defendants already knew by this point that Garrett had selected a stalking horse bidder and was negotiating the final terms of its court-supervised restructuring.  As summarized above, at the time the alleged false and misleading statements were made, any risks warned of had already materialized and were well known to the Defendants.  In other words, Defendants' putative "risk factors" about what "*may*" or "*could*" happen were inadequate and were *themselves misleading* because the risk had already manifested.

151.    Finally, the sheer volume of the Defendants' misstatements and omissions on these subjects crucial to Garrett's survival and accompanied at best by inadequate-general qualifying language – particularly when viewed in the context of the Defendants' countervailing admissions – demonstrates the materiality of the statements and that a reasonable investor would have been misled.

## X.    CLASS ACTION ALLEGATIONS

152.    Lead Plaintiffs bring this Class Action pursuant to Rule 23 of the Federal Rules of Civil Procedure against Defendants on behalf of themselves and all other individuals or entities (excluding Defendants), who purchased or otherwise acquired Garrett securities during the period February 27, 2020 through September 18, 2020, inclusive, and were damaged thereby.

153.    There are numerous questions of law and fact that are common to the Class, which predominate over any individual issues, including:

(a)    whether Defendants misrepresented or omitted material facts;

     (b)     whether Defendants knew or recklessly disregarded that their statements and/or omissions were false and misleading;

     (c)     whether the price of Garrett's common stock and related securities were artificially inflated;

     (d)     whether the Director and Officer Defendants are liable as "controlling persons" under §20(a) of the Exchange Act; and

     (e)     whether Plaintiffs and the other members of the Class were injured as a result of Defendants' misconduct.

154.    Lead Plaintiffs' claims are typical of the claims of the other members of the Class because Lead Plaintiffs and the Class sustained damages from Defendants' wrongful conduct.

155.    Lead Plaintiffs are committed to prosecuting this action and have retained competent counsel experienced in litigation of this nature.  Lead Plaintiffs have the same interests as the other members of the Class.  Accordingly, Lead Plaintiffs are adequate representatives of the Class and will fairly and adequately protect the interests of the Class.

156.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

157.    On March 1, 2021, Lead Plaintiffs filed securities proofs of claim on their own behalf and a class proof of claim against Garrett in the Bankruptcy Proceedings "on behalf of the class of investors who purchased or otherwise acquired Garrett common stock from October 1, 2018 to September 18, 2020 and suffered losses from the conduct alleged in the consolidated amended complaint . . .  as may be subsequently amended."  In total, more than 1,200 securities proofs of claim were filed by shareholders.[26]  Lead Plaintiffs' class proof of claim was intended to protect those shareholders who were unaware of the requirement to file a proof of claim or were unable to do so.

---

[26] Chapter 11 Case, ECF No. 1289 at ¶2.

158.    Following confirmation of Garrett's Reorganization Plan and Garrett's emergence from bankruptcy on April 30, 2021, on June 9, 2021, Lead Plaintiffs and Debtors filed in the Chapter 11 Case an *Amended Joint Motion for Class Treatment of Lead Securities Plaintiffs' Proof of Claim and Related Relief* (the "Class Treatment Motion") because, among other things, adjudicating the Section 510(b) Claims – which overlap with the claims against the Director and Officer Defendants – in this Action "eliminates the need for the Debtors and the [Bankruptcy] Court to incur the cost and burden of attempting to liquidate the more than approximately 1,200 individual Section 510(b) Claims that were filed against [Garrett] in connection with the established Bar Dates."[27]

159.    On July 2, 2021, Judge Wiles issued an order granting the Class Treatment Motion (the "Class Treatment Order") that: (i) authorizes class treatment of Lead Plaintiffs' bankruptcy proof of claim against Garrett (the "Bankruptcy Class Claim") under Federal Rule of Bankruptcy Procedure 7023.

## XI.    CLAIMS FOR RELIEF

### COUNT I
### For Violations of Section 10(b) of the Exchange Act and Rule 10b-5
### Against Defendant Garrett

160.    Lead Plaintiffs repeat, incorporate and reallege each and every allegation contained above as if fully set forth herein. This Count asserts the Section 510(b) Claims against Garrett preserved in Garrett's Reorganization Plan and, pursuant to the Plan and the Class Treatment Order, the Class's recovery on this Count is limited to Garrett's available insurance policies.

161.    During the Class Period, Garrett made, or caused the Director and Officer Defendants Olivier Rabiller, Peter Bracke, Sean Deason, Russell James, Carlos Cardoso, Maura

---

[27] *Id.*

Clark, Courtney Enghauser, Susan Main, Carsten Reinhardt and Scott Tozier, each to make untrue statements of material fact and/or omit to state material facts necessary to make the statements not misleading in an effort to maintain artificially high market prices for Garrett's securities in violation of Section 10(b) of the Exchange Act, 15 U.S.C. §§ 78j(b), and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5.

162.    Garrett, with the Director and Officer Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the Company's financial well-being, operations, and prospects.

163.    Garrett made, or caused the Director and Officer Defendants to make, the false and misleading statements specified above, which the Defendants knew or recklessly disregarded to be false or misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

164.    Garrett, through the Director and Officer Defendants, had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or recklessly disregarded the true facts that were available to them.  The Defendants engaged in this misconduct to conceal Garrett's true condition from the investing public and to support the artificially inflated prices of the Company's common stock.

165.    As described above, Garrett, through the Director and Officer Defendants, acted with scienter in committing the wrongful acts and omissions alleged herein in that the Defendants either had actual knowledge of the misrepresentations and omissions of material facts set forth

herein, or acted with reckless disregard for the truth in that they failed to ascertain and disclose the true facts, even though such facts were available to them.

166.    Lead Plaintiffs and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Garrett's common stock and related securities.  Lead Plaintiffs and the Class would not have purchased the Company's securities at the prices they paid, or at all, had they been aware that the market prices for Garrett's securities had been artificially inflated by Garrett's fraudulent course of conduct.

167.    As a direct and proximate result of Garrett's wrongful conduct, Lead Plaintiffs and the Class suffered damages in connection with their purchases of Garrett securities during the Class Period.

## COUNT II
### For Violations of Section 10(b) of the Exchange Act and Rule 10b-5
### Against the Director and Officer Defendants

168.    Lead Plaintiffs repeat, incorporate and reallege each and every allegation contained above as if fully set forth herein.

169.    During the Class Period, Director and Officer Defendants Olivier Rabiller, Peter Bracke, Sean Deason, Russell James, Carlos Cardoso, Maura Clark, Courtney Enghauser, Susan Main, Carsten Reinhardt and Scott Tozier each made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading in an effort to maintain artificially high market prices for Garrett's securities in violation of Section 10(b) of the Exchange Act, 15 U.S.C. §§ 78j(b), and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5.

170.    The Director and Officer Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails,

engaged and participated in a continuous course of conduct to conceal adverse material information about the Company's financial well-being, operations, and prospects.

171.     The Director and Officer Defendants made the false and misleading statements specified above, which they knew or recklessly disregarded to be false or misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

172.     The Director and Officer Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or recklessly disregarded the true facts that were available to them.   The Director and Officer Defendants engaged in this misconduct to conceal Garrett's true condition from the investing public and to support the artificially inflated prices of the Company's common stock.

173.     As described above, the Director and Officer Defendants acted with scienter in committing the wrongful acts and omissions alleged herein in that they either had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and disclose the true facts, even though such facts were available to them.

174.     Lead Plaintiffs and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Garrett's common stock and related securities.   Lead Plaintiffs and the Class would not have purchased the Company's securities at the prices they paid, or at all, had they been aware that the market prices for Garrett's securities had been artificially inflated by Director and Officer Defendants' fraudulent course of conduct.

175.    As a direct and proximate result of the Director and Officer Defendants' wrongful conduct, Lead Plaintiffs and the Class suffered damages in connection with their purchases of Garrett securities during the Class Period.

176.    The Class's recovery on this Count is not limited to Garrett's available insurance policies.

**COUNT III**
**For Violations of Section 20(a) of the Exchange Act**
**Against the Director and Officer Defendants**

177.    Lead Plaintiffs repeat, incorporate and reallege each and every allegation set forth above as if fully set forth herein.

178.    This Count is asserted against Director and Officer Defendants Olivier Rabiller, Peter Bracke, Sean Deason, Russell James, Carlos Cardoso, Maura Clark, Courtney Enghauser, Susan Main, Carsten Reinhardt and Scott Tozier for violations of Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a).

179.    As alleged above, the Director and Officer Defendants each violated Section 10(b) and Rule 10b-5 thereunder by their acts and omissions as alleged in this Complaint.

180.    By virtue of their high-level positions, participation in and/or awareness of the Company's operations, direct involvement in the day-to-day operations of the Company, and/or intimate knowledge of the Company's actual performance, and their power to control the materially false and misleading public statements about Garrett during the Class Period, each of the Director and Officer Defendants named in this Count had the power and ability to control the actions of Garrett and its employees.

181.    Among other things alleged herein, the Director and Officer Defendants were fully aware of and involved in the alleged wrongdoing.  Garrett's Board directed each of the various actions taken by Garrett both before and during the Class Period including, specifically, the

retention of restructuring advisors, bankers and lawyers: to conduct a strategic review; solicit bidders to merge with or acquire the Company; to solicit a stalking horse bidder; to prepare the Company for a court-supervised restructuring; to negotiate and then mediate with Honeywell; to file suit against Honeywell; and, ultimately, to file for bankruptcy. The Director and Officer Defendants also understood the Company's leverage ratio shortly after the Spin-Off and Garrett's senior officers and customer relationship teams reported to the Board that OEMs were nervous about Garrett's financial health.

182.    The Class's recovery on this Count is not limited to Garrett's available insurance policies.

## XII.   JURY DEMAND

183.    Lead Plaintiffs hereby demand a trial by jury.

## XIII.  PRAYER FOR RELIEF

WHEREFORE, Lead Plaintiffs pray for judgment as follows:

A.      Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

B.      Awarding compensatory damages in favor of Lead Plaintiffs and other Class members against all Defendants, jointly and severally, for all damages sustained as a result of the Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.      Awarding Lead Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including attorneys' fees and expert fees; and

D.      Awarding such equitable/injunctive or other further relief as the Court may deem just and proper.

DATED:  May 2, 2022                          Respectfully Submitted,
              New York, New York


                                             _/s/ Andrew J. Entwistle_____
                                             Andrew J. Entwistle
                                             **ENTWISTLE & CAPPUCCI LLP**
                                             500 W. 2nd Street
                                             Suite 1900
                                             Austin, TX 78701
                                             Telephone: (512) 710-5960
                                             aentwistle@entwistle-law.com

                                             -and-

                                             Vincent R. Cappucci
                                             Joshua K. Porter
                                             Andrew M. Sher
                                             230 Park Avenue, 3rd Floor
                                             New York, New York 10169
                                             Telephone:  (212) 894-7200
                                             vcappucci@entwistle-law.com
                                             jporter@entwistle-law.com
                                             asher@entwistle-law.com

                                             _Lead Counsel for the Class_